Kevin Goering
Bardia Bakhtari
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza, 24th Floor
New York, New York  10112
(212) 332-3800 (phone)
(212) 332-3888 (fax)

Lee R. Goldberg
LAW OFFICES OF LEE R. GOLDBERG
23272 Mill Creek Drive, Suite 360-W
Laguna Hills, CA 92653
(949) 305-6870 (phone)
(949) 305-6874 (fax)
(admitted *pro hac vice*)

Attorneys for Plaintiff
RICHARD KELTER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

**RICHARD KELTER, individually and as**          :
**Trustee of the RICHARD KELTER TRUST**          :
**DATED JUNE 30, 2004,**                          :          No. 08 Civ. 02911 (NRB)
                                                  :          ECF Case
                          **Plaintiff,**          :
                                                  :
                                                  :
                     **-against-**                :          **FIRST AMENDED COMPLAINT**
                                                  :          **AND JURY DEMAND**
                                                  :
**APEX EQUITY OPTIONS FUND, LP, APEX**           :
**EQUITY MANAGEMENT, LLC, KYLE J.**              :
**THOMPSON, CORY H. THOMPSON,**                   :
**THOMPSON CONSULTING, INC.,**                    :
**SHERWOOD FINANCIAL, INC.,**                     :
**E. SHERMAN WARNER, M&K HOLDINGS,**             :
**LLC, MICHAEL T. MORLEY, KRYSTIN P.**           :
**MORLEY, MTM, LTD. and WILLOWBEND**             :
**PROPERTY COMPANY, LLC,**                        :
                                                  :
                        **Defendants.**           :
-------------------------------------------------------------- x

Plaintiff, Richard Kelter, individually and as trustee of the Richard Kelter Trust dated
June 30, 2004, alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action that arises from the gross and fraudulent mismanagement of a
hedge fund (the "Apex Fund") by its managers and principals, which severely harmed its
investors, including plaintiff Richard Kelter.  By blatantly and repeatedly ignoring the Apex
Fund's stated investment strategies of protecting its investors' principal capital contributions, the
defendants' conduct in this action rises far above simple negligence or poor judgment, but rather,
reflects the defendants' conscious misbehavior and reckless disregard, which caused the loss
suffered by Plaintiff.  This action seeks to pursue remedies under both state law and the federal
securities laws.

2.      At the heart of this scheme was defendants' fraudulent misrepresentation that the
Apex Fund was created to protect the investors' principal by making low-risk investments
intended to slowly increase the value of the Apex Fund.

3.      After soliciting and inducing plaintiff and other investors to contribute millions of
dollars into the Apex Fund under the guise that the fund would not expose the investors'
principal contributions to any high-risk investment strategies, defendants employed an
investment strategy which was premised on extremely risky one-sided bets which essentially
depleted all of the investors' portfolios.

4.      When these highly risky investment strategies caused the Apex Fund to lose much
of its value and investor confidence waned, the defendants made further misrepresentations
regarding the future of the Apex Fund and the investment strategies the fund would employ in
order to induce investors, including plaintiff, not to withdraw their investments.  Indeed, even

when the Apex Fund was nearly wiped out, the defendants made material omissions in communications with investors in order to prevent the fund's Limited Partners from salvaging what little was left of their mismanaged investments.

5.      Instead, with the Apex Fund nearly depleted, the fund's managers, advisers, and handlers conspired to loot what was left of the fund for themselves and their co-conspirators. The defendants transferred millions of dollars out of the Apex Fund by funneling the money into the hands of their own business partners and friends by characterizing the transfers as "loans". However, these loans were not made with the intention to be repaid, but rather, were made to transfer what was left of the Apex Fund through enough channels so as to hide the money from the Apex Fund investors, including plaintiff Richard Kelter.

6.      Plaintiff Richard Kelter, individually and as trustee of the Richard Kelter Trust dated June 30, 2004, brings this action to recover no less than $3.83 million in compensatory damages that he has suffered as the cause of defendants' conscious misbehavior, as well as punitive damages for the defendants' egregious misconduct.

## PARTIES

7.      Richard Kelter ("Kelter") is an individual and, at all relevant times, a resident of Costa Mesa, California.  Kelter is also the trustee of the Richard Kelter Trust dated June 30, 2004 ("Trust").

8.      Upon information and belief, defendant Apex Equity Options Fund, LP (the "Apex Fund"), is a limited partnership hedge fund organized and existing under the laws of the State of Delaware and that does business in the State of California.  At all relevant times, Kelter was an investor in and a Limited Partner of the Apex Fund.

9.      Upon information and belief, defendant Apex Equity Management, LLC ("Apex

Management"), is a limited liability company organized and existing under the laws of the State of Utah that does business in the State of California. Kelter further alleges that Apex Management is the General Partner of the Apex Fund.

10.    Upon information and belief, defendant Kyle J. Thompson ("Kyle Thompson") is an individual and, at all relevant times, a resident of the State of Utah. Kelter further alleges that Kyle Thompson is a principal of defendants Apex Management and Sherwood Financial, Inc.

11.    Upon information and belief, defendant Cory H. Thompson ("Cory Thompson") is an individual and, at all relevant times, a resident of the State of Utah. Kelter further alleges that Cory Thompson is a principal of defendants Apex Management and Sherwood Financial, Inc.

12.    Upon information and belief, defendant Thompson Consulting, Inc., ("Thompson Consulting") is a corporation organized and existing under the laws of the State of Utah. Kelter further alleges that Kyle Thompson is the president of Thompson Consulting and that Cory Thompson the vice president of Thompson Consulting. Kelter further alleges that at all relevant times, Thompson Consulting managed the Apex Fund as its Adviser and that Thompson Consulting was the agent for, and co-conspirator with, defendant M&K Holdings, LLC, for whom Thompson Consulting managed at least one account. Kelter further alleges that at all relevant times, Thompson Consulting was and continues to be the alter ego of, agent for, and co-conspirator with Kyle Thompson and Cory Thompson.

13.    Upon information and belief, defendant Sherwood Financial, Inc., ("Sherwood Financial") is a corporation organized and existing under the laws of the State of Utah. Kelter further alleges that Sherwood Financial is the Manager of Apex Management. Kelter further alleges that Kyle Thompson is a Vice President of Sherwood Financial and Cory Thompson is

the President of Sherwood Financial, and that Sherwood Financial is the agent for and co-conspirator with Kyle Thompson and Cory Thompson.

14.     Upon information and belief, defendant E. Sherman Warner ("Sherman Warner") is an individual and, at all relevant times, a resident of the State of Utah. Kelter further alleges that Sherman Warner actively participated in the solicitation of investors on behalf of the Apex Fund and was a trader for the Apex Fund. Kelter further alleges that Sherman Warner was the agent for, and co-conspirator with, Kyle Thompson, Cory Thompson, and the entities controlled by Kyle Thompson and Cory Thompson.

15.     Upon information and belief, defendant M&K Holdings, LLC ("M&K Holdings") is a limited liability company organized and existing under the laws of the State of Utah. Kelter further alleges that at all relevant times, Thompson Consulting was the Manager for at least one of M&K Holdings' accounts, and that Thompson Consulting was the agent for, and co-conspirator with, M&K Holdings. Furthermore, Kelter alleges that at all relevant times, M&K was a Limited Partner in the Apex Fund, and that M&K Holdings is the alter ego of, agent of, and a co-conspirator with defendants Michael T. Morley and Krystin P. Morley.

16.     Upon information and belief, defendant Michael T. Morley ("Michael Morley") is an individual and, at all relevant times, a resident of the State of Utah. Kelter further alleges that Michael Morley is one of the two beneficial owners of the M&K Holdings account managed by Thompson Consulting. Upon information and belief, Kelter further alleges that Michael Morley is the General Partner of defendant MTM, Ltd. Upon information and belief, Kelter further alleges that Michael Morley is the cousin of David C. Condie, Chief Operating Officer of defendant Sherwood Financial and a principal of defendant Thompson Consulting.

17.     Upon information and belief, defendant Krystin P. Morley ("Krystin Morley") is

an individual and, at all relevant times, a resident of the State of Utah.  Kelter further alleges that Krystin Morley is the wife of Michael Morley, and is the other beneficial owner of the M&K Holdings account managed by Thompson Consulting.  Upon information and belief, Kelter further alleges that Krystin Morley is the General Partner of MTM, Ltd.

18.     Upon information and belief, defendant MTM, Ltd. ("MTM") is a corporation organized and existing under the laws of the State of Utah.  Kelter further alleges upon information and belief that MTM, along with M&K Holdings, is the alter ego of, agent for, and a co-conspirator with defendants Michael Morley and Krystin Morley.  Kelter further alleges that MTM was the recipient of over $2 million from the Apex Fund in May 2007, and was a signatory to a purported loan between the Apex Fund and M&K Holdings or another entity owned, operated, or controlled by defendants Michael Morley and Krystin Morley.

19.     Upon information and belief, defendant Willowbend Property Company, LLC ("Willowbend"), is a limited liability company organized and existing under the laws of the State of Utah.  Kelter further alleges that defendant Michael Morley has an interest in Willowbend.  Kelter further alleges that Willowbend was the recipient of over $2 million from the Apex Fund and/or MTM in May 2007.

20.     As used in this complaint, the "Apex Defendants" shall mean the Apex Fund, Apex Management, Thompson Consulting, Kyle Thompson, Cory Thompson, and Sherwood Financial.

21.     As used in this complaint, the "Morley Defendants" shall mean M&K Holdings, Michael Morley, Krystin Morley, MTM, and Willowbend.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1367, as Kelter alleges causes of action arising under the laws of the United States.

23.     This Court has jurisdiction over the parties, and venue is proper in this district, pursuant to a valid and enforceable forum selection clause consenting to personal jurisdiction in New York and designating the proper venue as any court in the State of New York.

24.     In connection with the actions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## STATEMENT OF FACTS

### THE CREATION OF THE APEX FUND

25.     Upon information and belief, Kyle Thompson, Cory Thompson, and David C. Condie ("Condie"), Chief Operations Officer of defendant Sherwood Financial, founded defendants Thompson Consulting and Sherwood Financial at an undetermined time before March 1, 2005.  Thereafter, Kyle Thompson, Cory Thompson, Thompson Consulting, Sherwood Financial, and Sherman Warner and Condie created the Apex Fund as a limited partnership, and created Apex Management to serve as General Partner of the Apex Fund.

26.     In April 2005, Thompson Consulting established trading accounts at Cybertrader, a division of Charles Schwab and Company ("Cybertrader").  These trading accounts were used by Thompson Consulting to trade for the accounts of the Apex Fund and M&K Holdings, among other clients.

27.     On or about March 1, 2005, the Apex Fund began offering for sale limited partnership interests in the fund.  Attached as Exhibit A is a true and correct copy of a Confidential Private Placement Memorandum ("Private Placement Memorandum") that the Apex Defendants and Sherman Warner prepared and circulated to such potential investors.

28.     Kelter received this Private Placement Memorandum from the Apex Defendants in or around the spring of 2005.  As stated in the Private Placement Memorandum, the money obtained from investor Limited Partners would be used by the Apex Fund to achieve its "Investment Objective" through its designated "Strategy."  Specifically, and again according to the Private Placement Memorandum, the "Investment Objective and Strategy" was as follows:

> The Fund was formed to provide investors with long-term investment returns by utilizing sophisticated techniques in public securities markets such as stock options and index options.  The Fund will use a proprietary investment selection criteria and methodology developed by the Adviser [Thompson Consulting] in the writing of short term investment contracts, including put and call options (naked and covered) on publicly traded securities through the investing and pledging of the Fund's capital and assets.  (See Exhibit A, at 6.)

29.     The Private Placement Memorandum further stated that:

> The Fund will attempt to execute a consistent program of implementing this methodology to maximize option premium and other investment income for the Fund while at the same time minimizing the downside risk of loss of contributed and pledged collateral to the extent possible.  The Fund intends to use invested commitments as collateral in its margin trading account with the goal of being to generate consistent long-term investment returns.  (See Exhibit A at 7.)

30.     The Private Placement Memorandum also provided that the General Partner, Apex Equity Management, could cause the Apex Fund to make a loan to one of the Apex Fund's Limited Partners.  See Exhibit A, at 25.  The Private Placement Memorandum did not contain any provisions regarding loans to any entity besides a Limited Partner in the Apex Fund.

**THE SALE OF THE APEX FUND**

31.     Upon information and belief, on or about March 1, 2005, WealthWise, LLC ("WealthWise") – a Registered Investment Advisor – and Jeffrey A. Forrest ("Forrest") received from the Apex Defendants a copy of the Apex Fund Private Placement Memorandum for the purposes of enticing their clients in investing in the Apex Fund.  Upon information and belief, clients of WealthWise, including Kelter, purchased limited partnership interests in the Apex Fund in the approximate amount of $40 million.

32.     WealthWise and Forrest gave Kelter a copy of the Apex Fund Private Placement Memorandum in or around the spring of 2005, and thereafter recommended that Kelter, on behalf of the Richard Kelter Trust, purchase limited partnership units in the Apex Fund.

33.     According to Forrest, he visited with the principals of Thompson Consulting in approximately April 2005, and conducted his proper due diligence on the Apex Fund.  Attached as Exhibit B is a true and copy of a memorandum from Forrest to "WealthWise Clients and Accredited Investors," including Kelter, dated July 15, 2005 ("WealthWise Memorandum").  Kelter received the WealthWise Memorandum on or about July 15, 2005.

34.     WealthWise and Forrest represented to Kelter that they had "check[ed] out the individuals as well as checking out and analyzing" the Apex Defendants' "investment strategy." According to the Apex Defendants, as communicated to Kelter by WealthWise and Forrest, the Apex Defendants had a more than a five-year track record of success with an investment strategy they called the "APEX Process" and would use the so-called APEX Process in investing through the Apex Fund.  These representations came from the Apex Defendants and Sherman Warner, who intended that these statements made to WealthWise and Forrest, among others, would be further disseminated to, and relied upon by, investors such as Kelter in deciding whether to

invest in the Apex Fund.

35.     The Apex Defendants and Sherman Warner made the following representations which WealthWise and Forrest relayed to Kelter:

    a.     that the "'APEX Process' protects your principal and your investment is liquid at all times";

    b.     that Kelter's and other investors' "principal is set aside safely into a money market account with a cyber-trader and it will earn approximately 2% return while it sits there";

    c.     that the APEX Process involved selling options "on both sides of the market by selling a call and selling a put at the same time"; and, finally,

    d.     that the "expected rate of return on a monthly basis is 3% net of all fees to" Kelter and other the other investors.

36.     In order to induce convince investors into investing with the Apex Fund, the Apex Defendants and Sherman Warner had WealthWise and Forrest further represent to Kelter that Thompson Consulting and its principals – defendants Kyle Thompson, Cory Thompson, and Sherman Warner – were "honest, forthright, caring, and committed to handling any of their client money at the highest fiduciary capacity and commitment."  Finally, it was represented to Kelter that an investment in the Apex Fund was a "significant investment opportunit[y]" which WealthWise and Kelter represented as having a "significant risk reward ratio[]."

37.     In addition to the written representations from the Apex Defendants and other representations relayed by the Apex Defendants through WealthWise and Forrest as set forth above and in Exhibits A and B, on or about March 6, 2005, Kelter participated in a face-to-face meeting with Kyle Thompson (along with Condie and Forrest) in San Luis Obispo County, California ("San Luis Obispo Meeting"), in which the Apex Fund was further marketed and discussed with Kelter and other potential investors.  At the San Luis Obispo Meeting, Kyle Thompson specifically represented to Kelter: (i) that the investment was "principal protected,"

(ii) that Kelter, were he to become an investor, would not have his principal put at risk, and (iii) that the various written representations, including the statements reflected in the Private Placement Memorandum and in materials transmitted to Kelter through WealthWise and Forrest were, in fact, true.

38.     Upon information and belief, however, Kelter is now aware that all of the foregoing representations as to the nature and security of the Apex Fund and the integrity of the Apex Defendants were false when made, and that the Apex Fund, Apex Management, Thompson Consulting, Kyle Thompson, Cory Thompson, Sherwood Financial, and Sherman Warner did not believe the representations to be true, and consciously disregarded the truth or were reckless when making the representations in that they lacked sufficient information on which to base such representations.

**Kelter Invests in the Apex Fund**

39.     On or about July 29, 2005, in reliance on the representations and omissions made to Kelter at the San Luis Obispo Meeting and in the Private Placement Memorandum from the Apex Defendants, Sherman Warner, as to the nature and security of the Apex Fund, the Richard Kelter Trust became a Limited Partner of the Apex Fund by executing the Private Placement Memorandum.

40.     Shortly thereafter, Kelter made an initial capital contribution of $250,000.00 in or about September 2005.  Kelter further contributed an additional $730,000.00 in or about January 2006, and again contributed another $3,000,000.00 in or around May 2006.  Between approximately September 2005 and May 2006, Kelter contributed a total of $3,980,000.00 into the Apex Fund as a Limited Partner.

41.     Between October 2005 and May 2007, Kelter made a total of eight (8)

withdrawals from his Apex Fund capital account.  These withdrawals total approximately $146,611.52.

42.     Therefore, Kelter's total investment in the Apex Fund between September 2005 and May 2007 was approximately $3,833,388.48, which includes the total amount contributed and reflects the eight (8) withdrawals Kelter made during this time period.

## THE APEX FUND FAILS TO PERFORM AS REPRESENTED

43.     Despite the many representations as to the performance of the Apex Fund, its investment strategy, and the so-called APEX Process, the Apex Fund did not perform as represented nor did the Apex Fund follow its own stated investment strategy.

44.     Throughout early 2007, the Apex Fund failed to achieve the returns either promised by the Apex Defendants in the Private Placement Memorandum, or further promised by Kyle Thompson at the San Luis Obispo Meeting.  The Apex Defendants did not adhere to the low-risk investment strategy they had represented, and instead, using their management and control positions, caused the Apex Fund to engage in highly risky investments and to utilize highly risky trading strategies.

45.     For example, in March 2007, Kyle Thompson, Cory Thompson, and Sherman Warner caused Thompson Consulting to write put option contracts on New Century Financial Corp. ("NCFC") stock, a subprime lender that had previously experienced a significant drop in price.  Thompson Consulting wrote large numbers of put contracts on NCFC stock, but no offsetting call contracts, in the accounts of the Apex Fund and M&K Holdings, among other accounts.

46.     This strategy, in and of itself, was in complete contradiction to the representations made to Kelter in writing in the Private Placement Memorandum and in the WealthWise

Memorandum, and orally at the San Luis Obispo Meeting. Specifically, a strategy of writing a large number of put option contracts without any offsetting call contracts was a complete departure from the so-called "APEX Process," which was focused, in part, on selling options "on both sides of the market by selling a call and selling a put at the same time".

47.     In March, 2007, the price of NCFC's stock declined further and the put contracts defendant Thompson Consulting had written on the NCFC stock were exercised, requiring defendant Thompson Consulting to purchase tens of thousands of shares of NCFC at a price substantially higher than the market price. Within days, Thompson Consulting liquidated its holdings in NCFC, losing millions of dollars in its client accounts, including Kelter's account with the Apex Fund.

48.     These large losses and lack of performance caused Kelter to question whether to continue with his Apex Fund investment, or to find other investments and investment advisors. Kelter alleges upon information and belief, however, that in recognition of this waning confidence, on or about March 6, 2007, the Apex Defendants caused Forrest and WealthWise to send Kelter (and other Apex Fund investors) a memorandum ("March 6, 2007 Memorandum") continuing to tout the Apex Fund and asserting market developments "which have directly affected [the Kelter Trust's] APEX investment in a positive manner." A true and correct copy of the March 6, 2007 Memorandum is attached as Exhibit C.

49.     In further recognition of the waning investor confidence at the time, on or about April 15, 2007, Kyle Thompson distributed a letter ("April 15, 2007 Letter") to Kelter (and other Apex Fund investors) stating among other things, "[w]ith a disciplined long-term investment approach, all account values should reflect the impressive results achieved over the history of the fund. I am confident that the risk control measures that are integral to the Apex strategy continue

to add tremendous value to your portfolio."

50.     Upon information and belief, Kyle Thompson sent the April 15, 2007 Letter to investors in order to conceal the Apex Fund's poor performance, as well as to further mislead the Apex Fund's Limited Partners by stating that the Apex Fund would follow the "disciplined long-term investment approach" called for by the Apex Fund's Private Placement Memorandum, even though Kyle Thompson and the other Apex Defendants, along with Sherman Warner, had no intention of managing the Apex Fund in a manner fitting its stated Investment Objective and Strategy.  A true and correct copy of the April 15, 2007 Letter is attached as Exhibit D.

51.     Neither the March 6, 2007 Memorandum nor the April 15, 2007 Letter corrected any of the prior misrepresentations or omissions concerning the Apex Fund, its safety, or the investment strategy.  However, these letters – direct correspondence from the Apex Fund and its managers – played a significant role in Kelter's decision-making, and in reliance upon the representations made in both the March 6, 2007 Memorandum and the April 15, 2007 Letter, Kelter did not remove his investments from the Apex Fund and allowed the Trust's investments to continue with the Apex Fund, believing both that the Apex Fund was using the investment strategy that had been represented to him and that the Trust's principal was "protected."

52.     Kelter alleges upon information and belief that the "Investment Objectives and Strategy" of the Apex Fund were never as represented by the Apex Defendants and Sherman Warner in the Private Placement Memorandum, as verbally represented to Kelter by Kyle Thompson at the San Luis Obispo Meeting, as represented to Kelter by Forrest and WealthWise at the behest of the Apex Defendants and Sherman Warner, in the March 6, 2007 Memorandum, or as represented by the Apex Defendants and Sherman Warner in the April 15, 2007 Letter. Instead, Kelter alleges upon information and belief that the true facts are:

a.      the Apex fund was highly speculative;

b.      the principal of Apex Fund investors was not protected or "set aside safely"; and,

c.      the investment in Apex Funds was not liquid at all times.

53.      In the summer of 2007, the stock market experienced a significant decline in value.  Kelter, among other Apex Fund investors, inquired of Forrest and WealthWise as to the impact of this decline on the Apex Fund.  Forrest and WealthWise were unable to answer the question, as apparently, Kelter alleges upon information and belief, they either did not follow the Apex Fund or the market closely enough, or did not understand the nature of the Apex Fund's investments and investment strategy.  Instead, Forrest promised to inquire of the Apex Defendants and Sherman Warner to determine the effect of the market volatility on the Apex Fund.

54.      Kelter alleges upon information and belief that Kyle Thompson, when asked by Forrest for an update of the Apex Fund in light of the then-recent market movements, responded in an e-mail dated August 9, 2007 ("August 9, 2007 E-Mail"), that the Apex Defendants, as well as Sherman Warner, "are working feverishly, adjusting according to the strategy and making decisions specifically for end of quarter results, which we anticipate will be very good.  The strategy is performing very well and we'll continue giving our best to it."  The Apex Defendants and Sherman Warner knew or should have known that these statements would be disseminated to the Apex Fund's Limited Partners, and that these statements would be a significant factor in influencing the Limited Partners' decision, including Kelter, whether to continue investing with the Apex Fund.

55.      Upon information and belief, Kelter alleges that the August 9, 2007 E-Mail was sent so as to further conceal the Apex Fund's poor performance as well as to further mislead the Apex Fund's Limited Partners by stating that the Apex Fund would follow the Investment

Objective and Strategy stated in the Private Placement Memorandum. A true and correct copy of the August 9, 2007 E-Mail is attached as Exhibit E.

56.     Forrest and WealthWise forwarded Kyle Thompson's response in the August 9, 2007 E-Mail to Kelter, who reasonably relied upon it for the conclusion that the strategy was, in fact, performing as described to him, that the results for that quarter would be "very good," and that the market volatility would not impact the Trust's investment in the Apex Fund. Nothing in the August 9, 2007 E-Mail, or in any other communication received by Kelter at the time, suggested to him that his principal was not protected. Had Kelter been advised otherwise, he would have moved the Trust's investment to a less volatile, more stable investment fund.

## THE APEX FUND IS WIPED OUT

57.     Despite the foregoing representations made to Kelter by the Apex Defendants and Sherman Warner – in writing in the Private Placement Memorandum, WealthWise Memorandum, March 6, 2007 Memorandum, April 15, 2007 Letter, August 9, 2007 E-Mail, and orally made to Kelter at the San Luis Obispo Meeting – the Apex Fund did not protect investor principal or "set aside safely" that investor principal.

58.     Instead, Kelter alleges upon information and belief that the Apex Fund failed to follow its Investment Objective and Strategy, failed to execute the trading strategy set out in the Private Placement Memorandum, and put its investors' principal at risk.

59.     Kelter further alleges, upon information and belief, that the Apex Fund has since essentially become worthless, suffering on August 16, 2007 what defendant Kyle Thompson later referred to in an August 22, 2007 letter ("August 22, 2007 Letter") to investors as "a near-total loss." A true and correct copy of the August 22, 2007 Letter is attached as Exhibit F.

60.     This "near-total loss" came about as the result of a high-risk investment strategy

employed by the Apex Defendants and Sherman Warner during the summer of 2007.

61.     During this time, Thompson Consulting wrote significant numbers of unhedged call contracts on the Chicago Board Options Exchange Volatility Index (the "VIX").

62.     The VIX represents a measure of the market's expected volatility with more dramatic price fluctuations relative to the S&P 500's fluctuations.

63.     Commencing in June 2007, Thompson Consulting began writing significant numbers of call contracts in the VIX, with no offsetting put contracts.  Then, from approximately July 18, 2007 through August 9, 2007, Thompson Consulting wrote tens of thousands of VIX call contracts, with no offsetting put contracts.

64.     Without any put contracts to offset the thousands of call contracts, Thompson Consulting essentially made an extremely high-risk investment by failing to take steps to minimize the risk of this strategy should the value of the VIX drop.

65.     As with the Apex Fund's strategy of only writing large numbers of put contracts for NCFC stock, the strategy of writing tens of thousands of VIX call contracts without any offsetting puts, in and of itself, was in complete contradiction to the representations made to Kelter in writing in the Private Placement Memorandum and in the WealthWise Memorandum, and orally at the San Luis Obispo Meeting, as to how the so-called "APEX Process" would guide the investments of the Apex Fund.

66.     This high-risk strategy represented the Apex Fund's overall investment strategy in the summer of 2007.  Indeed, by August 13, 2007, virtually the only positions remaining in Apex Fund were the VIX call contracts Thompson Consulting had written.

67.     The Apex Defendants' and Sherman Warner's investment activity in the Apex Fund in July and August 2007, consisting of almost exclusively writing VIX call contracts, was

contrary to the representations they made to Kelter concerning their low-risk investment strategy, and subjected Kelter's investments in the Apex Fund to the risk of total loss.

68.     As described above, this high-risk investment strategy could not have been any more in contradiction with the Apex Fund's strategy – as stated in numerous writings including in the Private Placement Memorandum, and as stated in oral representations made to Kelter by Kyle Thompson at the San Luis Obispo Meeting – of never putting its investors' principal contributions at risk.  The high-risk aspect of this strategy was further compounded by the fact that this risky investment comprised a large part of the fund's overall portfolio.

69.     In layman's terms, the Apex Fund had put all of its investors' eggs in one basket, and had not prepared or provided for any way to hedge these high risks in direct contradiction to the fund's stated and reiterated strategy and objectives.

70.     As a result of market activity in August 2007, the price of the VIX rose and the Apex Fund experienced a virtual total loss when the VIX call contracts Thompson Consulting had written in the Apex Fund account were either exercised or closed due to maintenance calls required by Cybertrader.

71.     Kelter alleges upon information and belief that, at the time the Apex Fund was virtually wiped out, defendants Kyle Thompson and Cory Thompson, who were supposed to be discharging their duties by monitoring the market and implementing the Apex Fund's investment strategy, were instead, vacationing in Hawaii.

72.     Kelter alleges upon information and belief that the Apex Fund suffered the supposed "near-total loss" as a result of the Apex Defendants and Sherman Warner deviating from the so-called APEX Process, failing to sell options "on both sides of the market by selling a call and selling a put at the same time," pledging the entire or a very large percentage of the

account on margin, and otherwise unreasonably putting investor principal at risk.

## PREFERENTIAL TRANSFERS TO MORLEY DEFENDANTS AND MISAPPROPRIATION OF FUNDS

73.     Along with the Apex Fund, the M&K Holdings account managed by Thompson Consulting suffered significant losses in March 2007 as a result of, among other things, transactions in NCFC options.  The value of the M&K Holdings account had declined from a balance of approximately $5 million in January, 2007 to approximately $2.5 million by March, 2007.

74.     To both address the losses suffered in the M&K Holdings account and to loot the Apex Fund account before its value had entirely vanished, upon information and belief, the Apex Defendants and Sherman Warner transferred approximately $1 million from the Apex Fund account, or another account managed and controlled by the Apex Defendants, to the Morley Defendants in March 2007, and transferred approximately another $2 million in May 2007.

75.     Both transfers were falsely characterized by the Apex as "loans" by the Apex Fund to one or more of the Morley Defendants.

76.     Upon information and belief, on or about March 15, 2007, $1 million was transferred from the Apex Fund account, or another account managed and controlled by the Apex Defendants and Sherman Warner, to the M&K Holdings account.

77.     Upon information and belief, Condie effectuated the transfer of $1 million at the behest of the Apex Defendants, Sherman Warner, and the Morley Defendants.  At an unknown date on or about March 15, 2007, this transfer was characterized as a "loan" from the Apex Fund to one or more of the Morley Defendants.

78.     On or about May 24, 2007, defendants Apex Fund and M&K Holdings entered into a Promissory Note ("Note") whereby the Apex Fund "loaned" M&K Holdings $2 million.

The "loan" did not call for any monthly payments, was to be repaid in full in less than two (2) months time, and pledged $2.1 million of the M&K Holdings account as collateral for the loan.

79.     Defendant Kyle Thompson executed the Note on behalf of both parties to the Note – signing in his capacity as President of Thompson Consulting, Manager of M&K Holdings, on behalf of M&K Holdings, and signing in his capacity as Manager of Apex Equity Management, itself the General Partner of the Apex Fund, on behalf of the Apex Fund.  In addition, defendant Michael Morley, in his capacity as General Partner of MTM, also was a signatory to the Note.

80.     Upon information and belief, the Note was never meant to represent a true loan, but rather, was an attempt at masking the conspiracy between the defendants to loot what was left of the Apex Fund for the benefit of the Morley Defendants.  That defendant Kyle Thompson executed the Note on behalf of both the borrower and the lender suggests that the Note was drafted solely for the purpose of attempting to legitimize the defendants' fraudulent and conspiratorial conduct, namely, looting the Apex Fund by transferring $2 million to the Morley Defendants.

81.     Accordingly, on or about May 24, 2007, $2 million was transferred from the Apex Fund account to the M&K Holdings account.  Upon information and belief, Condie effectuated the transfer of $2 million at the behest of the Apex Defendants, Sherman Warner, and the Morley Defendants.

82.     Thereafter, on or about May 25, 2007, Condie wired $2 million from the M&K Holdings account to defendant Willowbend in furtherance of the request made by the Apex Defendants, Sherman Warner, and the Morley Defendants.

83.     The transfer of approximately $3 million from the Apex Fund account to the

M&K Holdings account was a misappropriation of funds belonging to the Apex Fund. While the Private Placement Memorandum authorized loans to be made from the Apex Fund to Limited Partners of the fund, it did not contain any provisions concerning loans to any entities besides Limited Partners in the Apex Fund.

84. Upon information and belief, the Morley Defendants received these preferential transfers because they were Limited Partners of the Apex Fund subject to the Private Placement Memorandum. Insofar as none of the Morley Defendants executed the Private Placement Memorandum, these preferential transfers – in addition to evidencing a conspiracy between the Apex Defendants, Sherman Warner, and the Morley Defendants – clearly violated the terms of the Private Placement Memorandum.

85. Defendants Kyle Thompson and Sherman Warner instructed Condie to effectuate the transfers to the M&K Holdings account, or at the very least, acquiesced to Condie's transfer of the $3 million in funds from the Apex Fund account to the M&K Holdings account.

86. Upon information and belief, after the collapse of the Apex Fund in August 2007, defendants Kyle Thompson and Sherman Warner (along with Condie) caused approximately $1.4 million to be wired from various accounts Thompson Consulting managed.

## FIRST CLAIM FOR RELIEF

### (Fraud in the Sale of Securities against the Apex Defendants and Sherman Warner)

87. Kelter incorporates by reference paragraphs 1 through 86 of this First Amended Complaint as if set forth in full.

88. 15 U.S.C.A. § 78j(b), and Rule 10b-5 promulgated thereunder, prohibit manipulative or deceptive practices in connection with the purchase or sale of any security. The limited partnership interests which Kelter purchased in the Apex Fund was a "security" within

the meaning of state and federal law.

89.    The numerous representations set forth above – including, for example,
representations made by the Apex Defendants and Sherman Warner in writing in the Private
Placement Memorandum, in the April 15, 2007 Letter, in the August 9, 2007 E-Mail, and in the
August 22, 2007 Letter, and made orally by Kyle Thompson to Kelter during the San Luis
Obispo Meeting – with respect to the sale of the Apex Fund to Kelter were false when made, and
the Apex Defendants and Sherman Warner knew them to be false when made.  Moreover, the
Apex Defendants and Sherman Warner made false representations to investment advisers
WealthWise and Forrest, knowing that these representations would materially induce investors
such as Kelter into purchasing a limited partnership interest and investing in the Apex Fund.

90.    These material misrepresentations were made by the Apex Defendants and
Sherman Warner to Kelter in writing in the: (i) Private Placement Memorandum, (ii)
WealthWise Memorandum, (iii) March 6, 2007 Memorandum, (iv) April 15, 2007 Letter, (v)
August 9, 2007 E-Mail, and (vi) August 22, 2007 Letter, and were also verbally made to Kelter
by Kyle Thompson at the San Luis Obispo Meeting.

91.    In particular, the statements "'APEX Process' protects your principal and your
investment is liquid at all times," that the Trust's "principal is set aside safely into a money
market account with a cyber-trader and it will earn approximately 2% return while it sits there,"
that the APEX Process involved selling options "on both sides of the market by selling a call and
selling a put at the same time," and, the "expected rate of return on a monthly basis is 3% net of
all fees to" Kelter and the other investors were false when made.

92.    The April 15, 2007 Letter was false when written and distributed to investors.
Kyle Thompson sent the April 15, 2007 Letter to investors and materially omitted to disclose the

Apex Fund's poor performance and its highly-risky strategy of writing significant number of put option contracts in NCFC without any offsetting call contracts. The April 15, 2007 Letter was written to induce investors, including Kelter, to continue investing in the Apex Fund. Along these lines, the April 15, 2007 Letter further misled the Apex Fund's Limited Partners by stating that the Apex Fund would follow the "disciplined long-term investment approach" called for by the Apex Fund's Private Placement Memorandum, even though Kyle Thompson and the other Apex Defendants, along with Sherman Warner, had no intention of managing the Apex Fund in a manner fitting its stated Investment Objective and Strategy.

93.     The August 9, 2007 E-Mail was false when written and sent to investors. The Apex Defendants and Sherman Warner disseminated the August 9, 2007 E-Mail so as to further conceal the Apex Fund's poor performance as well as to further mislead the Apex Fund's Limited Partners and induce them to remain invested in the fund by stating that the Apex Fund would follow the Investment Objective and Strategy stated in the Private Placement Memorandum.

94.     In addition, the August 22, 2007 Letter was false when written and distributed to investors. Kyle Thompson knew the letter was false when it was written, and materially omitted to disclose to Apex Fund investors that the Apex Fund had employed a highly speculative and risky scheme, in contradiction to the stated strategy of the Apex Fund, whereby the Apex Defendants and Sherman Warner caused the Apex Fund to write significant numbers of un-hedged call contracts on the VIX.

95.     None of the foregoing representations, despite being made repeatedly in writing by the Apex Defendants and Sherman Warner and made orally at the San Luis Obispo Meeting by Kyle Thompson were true when made and the Apex Defendants and Sherman Warner knew

them not to be true.

96.     In addition to the numerous misrepresentations made to Kelter both in writing and orally, the Apex Defendants and Sherman Warner's conduct reflects the recklessness with which they managed the Apex Fund.  For example, when the Apex Fund was virtually wiped out due to the Apex Fund's highly risky strategy of writing significant numbers of un-hedged call contracts on the VIX, Kyle Thompson and Cory Thompson, who were supposed to be monitoring the market and implementing the Apex Fund's investment strategy, were not discharging their duties, but instead, were vacationing in Hawaii.  The conduct described above reflects the Apex Defendants and Sherman Warner's conscious misbehavior and recklessness.

97.     The Apex Defendants and Sherman Warner knew, or reasonably should have known, that investor principal was not protected, that the investment was not liquid at all times, that principal was not set aside safely in a money market account, that the investor money was not earning 2%, or any other amount, that calls and puts were not sold on both sides of a stock position at the same time, and that the expected return was not 3% net of fees.

98.     There can be no question that the misrepresentations described above – such as the misrepresentations made to Kelter in person at the San Luis Obispo Meeting and in writing in the April 15, 2007 Letter – were material.  Kelter considered these representations regarding the strategy and performance of the Apex Fund, made by the Apex Fund's founders and principals, who managed the fund's day-to-day operations, to be significant in making his investment decisions.

99.     These misrepresentations were made to either induce Kelter and other investors into investing in the Apex Fund, or were made to mislead Kelter so that he would not withdraw his investment when the Apex Fund failed to perform as described in the Private Placement

Memorandum.  For example, the very purpose of the San Luis Obispo Meeting was to convince Kelter to invest in the Apex Fund to begin with.  Kelter directly relied upon the representations made to him at that meeting, along with other similar, if not identical, misrepresentations made to him in writing, in deciding to invest with the Apex Fund.

100.    Each of the Apex Defendants, along with Sherman Warner, by engaging in the foregoing conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or (3) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

101.    The false statements as alleged above were transmitted to Kelter and made by the Apex Defendants and Sherman Warner by way of the U.S. mail, by interstate telephone calls, and in face-to-face meetings, such as during the San Luis Obispo Meeting.

102.    As the direct, natural, probable, foreseeable, but-for and proximate cause of the Apex Defendants and Sherman Warner's conduct as alleged above in connection with the sale of a security, Kelter and the Trust have suffered actual harm and have been damaged by the Apex Defendants and Sherman Warner, and each of them, in an amount to be determined at trial, plus interest thereon at the highest legal rate.

103.    The foregoing conduct of the Apex Defendants and Sherman Warner, and each of them, was undertaken in a malicious, oppressive, and fraudulent manner in order to harm Kelter and the Trust, or with a willful and conscious disregard for their rights or the potential of causing

them unjust hardship, humiliation, distress, and damage.  Such conduct was despicable and

justifies an award of punitive damages against the Apex Defendants and Sherman Warner, and

each of them, in an amount sufficient to punish them and to deter them from engaging in such

conduct in the future.

## SECOND CLAIM FOR RELIEF

### (Violation of 15 U.S.C.A. §78t(a) against the Apex Defendants and Sherman Warner)

104.     Kelter incorporates by reference paragraphs 1 through 86 and 88 through 103 of

this First Amended Complaint as if set forth in full.

105.     The Apex Defendants and Sherman Warner acted as controlling persons of the

Apex Fund within the meaning of § 20(a) of the Securities Exchange Act of 1934 (15 U.S.C.A.

§78t(a)) as alleged herein.

106.     Specifically, Kyle Thompson is the vice president and Cory Thompson is the

president of Sherwood Financial, itself the Manager of Apex Equity Management.  Kyle

Thompson and Cory Thompson are also direct principals of Apex Equity Management.  In

addition, Kyle Thompson is the president of Thompson Consulting, and Cory Thompson is the

Vice President of Thompson Consulting.

107.     Apex Equity Management, controlled by Kyle Thompson and Cory Thompson, is

the General Partner of the Apex Fund.  In addition, Thompson Consulting is the Adviser for the

Apex Fund.  The Private Placement Memorandum itself clearly explained that the General

Partner (Apex Equity Management) and the Adviser (Thompson Consulting) would manage the

Apex Fund's day-to-day operations.

108.     Sherman Warner also exercised control over the Apex Fund by actively

participating in the solicitation of investors in the Apex Fund and serving as a trader in the Apex

Fund.

109.    By virtue of their high-level positions, the Apex Defendants and Sherman Warner each participated in and were aware of the Apex Fund's operations, and had intimate knowledge of the misrepresentations and omissions disseminated to Kelter and other investors in the Apex Fund.  The Apex Defendants and Sherman Warner had the power to influence and control, and indeed, did influence and control, directly and indirectly, the decision-making of the Apex Fund.

110.    This control includes the Apex Defendants and Sherman Warner's participation in developing and implementing the highly risky investment strategies described above and the awareness of the content and dissemination of the various false and leading misrepresentations such as the statements made to Kelter at the San Luis Obispo Meeting, the written misrepresentations made in the April 15, 2007 Letter, and the material omissions in the August 22, 2007 Letter.

111.    The Apex Defendants and Sherman Warner either authored or were the source of, or were provided with and had unfettered access to, copies of the Private Placement Memorandum, the April 15, 2007 Letter, the August 22, 2007 Letter and other statements alleged by Kelter to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected and culpably participated in the wrongful conduct complained of herein.

112.    Each of these Apex Defendants and Sherman Warner had direct and supervisory involvement in the day-to-day operations of the Apex Fund by assisting in the selection and evaluation of prospective investments and monitoring the fund's investment strategies, and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

113.    As set forth above, the Apex Defendants and Sherman Warner violated 15 U.S.C.A. § 78j(b) and Rule 10b-5 promulgated thereunder.  To the extent that any one of the Apex Defendants or Sherman Warner did not directly violate 15 U.S.C.A. § 78j(b) and Rule 10b-5, those individual defendants exercised control and were culpable participants in the violation of these rules, and therefore, by virtue of their positions as controlling persons, are liable pursuant to 15 U.S.C.A. §78t(a).

114.    As the direct, natural, probable, foreseeable, but-for and proximate cause of the Apex Defendants and Sherman's culpable and wrongful conduct, Kelter and the Trust suffered actual harm and damages in connection with its purchase and retained interest in the Apex Fund.

### THIRD CLAIM FOR RELIEF

### (Fraud against the Apex Defendants and Sherman Warner)

115.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, and 105 through 114 of this First Amended Complaint as if set forth in full.

116.    The numerous representations set forth above – including, for example, representations made by the Apex Defendants and Sherman Warner in writing in the Private Placement Memorandum, in the April 15, 2007 Letter, in the August 9, 2007 E-Mail, and in the August 22, 2007 Letter, and made orally by Kyle Thompson to Kelter during the San Luis Obispo Meeting – with respect to the sale of the Apex Fund to Kelter were false when made, and the Apex Defendants and Sherman Warner knew them to be false when made.  Moreover, the Apex Defendants and Sherman Warner made false representations to investment advisers WealthWise and Forrest, knowing that these representations would materially induce investors such as Kelter into purchasing a limited partnership interest and investing in the Apex Fund.

117.    These material misrepresentations were made by the Apex Defendants and

Sherman Warner to Kelter in writing in the: (i) Private Placement Memorandum, (ii) WealthWise Memorandum, (iii) March 6, 2007 Memorandum, (iv) April 15, 2007 Letter, (v) August 9, 2007 E-Mail, and (vi) August 22, 2007 Letter, and were also verbally made to Kelter by Kyle Thompson at the San Luis Obispo Meeting.

118.   In particular, the statements "the 'APEX Process' protects your principal and your investment is liquid at all times," that the Trust's "principal is set aside safely into a money market account with a cyber-trader and it will earn approximately 2% return while it sits there," that the APEX Process involved selling options "on both sides of the market by selling a call and selling a put at the same time," and, the "expected rate of return on a monthly basis is 3% net of all fees to" Kelter and the other investors were false when made.

119.   The April 15, 2007 Letter was false when written and distributed to investors. Kyle Thompson sent the April 15, 2007 Letter to investors and materially omitted to disclose the Apex Fund's poor performance and its highly-risky strategy of writing significant number of put option contracts in NCFC without any offsetting call contracts. The April 15, 2007 Letter was written to induce investors, including Kelter, to continue investing in the Apex Fund. Along these lines, the letter further misled the Apex Fund's Limited Partners by stating that the Apex Fund would follow the "disciplined long-term investment approach" called for by the Apex Fund's Private Placement Memorandum, even though Kyle Thompson and the other Apex Defendants, along with Sherman Warner, had no intention of managing the Apex Fund in a manner fitting its stated Investment Objective and Strategy.

120.   The August 9, 2007 E-Mail was false when written and sent to investors. The Apex Defendants and Sherman Warner disseminated the August 9, 2007 E-Mail so as to further conceal the Apex Fund's poor performance as well as to further mislead the Apex Fund's

Limited Partners and induce them to remain invested in the fund by stating that the Apex Fund would follow the Investment Objective and Strategy stated in the Private Placement Memorandum.

121.     In addition, the August 22, 2007 Letter was false when written and distributed to investors.  Kyle Thompson knew the letter was false when it was written, and materially omitted to disclose to Apex Fund investors that the Apex Fund had employed a highly speculative and risky scheme, in contradiction to the stated strategy of the Apex Fund, whereby the Apex Defendants and Sherman Warner caused the Apex Fund to write significant numbers of un-hedged call contracts on the VIX.

122.     None of the foregoing representations, despite being made repeatedly in writing by the Apex Defendants and Sherman Warner and made orally at the San Luis Obispo Meeting by Kyle Thompson were true when made and the Apex Defendants and Sherman Warner knew them not to be true.

123.     These misrepresentations were made with an intent to deceive Kelter and for the purpose of inducing Kelter to rely upon the statements that the Apex Defendants and Sherman Warner knew to be false.  The material misrepresentations made in writing in the Private Placement Memorandum and made verbally to Kelter during the San Luis Obispo Meeting were intended to induce Kelter to invest millions of dollars into the Apex Fund to begin with.

124.     Furthermore, once Kelter was a Limited Partner in the Apex Fund, the April 15, 2007 Letter, the August 9, 2007 E-Mail, and the August 22, 2007 Letter all contained material misrepresentations and omissions regarding the Apex Fund's strategy and investments so as to induce Kelter not to withdraw what remained of his investments in the fund.

125.     Kelter considered these representations regarding the strategy and performance of

the Apex Fund, made by the Apex Fund's founders and principals, who managed the fund's day-to-day operations, to be significant in making his investment decisions.

126.    Accordingly, Kelter justifiably relied upon the statements made by the Apex Fund's founders and principals, who managed the fund and were intimately familiar with its strategy and prospective investments, in making these investment decisions.  Specifically, Kelter relied upon the Apex Defendants and Sherman Warner's statements regarding the strategy of the Fund and the "APEX Process" – as expressed in writing in the Private Placement Memorandum and as expressed orally by Kyle Thompson at the San Luis Obispo Meeting – in deciding to invest with the Apex Fund.  Had Kelter known the true facts, he would never have purchased a limited partnership interest in the Apex Fund to begin with.

127.    Kelter further relied upon the statements made by the Apex Defendants and Sherman Warner in the April 15, 2007 Letter, the August 9, 2007 E-Mail, and the August 22, 2007 Letter in deciding not to withdraw his investments from the Apex Fund.  Had Kelter known the true facts concerning the fund's actual investment strategy, including its departure from its stated objectives in favor of a one-sided and incredibly risky betting strategy, Kelter would never have continued allowing his investment to remain with the Apex Fund.

128.    As the direct, natural, probable, foreseeable, but-for and proximate cause of Kelter's reliance upon the Apex Defendants and Sherman Warner's fraudulent statements which induced him to become a Limited Partner in and continue investing with the Apex Fund, Kelter and the Trust have suffered actual harm and have been damaged by the Apex Defendants and Sherman Warner, and each of them, in an amount to be determined at trial, plus interest thereon at the highest legal rate.

129.    The foregoing conduct of the Apex Defendants and Sherman Warner, and each of

them, was undertaken in a malicious, oppressive, and fraudulent manner in order to harm Kelter

and the Trust, or with a willful and conscious disregard for their rights or the potential of causing

them unjust hardship, humiliation, distress, and damage. Such conduct was despicable and

justifies an award of punitive damages against defendants, and each of them, in an amount

sufficient to punish them and to deter them from engaging in such conduct in the future.

## FOURTH CLAIM FOR RELIEF

### (Negligent Misrepresentation against the Apex Defendants and Sherman Warner)

130.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105

through 114, and 116 through 129 of this First Amended Complaint as if set forth in full.

131.    The Apex Defendants and Sherman Warner made numerous representations to

Kelter regarding the Apex Fund's investment objectives and strategies, the methods by which

those strategies would be implemented using the "APEX Process," and the continued and future

performance of the Apex Fund.

132.    These material statements were made by the Apex Defendants and Sherman

Warner to Kelter in writing in the: (i) Private Placement Memorandum, (ii) WealthWise

Memorandum, (iii) March 6, 2007 Memorandum, (iv) April 15, 2007 Letter, (v) August 9, 2007

E-Mail, and (vi) August 22, 2007 Letter, and were also verbally made to Kelter by Kyle

Thompson at the San Luis Obispo Meeting.

133.    When making these statements, the Apex Defendants and Sherman Warner knew

that the information and disclosures were desired by Kelter and other investors for a serious and

particular purpose – whether to invest millions of dollars in the Apex Fund, and later, whether to

continue allowing Kelter's investments to continue with the Apex Fund.  When making these

statements, the Apex Defendants knew that Kelter would rely upon these statements in making

his investment decisions, and indeed, intended to induce Kelter to rely on these statements.

134.    The Apex Defendants and Sherman Warner further knew when these statements were made, both in writing and in a face-to-face meeting, that any false or erroneous information provided to Kelter could cause him damage.

135.    In reliance upon the various statements made by the Apex Defendants and Sherman Warner, Kelter decided to both invest in the Apex Fund, and later, to continue investing with the Apex Fund.

136.    The Apex Defendants and Sherman Warner, as managers and principals of the entities which served as the General Partner and Adviser to the Apex Fund, were in privity with Kelter, a Limited Partner in the Apex Fund.  By virtue of the Apex Defendants and Sherman Warner's roles in managing the Apex Fund on behalf of the Limited Partners and mapping out the fund's investment strategy, objectives, and decisions, the Apex Defendants and Sherman Warner knew that material statements made to Kelter and other Limited Partners regarding the performance of the fund, its future performance, and adherence to its stated objectives and strategies would induce reasonable reliance by Kelter and other Limited Partners and would significantly influence Kelter's investment decisions.  Indeed, the very purpose of the San Luis Obispo Meeting was to convince Kelter to invest in the Apex Fund.

137.    As the direct, natural, probable, foreseeable, but-for and proximate cause of the Apex Defendants' conduct as alleged above in connection with the sale of a security, Kelter and the Trust have been damaged by defendants, and each of them, in an amount to be determined at trial, plus interest thereon at the highest legal rate.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract against the Apex Defendants)

138.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105 through 114, 116 through 129, and 131 through 137 of this First Amended Complaint as if set forth in full.

139.    Included in the Private Placement Memorandum is a Limited Partnership Agreement, which is a valid and binding contract.  Kelter, by virtue of his purchase of a limited partnership interest in the Apex Fund, and the Apex Fund and Apex Equity Management, as the General Partner of the Apex Fund, on the other hand, are parties to this Limited Partnership Agreement.  In addition, Sherwood Financial, as the Manager of the General Partner, and Kyle Thompson and Cory Thompson, as principals of the General Partner of the Apex Fund, and Thompson Consulting, as the Adviser to the Apex Fund, are also parties to this Limited Partnership Agreement.

140.    Kelter's execution of the Limited Partnership Agreement included valid consideration on both sides of the contract.  In exchange for Kelter's purchase of a limited partnership interest and investment into the Apex Fund, the Apex Defendants agreed to control and manage the Apex Fund and cause the fund to invest the Limited Partners' principal according to the mutually agreed upon investment strategy and objectives, namely, that the Apex Fund would protect its Limited Partners' principal while utilizing the "APEX Process" to sell options on both sides of the market.

141.    The foregoing conduct of the Apex Defendants – among other things, in their failure to monitor trading in the Apex Fund, to deviate from the so-called APEX Process, to change investment strategies, and to fraudulently transfer and misappropriate funds – constitute

breaches of the Limited Partnership Agreement.  Kelter, for his part, has performed all

obligations required of him under the terms of the Limited Partnership Agreement except for any

such obligations which have been excused by the foregoing conduct of the Apex Defendants.

142.    As a direct and proximate result of the Apex Defendants' conduct in breaching

the Limited Partnership Agreement, Kelter has been damaged in an amount to be determined at

trial, plus interest thereon at the highest legal rate.

## SIXTH CLAIM FOR RELIEF

**(Violation of Corporations Code § 25401 against Apex Defendants and Sherman Warner)**

143.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105

through 114, 116 through 129, 131 through 137, and 139 through 142 of this First Amended

Complaint as if set forth in full.

144.    Pursuant to California Corporation Code § 25401, it is unlawful for any person

"to offer or sell a security in this state . . . by means of any written or oral communication which

includes an untrue statement of material fact."  The foregoing conduct of the Apex Defendants

and Sherman Warner, and each of them, in selling to Kelter and the Trust the Apex Fund based

upon the false representations alleged above, violated § 25401 of the California Corporations

Code.

145.    None of the foregoing representations, despite being made in writing and orally

by the Apex Defendants and Sherman Warner, were true when made and defendants knew them

not to be true.  The Apex Defendants and Sherman Warner knew, or reasonably should have

known, that investor principal was not protected, that the investment was not liquid at all times,

that principal was not set aside safely in a money market account, that the investor money was

not earning 2%, or any other amount, that calls and puts were not sold on both sides of a stock

position at the same time, and that the expected return was not 3% net of fees.

146.    As a direct and proximate result of the Apex Defendants and Sherman Warner's conduct as alleged above in connection with the sale of a security, Kelter and the Trust have been damaged by the Apex Defendants and Sherman Warner, and each of them, in an amount to be determined at trial, plus interest thereon at the highest legal rate.

147.    The foregoing conduct of the Apex Defendants and Sherman Warner, and each of them, was undertaken in a malicious, oppressive, and fraudulent manner in order to harm Kelter and the Trust, or with a willful and conscious disregard for their rights or the potential of causing them unjust hardship, humiliation, distress, and damage. Such conduct was despicable and justifies an award of punitive damages against the Apex Defendants and Sherman Warner, and each of them, in an amount sufficient to punish them and to deter them from engaging in such conduct in the future.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty against the Apex Defendants)

148.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105 through 114, 116 through 129, 131 through 137, 139 through 142, and 144 through 147 of this First Amended Complaint as if set forth in full.

149.    By virtue of their high-level positions of management and control, the Apex Defendants owed a fiduciary duty to Kelter and other Limited Partners in the Apex Fund.  As General Partner of the Apex Fund, Apex Equity Management LLC owed a fiduciary duty to the partnership and the Limited Partners, including Kelter, to exercise due care in the management of the limited partnership and act in the best interest of the partnership and the Limited Partners. Sherwood Financial, as the Manager of the General Partner, Thompson Consulting, as the

Adviser to the partnership, and Kyle Thompson and Cory Thompson, as principals of the General Partner, similarly owed a fiduciary duty to the partnership and to the Limited Partners, including Kelter.

150.    The foregoing conduct of the Apex Defendants in misrepresenting to Kelter the nature, security, investment strategy, and trustworthiness of the Apex Fund, and in mishandling the Apex Fund and failing to follow the so-called APEX process, all as alleged above, breached the fiduciary duties they owed to Kelter and the Trust as a Limited Partner of the Apex Fund.

151.    As the direct, natural, probable, foreseeable, but-for and proximate cause of the Apex Defendants' conduct in breaching their respective fiduciary duties, Kelter and the Trust have been damaged in an amount to be determined at trial, plus interest thereon at the highest legal rate.

152.    The foregoing conduct of the Apex Defendants was undertaken in a malicious, oppressive, and fraudulent manner in order to harm Kelter and the Trust, or with a willful and conscious disregard for their rights or the potential of causing them unjust hardship, humiliation, distress, and damage.  Such conduct was despicable and justifies an award of punitive damages against the Apex Defendants in an amount sufficient to punish them and to deter them from engaging in such conduct in the future.

## EIGHTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith & Fair Dealing against Apex Defendants)

153.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105 through 114, 116 through 129, 131 through 137, 139 through 142, 144 through 147, and 149 through 152 of this First Amended Complaint as if set forth in full.

154.    There is implied in every contract a covenant of good faith and fair dealing such

that no party to such contract may act to deprive the other of the benefits and bargains of the agreement. The foregoing conduct of the Apex Defendants breached that implied covenant.

155.    As the direct, natural, probable, foreseeable, but-for and proximate cause of the Apex Defendants' conduct, Kelter and the Trust have been damaged by the Apex Defendants in an amount to be determined at trial, plus interest thereon at the highest legal rate.

## NINTH CLAIM FOR RELIEF

### (Accounting against the Apex Defendants)

156.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105 through 114, 116 through 129, 131 through 137, 139 through 142, 144 through 147, 149 through 152, and 154 through 155 of this First Amended Complaint as if set forth in full.

157.    Kelter and the Trust are entitled to an accounting with respect to all funds into and out of the Apex Fund, all trades executed by the Apex Funds, and all payments made to the Morley Defendants and other third parties such as WealthWise and Forrest.

## TENTH CLAIM FOR RELIEF

### (Fraudulent Conveyance against the Apex Defendants and the Morley Defendants)

158.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105 through 114, 116 through 129, 131 through 137, 139 through 142, 144 through 147, 149 through 152, 154 through 155, and 157 of this First Amended Complaint as if set forth in full.

159.    The transfer of approximately $3 million from the Apex Fund account to the M&K Holdings account at Thompson Consulting in March and May 2007 were characterized by the Apex Defendants as loans by the Apex Fund to M&K Holdings and/or MTM and/or Michael Morley and/or Willowbend.

160.    However, these transfers were not loans, but rather, an attempt by the Apex

Defendants to address both the losses suffered in the M&K Holdings account and to loot the Apex Fund account before its value had entirely.

161.    The transfer of the $3 million from the Apex Fund account to the M&K Holdings account was a misappropriation of the Apex Fund's monies, was a conveyance fraudulently made without consideration, and was made without an intention to be repaid.  In making these fraudulent conveyances, the Apex Defendants and Morley Defendants have rendered the Apex Fund insolvent by looting $3 million belonging to the partnership.

162.    While the Private Placement Memorandum authorized loans to be made from the Apex Fund to Limited Partners of the fund, it did not contain any provisions concerning loans to any entities besides Limited Partners in the Apex Fund.  Insofar as none of the Morley Defendants executed the Private Placement Memorandum, these preferential transfers – in addition to evidencing a conspiracy between the Apex Defendants, Sherman Warner, and the Morley Defendants – clearly violated the terms of the Private Placement Memorandum.

163.    The Apex Fund, Apex Equity Management, Kyle Thompson, Cory Thompson, Thompson Consulting, M&K Holdings, MTM, Michael Morley, Krystin Morley, and Willowbend acquiesced to Condie's transfer of the $3 million in funds from the Apex Fund account to the M&K Holdings account, and the subsequent transfer from the M&K Holdings account to Willowbend itself.

## ELEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment against the Apex Defendants and the Morley Defendants)

164.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105 through 114, 116 through 129, 131 through 137, 139 through 142, 144 through 147, 149 through 152, 154 through 155, 157, and 159 through 163 of this First Amended Complaint as if set forth

in full.

165.    As a result of the foregoing unlawful conduct of defendants, the Apex Fund, Apex Equity Management, Kyle Thompson, Cory Thompson, Thompson Consulting, M&K Holdings, MTM, Michael Morley, Krystin Morley, and Willowbend have thus been unjustly enriched, and it would be unjust and inequitable for them to retain those funds misappropriated and fraudulently transferred to Willowbend.

## TWELFTH CLAIM FOR RELIEF

### (Conspiracy against all Defendants)

166.    Kelter incorporates by reference paragraphs 1 through 86, 88 through 103, 105 through 114, 116 through 129, 131 through 137, 139 through 142, 144 through 147, 149 through 152, 154 through 155, 157, 159 through 163, and 165 of this First Amended Complaint as if set forth in full.

167.    The numerous representations set forth above with respect to the sale and management of the Apex Fund made to Kelter and the Trust were made by defendants as part of a common agreement and understanding to defraud Kelter and other investors in the Apex Fund, and were false when made.  In particular, it was false that the "'APEX Process' protects your principal and your investment is liquid at all times," the Trust's "principal is set aside safely into a money market account with a cyber-trade and it will earn approximately 2% return while it sits there," that the APEX Process involved selling options "on both sides of the market by selling a call and selling a put at the same time," and, the "expected rate of return on a monthly basis is 3% net of all fees to" Kelter and other the other investors.

168.    The defendants committed numerous overt acts in furtherance of this conspiracy. The Apex Defendants and Sherman Warner disseminated the April 15, 2007 Letter, the August

9, 2007 E-Mail, and the August 22, 2007 Letter, which all contained material misrepresentations and omissions regarding the Apex Fund's strategy and investments so as to induce Kelter and other Limited Partners not to withdraw what remained of their investments in the fund.

169.    In addition, the Apex Defendants and Sherman Warner were aware of, acquiesced to, and acted in furtherance of Condie's transfer of a total of $3 million out of the Apex Fund into the M&K Holdings account at Thompson Consulting, and the subsequent transfer of $2 million from the M&K Holdings account at Thompson Consulting to Willowbend.

170.    The Morley Defendants knew of these fraudulent transfers and conveyances, and agreed to conspire with Kyle Thompson, Sherman Warner and Thompson Consulting (and Condie) in defrauding Kelter and the Apex Fund by framing these transfers as "loans," executing a Promissory Note in furtherance of one of these "loans," and by accepting these transfers.

171.    As the direct, natural, probable, foreseeable, but-for and proximate cause of the defendants' conduct as alleged above, Kelter and the Trust have been damaged by the defendants, and each of them, in an amount to be determined at trial, plus interest thereon at the highest legal rate.

172.    The foregoing conduct of the defendants, and each of them, was undertaken in a malicious, oppressive, and fraudulent manner in order to harm Kelter and the Trust, or with a willful and conscious disregard for their rights or the potential of causing them unjust hardship, humiliation, distress, and damage. Such conduct was despicable and justifies an award of punitive damages against defendants, and each of them, in an amount sufficient to punish them and to deter them from engaging in such conduct in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff Richard Kelter, individually and as Trustee for the Richard Kelter Trust dated June 30, 2004, prays for judgment in his favor and against Defendants, and each of them, as follows:

1.  For monetary damages in an amount subject to proof at trial, plus prejudgment interest thereon at the highest legal rate;

2.  For punitive damages in an amount sufficient to punish or set an example;

3.  For their attorneys' fees and costs of suit herein;

4.  For an accounting as to the Apex Fund; and,

5.  For such other relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: New York, New York
      November 14, 2008

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By:    _____

        Kevin Goering
        Bardia Bakhtari

        30 Rockefeller Plaza
        New York, NY 10112
        Telephone: (212) 332-3800
        Facsimile: (212) 332-3888

        Lee R. Goldberg
        LAW OFFICES OF LEE R. GOLDBERG
        23272 Mill Creek Drive, Suite 360-W
        Laguna Hills, CA 92653
        (949) 305-6870 (phone)
        (949) 305-6874 (fax)
        (admitted *pro hac vice*)

        *Attorneys for Plaintiff Richard Kelter*