# EXHIBIT A

# PART 1

.

FOR THE EXCLUSIVE USE OF: _____     COPY NO. _____

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# APEX EQUITY OPTIONS FUND, LP

A DELAWARE LIMITED PARTNERSHIP

March 1, 2005

### GENERAL PARTNER:

Apex Equity Management, LLC
1935 East Vine Street
Suite 100
Salt Lake City, Utah 84121

Telephone: 801-733-4488
Facsimile: 801-733-4396

*This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy securities in any state or jurisdiction in which such an offer or solicitation is unlawful.*

1

# DIRECTORY

**General Partner:**

Apex Equity Management, L.L.C.
1935 East Vine Street, Suite 100
Salt Lake City, Utah 84121
Attention: Kyle J. Thompson
Telephone: 801-733-4488
Facsimile: 847-733-4396

**Custodian:**

Penson Financial Services, Inc.
1700 Pacific Avenue, Suite 1400
Dallas, Texas 75201
Telephone: 214-765-1102

**Prime Broker:**

Cybertrader, Inc.
115 Wild Basin Road, Suite 100
Austin, Texas 78746
Telephone: 888-762-9237
Facsimile: 572-320-9921

**Adviser:**

Thompson Consulting, Inc.
1935 East Vine Street, Suite 100
Salt Lake City, Utah 84121
Attention: Kyle J. Thompson
Telephone: 801-733-4488
Facsimile: 801-733-4369

**Auditor:**

Melvin Sanders
1351 Amesbury Circle
Salt Lake City, Utah 84121
Telephone: 801-455-7717
Facsimile: 801-274-2289

**Legal Counsel:**

Steven J. Thayer
Handler, Thayer & Duggan, L.L.C.
191 N. Wacker Drive, 23rd Floor
Chicago, IL 60606-1633
Telephone 312-641-2100
Facsimile: 312-641-6866

## FOR ADDITIONAL INFORMATION:

If you have questions concerning this Memorandum, or would like additional information, please contact the General Partner at the address set forth above.

# TABLE OF CONTENTS

SECTION DESCRIPTION                                                                 PAGE

IMPORTANT CONSIDERATIONS .................................................................................. 4

SUMMARY OF THE OFFERING ................................................................................... 6

INVESTMENT OBJECTIVES & STRATEGY ............................................................... 15

THE GENERAL PARTNER & THE ADVISER ............................................................ 19

SUMMARY OF THE FUND AGREEMENT ................................................................. 21

BROKERAGE PRACTICES & CUSTODIAN ............................................................... 28

CERTAIN RISK FACTORS .......................................................................................... 31

FEDERAL INCOME TAX CONSIDERATIONS ......................................................... 38

ERISA CONSIDERATIONS .......................................................................................... 47

CERTAIN REGULATORY MATTERS ........................................................................ 50

CUSTOMER IDENTIFICATION PROGRAM ............................................................. 53

PRIVACY POLICY ....................................................................................................... 54

EXHIBIT A –   LIMITED PARTNERSHIP AGREEMENT OF APEX EQUITY OPTIONS FUND, LP

EXHIBIT B –   PART II OF UNIFORM APPLICATION FOR INVESTMENT ADVISER
              REGISTRATION ON FORM ADV FOR THOMPSON CONSULTING, INC.

EXHIBIT C –   FORM OF SUBSCRIPTION AGREEMENT

## IMPORTANT CONSIDERATIONS

Pursuant to this Private Placement Memorandum (the "Memorandum"), Apex Equity Options Fund, LP, a Delaware limited partnership (the "Fund"), is offering its limited partnership interests (the "Interests") only to persons who are Qualified Clients (as defined under the Investment Adviser's Act of 1940, as amended, and the rules and regulations thereunder) and who invest a minimum of $250,000 in the Fund. The General Partner may, however, at its sole discretion, accept commitment levels of less than $250,000, but under no circumstance will the General Partner accept commitment levels less than $50,000. The General Partner reserves the right to accept or reject subscriptions from prospective investors for any reason.

The proceeds of this offering will be used to purchase investments consistent with the Fund's investment objectives and policies, to pay operating expenses of the Fund and to reimburse the General Partner for certain expenses in connection with the organization of the Fund and the offer and sale of Interests of the Fund.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION ("SEC") NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE MERITS OF PARTICIPATING IN THE FUND, NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

You should not construe the contents of this Memorandum as legal, tax or investment advice and, if you acquire an Interest, you will be required to make a representation to that effect. You should review the proposed investment and the legal, tax and other consequences thereof with your own professional advisers. The purchase of an Interest involves certain risks and conflicts of interest between the General Partner and the Fund. See "Certain Risk Factors."

In making an investment decision, you must rely on your own examination of the Fund and the terms of the offering of Interests, including the merits and risks involved. You and your representative(s), if any, are invited to ask questions and obtain additional information from the General Partner concerning the terms and conditions of the offering, the Fund, and any other relevant matters to the extent the General Partner possesses such information or can acquire it without unreasonable effort or expense.

The General Partner anticipates that: (i) the offer and sale of the Interests will be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") and the various state securities laws; (ii) the Fund will not be registered as an investment company under the Investment Company Act of 1940 pursuant to an exemption provided by Section 3(c)(1) thereunder; (iii) the General Partner is not and does not anticipate being registered as an investment adviser with the SEC; and (iv) neither the General Partner nor the Adviser will be registered as a commodity pool operator under the Commodity Exchange Act. Consequently, you will not be entitled to certain protections afforded by those statutes.

The offering of Interests is made only by delivery of a copy of this Memorandum to the person whose name appears hereon. The offering is made only to the person who meet the suitability standards set forth in this Memorandum.

This Memorandum may not be reproduced, either in whole or in part, without the prior express written consent of the General Partner. By accepting delivery of this Memorandum, you agree not to reproduce or divulge its contents and, if you do not purchase any Interests, to return this Memorandum and the exhibits attached hereto to the General Partner. You and your agents may, however, disclose to any person or persons the tax treatment and tax structure that is provided herein.

There is no public market for the Interests nor is any expected to develop. Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Fund Agreement. Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner. Accordingly, if you purchase an Interest, you will be required to represent and warrant that you have read this Memorandum and are aware of and can afford the risks of an investment in the Fund for an indefinite period of time. You will also be required to represent that you are acquiring the Interest for your own account, for investment purposes only, and not with any intention to resell or transfer all or any part of the Interest. This investment is suitable for you only if you have adequate means of providing for your current and future needs, have no need for liquidity in this investment and can afford to lose the entire amount of your investment.

Although this Memorandum contains summaries of certain terms of certain documents, you should refer to the actual documents (copies of which are attached hereto or are available from the General Partner) for complete information concerning the rights and obligations of the parties thereto. All such summaries are qualified in their entirety by the terms of the actual documents. No person has been authorized to make any representations or furnish any information with respect to the Fund or the Interests, other than the representations and information set forth in this Memorandum or other documents or information furnished by the General Partner upon request, as described above.

No rulings have been sought from the Internal Revenue Service ("IRS") with respect to any tax matters discussed in this Memorandum. You are cautioned that the views contained herein are subject to material qualifications and subject to possible changes in regulations by the IRS or by Congress in existing tax statutes or in the interpretation of existing statutes and regulations.

Except where otherwise indicated, this Memorandum speaks as of the date hereof. Neither the delivery of the Memorandum nor any sale of the securities described herein shall, under any circumstances, create any implication that there has been no change in the affairs of the Fund or the General Partner since the date hereof.

## SUMMARY OF THE OFFERING

The following summary of the offering is only intended to give prospective investors a brief overview of the Fund. Prospective investors, in consultation with their advisers, should read this Memorandum and the accompanying exhibits and supporting documents (collectively, the "Offering Documents") in their entirety before investing in the Fund. This summary is qualified in its entirety by reference to the full text of the Offering Documents.

**The Fund**

The name of the Fund is Apex Equity Options Fund, LP, a Delaware limited partnership. The operation and management of the Fund is governed by the terms of the Fund Limited Partnership Agreement (the "Fund Agreement"), as the same may be amended from time to time.

**The General Partner and The Adviser**

Apex Equity Management, LLC, a Utah limited liability company, is the General Partner of the Fund (the "General Partner") and responsible for the administration of the Fund and the management of the Fund's day-to-day operation. The General Partner will receive subscription materials, process and respond to investor requests, calculate the Net Asset Value of the Fund, and oversee other administrative matters of the Fund. Kyle J. Thompson and Cory H Thompson are the principals of the General Partner and will, on behalf of the General Partner, manage the Fund's day-to-day operations. Sherwood Financial Inc., a Utah corporation, is the manager of the General Partner. Kyle J. Thompson and Cory H Thompson are also principals of Sherwood Financial, Inc. The General Partner, will invest not less than $50,000 in the Fund.

Thompson Consulting, Inc., a Utah corporation, will be engaged by the General Partner under an investment advisory agreement as the adviser (the "Adviser") to assist the Fund in the selection and evaluation of prospective Fund investments and in monitoring the Fund's investment strategies. The Adviser is licensed with the State of Utah as an investment adviser and is in the process of registering as an investment adviser with the SEC. All of the Fund's investment decisions are made by the Adviser, who has discretionary authority to invest the Fund's assets.

**Investment Objective and Strategy**

The Fund was formed to provide investors with long-term investment returns by utilizing sophisticated techniques in public securities markets such as stock options and index options. The Fund will use a proprietary investment selection criteria and methodology developed by the Adviser in the writing of short term investment contracts, including put and call options (naked and covered) on publicly traded securities through the investing and pledging of the Funds' capital and assets.

The Fund will attempt to execute a consistent program of implementing this methodology to maximize option premium and other investment income for the Fund while at the same time minimizing the downside risk of loss of contributed and pledged collateral to the extent possible. The Fund intends to use invested commitments as collateral in its margin trading account with the goal being to generate consistent long-term investment returns.   See "Risk Factors" and "Investment Objectives & Strategy."

In summary, the Fund seeks to provide its investors with superior and sustainable returns combined with effective risk management. Although the strategy and asset allocation utilized by the Fund is primarily centered on options, the Adviser intends to follow a flexible approach in order to place the Fund in the best position to capitalize on opportunities in the financial markets. Accordingly, the Adviser may employ other strategies and may take advantage of opportunities in diverse asset classes if they meet the Adviser's standards of investment merit.  See "Investment Objectives & Strategy."

**Sale of Interests**

The Fund is offering limited partnership interests in the Fund (the "Interests") exclusively to Qualified Clients who meet the minimum standards under Rule 205-3 of the Investment Advisers Act of 1940, and who invest a minimum of $250,000.  The General Partner may, however, in its sole discretion, accept commitment levels of less than $250,000, but in no event will accept commitment levels less than $50,000.

The offering of Fund Interests is being made by the General Partner on a best efforts basis.  There is no minimum or maximum aggregate amount of funds that may be contributed by all investors to the Fund. There is no assurance that the Fund will raise any particular amount of capital commitments.   Each Interest in the Fund will represent a percentage interest in the Fund determined by reference to the capital account of each Partner in relation to the aggregate capital accounts of all Partners of the Fund.

**Closings**

The initial closing of commitments shall occur any time after March 1, 2005, at the discretion of the General Partner.  Thereafter, the General Partner anticipates holding additional closings for subsequent commitments as of the first day of each calendar month until the General Partner decides to close the Fund to new investments.  The full purchase price of each capital contribution is due at the time of subscription.

The General Partner in its sole discretion has the right to admit new investors and to accept additional capital contributions from existing Limited Partners at any time up to the Fund's closing date, as may be

7

determined at the discretion of the General Partner.   Upon such admission of new investors or receipt of additional capital contributions from existing Limited Partners, the interests of the Limited Partners will be readjusted in accordance with their capital accounts.

**Eligible Investors and Suitability**

In order to qualify for an exemption from the registration requirements of the Investment Company Act of 1940 (the "Investment Company Act"), pursuant to Section 3(c)(1), the Fund will not admit more than 100 persons to the Fund. Further, in order to comply with Rule 205-3 of the Investment Advisers Act of 1940 (the "Adviser's Act"), the Fund will only accept subscriptions from "Qualified Clients" as that term is defined in the Adviser's Act.   In general, Qualified Clients are individuals with a net worth of at least $1,500,000 or who have a least $750,000 of assets under management with the Adviser.

The Subscription Documents set forth in detail the definitions of "Qualified Client" as well as other suitability standards for investors in the Fund.  You must check the appropriate places in the Subscription Documents to represent to the Fund that you are both a Qualified Client and that you meet certain other suitability standards established by the General Partner.

Under Regulation D of the Securities Act, you may be required to appoint a "purchaser representative" in order to assist you in evaluating the merits of investing in the Fund.  Each investor who proposes to engage a purchaser representative must, prior to or concurrently with that investor's subscription, have completed and returned to the General Partner a Purchaser Representative Questionnaire, available on request from the General Partner.  The General Partner will notify the investor as to the acceptability of that person as a purchaser representative.  You should not, however, rely on the General Partner to determine the qualifications of any proposed purchaser representative.

Entities subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and other tax-exempt entities may purchase Interests.  However, investment in the Fund by such entities requires special consideration.   Trustees or administrators of such entities should consult their own legal and tax advisers.

Each prospective foreign investor should consult its own tax and other advisers in determining the possible tax, exchange, control or other consequences of the purchase and ownership of Interests under the laws of the jurisdictions of which it is a citizen or to which it may otherwise be subject.

**How to Subscribe**

The General Partner has included Subscription Documents and instructions for subscribing as Exhibit C to this Memorandum. In order to subscribe for Interests, you must complete the Subscription Documents and return them to the General Partner. Investors will be required to pay their entire capital commitment at the time of their subscription. Payment may be made by wire transfer of immediately available funds, or by a check payable to the Fund. To ensure compliance with applicable laws, regulations and other requirements relating to money laundering, the General Partner may require additional information to verify the identity of any person who subscribes for any Interests in the Fund.

**Admission of Limited Partners**

The General Partner reserves the right to accept or reject subscriptions from potential investors for any reason and to accept any additional capital contributions from existing Limited Partners up to the Fund's closing date, as such closing date may be determined at the discretion of the General Partner. Capital contributions generally will be accepted as of the first day of each month, although the General Partner, in its sole discretion, has the right to admit new Limited Partners and to accept additional funds form existing Limited Partners at any time. Upon such admission of new investors or receipt of additional capital contributions from existing Limited Partners, the Interests of the investors will be readjusted in accordance with their capital accounts.

**Organizational and Operational Expenses**

Organizational expenses of the Fund will include all expenses incurred in connection with the organization of the Fund, including without limitation, legal and accounting fees, printing and mailing expenses, government filing fees and all expenditures classified as syndication expenses under §1.709-2(b) of the Treasury Regulations promulgated under Section 709 of the Internal Revenue Code of 1986, as amended (the "Code"). The Fund intends to amortize organizational expenses over a period of one hundred and eighty (180) months from the date the Fund commences operations as required under Code Section 195.

Operating expenses of the Fund will include (a) all expenses incurred in connection with the ongoing offer and sale of Fund Interests, including without limitation, printing of this Memorandum and exhibits, documentation of performance and the admission of Partners, (b) all operating expenses of the Fund such as the Management Fee and Performance Fee, tax preparation fees, governmental fees and taxes, communications with Partners, and ongoing legal, accounting, bookkeeping, consulting and other professional fees and expenses, (c) all Fund trading and investment related costs and expenses (e.g., brokerage commissions, custodial fees and clearing and settlement charges), (d) all fees to protect or preserve any investment held by the Fund, as determined in good faith by the General Partner, and (e) all fees and other expenses incurred in connection with the investigation, prosecution

or defense or any claims by or against the Fund. The Fund will pay or reimburse the General Partner and the Adviser for all organizational and operating expenses of the Fund that are incurred by them.

The General Partner and the Adviser will pay, from the Management Fee and Performance Fee (as defined below) or otherwise, their own general operating and overhead type expenses associated with providing the administrative and investment management services to the Fund. These expenses include all expenses incurred by the General Partner and the Adviser in providing their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, insurance, utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Fund organizational and operating expenses as described herein and in the Fund Agreement.

**Side Pocket Accounts**
The General Partner may designate that certain investments, such as investments in privately placed unregistered securities or securities that, in the opinion of the General Partner, do not have a readily ascertainable market value or other illiquid securities which may be valued but are not freely transferable (such privately placed and illiquid securities, collectively, "Illiquid Securities"), be carried in one or more separate memorandum accounts (a "Side Pocket Account") for such period of time as the General Partner determines. Illiquid Securities held in a Side Pocket Account shall be carried at their fair value as determined by the General Partner, and unrealized income with respect to such investments shall not be subject to the General Partner's Performance Fee until such investments are reallocated to the capital accounts of participating Partners. At the election of the General Partner or upon the sale or disposition of an Illiquid Security, such security or the proceeds thereof shall be reallocated, pro rata, to the capital accounts of participating Partners. Until such reallocation, a Limited Partner may not make withdrawals from its capital account that are related to the value of Illiquid Securities held in a Side Pocket Account. Illiquid Securities may be held in a Side Pocket Account for a period of time determined by the General Partner in its discretion.

Newly admitted Limited Partners shall not participate in investments in Illiquid Securities carried in a Side Pocket Account that were made prior to their admission. Any expenses relating specifically to a Side Pocket Account will be charged to the Partners participating in such account. If in its discretion the General Partner designates certain investments as follow-up investments to an existing investment in an Illiquid Security, only the Partners participating in such investment will participate in such follow-up investment in proportion to their interest in the related Side Pocket Account.

**Management Fee**
In addition to the Fund's organizational and operating expenses, the Fund will pay the Adviser a management fee (the "Management Fee") equal to 2% annually of the Net Asset Value of the Fund (as defined below) calculated as of the last day of each calendar month. The

Management Fee will be paid on a monthly basis by the Fund on or about the 15th business day of the subsequent calendar month. The Management Fee for any period of less than one (1) calendar month will be pro rated based on the number of days in such period.

**Performance Fee**

The General Partner shall be paid a quarterly performance fee (the "Performance Fee") equal to twenty-five percent (25%) of the net increase in the Fund's Net Asset Value as of the close of each calendar quarter. The Performance Fee will not be subject to any loss carry forward and will not include any change in the value of any Illiquid Securities held in a Side Pocket Account until such Illiquid Securities are reallocated to the capital accounts of participating Partners.

**Determination of Net Asset Value**

The "Net Asset Value" of the Fund means the Fund's assets, at fair value ("marked to market"), less liabilities, including any accrued but unpaid expenses and reserves for certain circumstances. The "Net Asset Value per Interest" means the Net Asset Value of the Fund divided by the number of Interests then outstanding. The term "marked to market" is an accounting term used to describe the adjustment of the valuation of a security or portfolio to reflect current market values. The Fund will mark all positions, except those held in a Side Pocket Account (as provided below), to market at the close of each monthly trading period in order to calculate performance, taking into account both realized and unrealized profits and losses. See "Summary of the Fund Agreement."

**Distributions**

The Fund does not expect to make any distributions to Limited Partners from profits or capital, except pursuant to requests for withdrawals and upon termination of the Fund.

Upon the termination of the Fund (as further described in the Fund Agreement), the assets of the Fund will be liquidated (or distributed) and the proceeds of liquidation will be used to pay off known liabilities and establish reserves for contingent liabilities and expenses of liquidation. Any remaining balance will be applied and distributed in proportion to the respective capital accounts of the Partners.

**Withdrawals**

Limited Partners may withdraw all or a portion of their capital account as of the close of business on the last business day of each calendar quarter (the "Withdrawal Date"), upon not less than sixty (60) days prior written notice to the General Partner, which notice period may be waived at the discretion of the General Partner. Withdrawals will be subject to certain withdrawal and/or administrative fees and other charges as set forth in the Fund Agreement, including without limitation, charges for unamortized organizational expenses and the pro rata portion of the Management Fee, and Performance Fee allocable to the withdrawing Limited Partner's capital account as of the applicable Withdrawal Date. Such withdrawals are deemed a return of capital, which will result in a reduction of the number of Interests in the Fund for accounting purposes.

The General Partner may suspend or postpone the payment of any withdrawals from capital accounts (i) in the event that Limited Partners, in the aggregate, request withdrawals of twenty-five percent (25%) or more of the value of the Fund's capital accounts as of any Withdrawal Date; (ii) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Fund's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Fund's investments impractical or prejudicial to the Partners; (iii) where any withdrawals or distributions, in the opinion of the General Partner, would result in the violation of any applicable law or regulation; or (iv) for such other reasons or for such other periods as the General Partner may in good faith determine.

Upon withdrawal of all of its capital account, a Limited Partner shall be deemed to have withdrawn from the Fund, and upon notice of such withdrawal, a Limited Partner shall not be entitled to exercise any voting rights afforded to Limited Partners under the Fund Agreement.

The General Partner may agree with a Limited Partner to establish a lock-up period for such Limited Partner.

**Transferability of Interests**

As a Limited Partner, investors may not assign or transfer their Interests (except by operation of law) without the consent of the General Partner, which consent may be given or withheld in its sole discretion. No transfer of an Interest by a Limited Partner will be permitted if it would result in termination of the partnership status of the Fund for federal income tax purposes. Transfers of Interests are subject to other restrictions set forth in the Fund Agreement, including compliance with federal and state securities laws. Due to these limitations on transferability, Limited Partners may be required to hold their Interests indefinitely unless they withdraw from the Fund in accordance with the procedures set forth in the Fund Agreement.

**Liability of Investors**

Except as otherwise provided by applicable law, an investor's liability to the Fund, other investors or to creditors of the Fund, is limited in amount to such investor's capital contribution to the Fund. Once an Interest has been paid for in full, the holder of that Interest will have no further obligation at any time to make any loans or additional capital contributions to the Fund. No investor shall be personally liable for any debts or obligations of the Fund.

**Margin Calls**

In the event the Fund is subject to a margin call by its brokerage firm, the General Partner will be solely responsible and liable for any amount of such margin call that exceeds the Net Asset Value of the Fund as of the calendar month immediately proceeding the date upon which the margin call obligation becomes due and payable.

**Prime Broker and
Custodian**

All cash and cash equivalents, securities and other assets of the Fund, will be held by one or more independent financial institutions, including any brokers and dealers or other institutions through which the Adviser effects transactions from time to time (each a "Custodian"). As of the initial date of this Memorandum, the initial custodian will be Penson Financial Services. The initial prime broker will be Cybertrader, Inc., a Charles Schwab company. The Company will pay each Custodian a reasonable custodial fee at a rate to be determined. No Custodian shall have any part in deciding the Fund's investment policies or making the Fund's investment decisions.

**Brokerage Practices**

Portfolio transactions for the Fund will be allocated by the Adviser among brokers and dealers on the basis of their ability to effect prompt and efficient executions at competitive rates but may also take into consideration such investment-management-related services and equipment, including without limitation, the broker's facilities, reliability and financial responsibility as well as the provision or payment of the costs of research and other services or property. The commission rates charged to the Fund by brokers in the foregoing circumstances may be higher than those charged by other brokers who may not offer such services. See "Brokerage Practices."

**New Issues**

From time to time, the Fund may purchase securities which are part of an initial public distribution. Under the rules adopted by the National Association of Securities Dealers, Inc. ("NASD"), certain persons engaged in the securities, banking or financial services industries, and members of their family (collectively, "Restricted Persons") are restricted from participating in initial public offerings of equity securities ("New Issues"), subject to a de minimus exemption. To the extent necessary to comply with NASD rules, in addition to the Fund's regular accounts, the General Partner may establish at any brokerage firm one or more special securities trading accounts that are authorized to participate in New Issues (each, a "New Issues Account"). Participation in New Issues Accounts shall be limited to (i) those investors who are not Restricted Persons, and (ii) those investors who are Restricted Persons but only to the extent that such participation by Restricted Persons does not exceed levels permitted under applicable NASD rules. The General Partner shall be entitled to receive its Performance Fee with respect to any profits in any New Issues Account.

In the event a New Issues Account is established, to effect a transaction in New Issues, the requisite funds will be transferred from the Fund to the New Issues Account. Securities held in the New Issues Account will be held there until they are eventually sold. Upon the sale of New Issues, proceeds in the New Issues Account will be transferred back to the Fund's regular accounts. Any profits or losses resulting from securities

13

transactions in the New Issues Account in any fiscal period will be credited or debited to the capital accounts of investors participating in the New Issues Account in accordance with their interests therein. Imputed interest amounts may, at the discretion of the General Partner, be credited to Restricted Persons in accordance with their capital accounts as of the beginning of such fiscal period.

The returns to investors on their Interests in the Fund may differ depending upon whether they are a Restricted Person. In the event the NASD adopts amendments to its New Issue rules, the General Partner is authorized to amend the Fund Agreement without the consent of the Limited Partners to conform to such amendments.

**Term**

The term of the Fund shall continue until the Fund is dissolved in accordance with the terms of the Fund Agreement. Under the Fund Agreement, the Fund may be terminated at the election of the General Partner.

**Fiscal Year**

The fiscal year of the Fund shall end on December 31 of each year, which fiscal year may be changed by the General Partner, in its sole and absolute discretion.

## INVESTMENT OBJECTIVES & STRATEGY

The following is a general description of the principal types of securities in which the Fund may invest, certain trading techniques that it may employ, the investment criteria that it plans to apply, and the guidelines that it has established with respect to the composition of its investment portfolio. The following description is merely a summary and you should not assume that any descriptions of the specific activities in which the Fund may engage are intended in any way to limit the types of investment activities which the Fund may undertake or the allocation of Fund capital among such investments.

### Investment Objective

The Fund's investment objective is to generate long-term investment returns through the maximization of option premiums and other investment income while mitigating the market risk of loss of contributed and pledged capital of the Fund. No assurance can be given, however, that the Fund will achieve its objective, and investment results may vary substantially over time and from period to period.

### Investment Strategy

The Fund's investment focus will be on short term investment contracts, including put and call options (naked and covered) on publicly traded securities through the pledging of the Fund's capital and assets. When market conditions present favorable or attractive investment opportunities, the Fund may, on a limited short-term basis, take long or short positions in specific securities or investment contracts. The Fund will utilize leverage in implementing its investment strategies.

An option is a contract that gives the buyer or the holder the right, but not the obligation, to buy or sell shares of a specific block of underlying securities at a specific price for a specified time. Each option contract typically covers a block of 100 shares of an underlying security. There are two types of options: "calls" and "puts." A call option gives the buyer or holder the right, but not the obligation, to buy an underlying security at a specific price for a specified period of time (e.g., one month, two months, three months, one year or longer). Conversely, the seller or writer of a call option has the obligation to sell the underlying security should the buyer exercise his option to buy. A put option gives the buyer or holder the right, but not the obligation, to sell an underlying security at a specific price for a specified period of time (e.g. one month). Conversely, the seller or writer of a put option has the obligation to buy the underlying security should the buyer exercise his option to sell at a predetermined price.

The option "premium" is the price the buyer pays to the seller or writer of the option contract. In consideration of the premium, the seller or writer of the option is obligated to sell the underlying security to the option buyer if the option is exercised or, in the case of a put option contract, to buy the underlying security if the put is exercised. In any case, the seller or writer gets to keep the premium whether or not the option is exercised.

The strike price, or exercise price, of an option is the specified price at which the underlying securities may be bought or sold by the buyer if they exercise their right to buy (in the case of a call) or sell (in the case of a put). When you exercise an option you now have the obligation to sell or purchase the underlying security at the strike price or exercise price. You may or may not have to fulfill this obligation. You are considered to be "assigned" or "exercised" if you are required by a buyer, or holder of the option contract to fulfill that obligation. Typically this occurs when the option is "in-the-money."

A call option is "in-the-money" if the market price of the underlying security is higher than the strike price. A put option is "in-the-money" if the market price of the underlying security is below the strike price. In other words, the option has intrinsic value in that the option buyer or holder can immediately realize profits by exercising their option and then liquidating the underlying security at market price. A call option is "out-of-the-money" if the strike price is greater than the market price of the underlying security. A put option is "out-of-the-money" if the strike price is less than the market price of the underlying security. In other words, it has no intrinsic value.

The expiration date is the last day on which an option may be exercised. Typically, this date is the Friday before the third Saturday of the expiration month. Different types of options have different expiration dates. The "time value" is the portion of the option premium that is attributable to the amount of time remaining until the expiration of the option contract. Time value is whatever value the option has in addition to its intrinsic value.

The "margin" is the amount of money that a brokerage firm will loan against an account's deposited assets. The "leverage" relates to the buying power or margin afforded an account based upon its deposited assets. For example, if the brokerage firm permits an account a margin limit of 25%, the account may purchase option positions up to four times (4:1) the assets on deposit with the brokerage. A margin requirement is the amount of money an option writer or seller is required to deposit and maintain with a brokerage firm to cover a position (e.g., $25 on deposit for every $100 in option contracts outstanding). A margin call is a mandatory request by a brokerage firm to deposit additional assets into a trading account to satisfy an obligation or to satisfy the brokerage firm's minimum deposit requirements.

The brokerage accounts used by the Fund are margin accounts. The primary investment strategy of the Fund will use leverage. The assets contributed to the Fund by investors will be used as collateral, leveraged in a margin trading account, with the goal to generate consistent investment returns with reduced market risk. The Fund does not intend to use margin or leverage beyond the value of the Fund assets. Should the Fund assets be insufficient to cover a margin call, the General Partner will be liable for any amount of a margin call that exceeds Fund assets. In no case will a Limited Partner be liable for any obligation beyond their capital contribution to the Fund.

A "combination" is any position involving both put and call options. A "straddle" is the buying or writing of both a put and a call on the same underlying security at the same exercise price. A "strangle" is the buying or writing of both a put and a call on the same underlying security at different exercise prices. Combinations such as straddles and strangles can be used to mitigate market risk or achieve specific investment objectives.

The Fund may purchase call options. As the holder of a call option, the Fund has the right to purchase the underlying security at the exercise price at any time during the option period. The Fund may enter into closing sale transactions with respect to such options, exercise them or permit them to expire. The Fund may purchase call options for the purpose of increasing our current return or avoiding tax consequences that could reduce its current return. The Fund may also purchase call options in order to acquire the underlying securities for its portfolio. Utilized in this fashion, the purchase of call options will enable the Fund to acquire the securities at the exercise price of the call option plus the premium paid. This technique may also be useful to the Fund in purchasing a large block of securities that would be more difficult to acquire by direct market purchases. As long as the Fund holds such a call option rather than the underlying security itself, it would be partially protected from any unexpected decline in the market price of the underlying security. Such an event could allow the call option to expire, thereby incurring a loss only to the extent of the premium paid for the option.

A call option is "covered" if the writer (seller) owns or controls the underlying security subject to the call option at all times during the option period. A call option is "naked" if the writer (seller) has no underlying security positions. The Fund may write both types of call options in its trading activities in order to achieve an optimum level of premium income as well as an acceptable level of risk versus reward in the best interest of Fund investors. The Fund may also enter into closing purchase transactions with respect to such options or permit them to expire. A covered call writer (in this case the Fund on your behalf) is required to deposit into the Fund's trading account the underlying security in accordance with the rules of the exchanges on which the option is traded and the appropriate clearing agency. The writing of covered call options is a relatively conservative investment technique. However, risk of loss of the contributed asset is still present. The writing of naked call options involves a substantially higher risk as the writer is required to purchase underlying securities above their current market price in order to sell them in satisfaction of a call obligation, thus incurring a loss on the transaction. However, the writing of naked call options also involves greater potential for profit.

The Fund expects to receive premiums from writing both "covered" and "naked" call options. The Fund will retain such premiums in the event the option expires unexercised or is closed out at a profit. The amount of the premium received will reflect, among other things, the relationship of the market price of the underlying security to the exercise price of the call option and the remaining term of the call option.

The Fund may also write put options on publicly traded securities it does not own or control to earn premium income or to assure a definite price for a security if the Fund is considering acquiring the security at a lower price than the current market price or to close out options previously purchased. The Fund may also enter into closing purchase transactions with respect to such options or it may permit them to expire. The Fund may also write put options to cover a short stock position.

The risks involved in writing put options include the risk that a closing transaction cannot be effected at a favorable market price and the possibility that the market price of the underlying security may fall below the exercise price. In this case, the Fund may be required to purchase the underlying security at a higher price than the market price of the security at the time the option is exercised, resulting in a potential capital loss unless the security subsequently appreciates in market value. The Fund may purchase put options on securities. As the holder of a put option, the Fund has the right to sell such securities at the exercise price at any time during the option period. The Fund may enter into closing sale transactions with respect to such options, exercise them or permit them to expire.

The Fund may purchase put options as a defensive technique (also known as a "protective put") in order to protect against declines in the market value of the underlying security. Such limited protection is provided only during the life of the put option when the Fund, as the holder of the put option, is able to sell such securities at the put exercise price regardless of any decline in the underlying security's market price. For example, a put option may be purchased in order to protect unrealized appreciation of a security where the Adviser deems it desirable to continue to hold the security because of tax or other considerations. The premium paid for the put option and any transaction costs would reduce any capital gain otherwise available for distribution when the security is eventually sold.

By purchasing put options on securities the Fund does not own, the Fund would seek to benefit from a decline in the market price of such securities. If the put option is not sold when it has remaining value, and if the market price of the underlying security remains equal to or greater than the exercise price during the life of the put option, the Fund would lose its entire investment in the put option. In order for the purchase of a put option to be profitable, the market price of the underlying security must decline sufficiently below the exercise price to cover the premium and transaction costs, unless the put option is sold in a closing sale transaction. The purchaser of a put option risks a total loss of the premium paid for

the option if the price of the underlying security does not increase or decrease sufficiently to justify exercise.

The primary investment strategy of the Fund will be the use of option combinations. "Straddle" and/or "strangle" positions will be entered into on an underlying security, typically Index Options or Exchange Traded Funds. An example of this type of underlying security would be the NASDAQ-100 Index Tracking Stock (Stock Symbol QQQQ, commonly known as the "Cubes" or "Qubes"), which is the most actively traded Exchange Traded Fund in the world. It represents stocks of the top companies traded on the National Association of Securities Dealers Automated Quote System (NASDAQ). This type of security offers tremendous liquidity due to its large daily trading volume. It also provides diversification as it represents the stocks of many companies each with varying volatility, price and capitalization.

The Fund expects to generate investment returns with reduced market risk by: (1) systematically selling option combinations on an Exchange Traded Fund (primarily the QQQQ); (2) regularly adjusting a portion of the positions based on the price movement of the security; and (3) exiting positions by buying back the combination when it is deemed by the Adviser to be at its optimum profitability.

You should not consider the above discussion a complete explanation of the strategies that may be implemented by the Fund when investing in the options markets. Prior to investing, you should also thoroughly review the booklet entitled "Characteristics and Risks of Standardized Options" jointly published by the American Stock Exchange, the Chicago Board Options Exchange, the New York Stock Exchange, the Pacific Stock Exchange, and the Philadelphia Stock Exchange. To receive a copy of this booklet, at no charge or obligation to you, please contact the General Partner at (801) 733-4488.

## THE GENERAL PARTNER, ADVISER AND MANAGEMENT TEAM

### The General Partner

The Fund will be under the day-to-day control of its General Partner, Apex Equity Management, LLC, which was organized in the State of Utah as a limited liability company on March 1, 2005.

Sherwood Financial, Inc., a Utah corporation, is the manager of the General Partner.  Kyle J. Thompson and Cory H Thompson are the founding members of the General Partner as well as principals of the manager of the General Partner.  As such they will be responsible for the management and administration of the day-to-day operations of the Fund.

### The Adviser

Thompson Consulting, Inc., which was organized as a corporation in the State of Utah in November of 1991, will be engaged as the Adviser to the Fund to assist the General Partner in the selection and evaluation of prospective Fund investments.  Kyle J. Thompson and Cory H Thompson are also principals of the Adviser.

### Regulatory Issues Related to The Adviser

The Adviser obtained its license as an Investment Adviser in the State of Utah in June of 2004. The Adviser is currently in the process of registering with the SEC as a Registered Investment Adviser. All of the Fund's investment decisions will be made by the Adviser, which has discretionary authority to invest the Fund's assets and will retain responsibility for monitoring Fund performance.  The Adviser has been the subject of an informal audit by the State of Utah Securities Division.  The Adviser has agreed to certain requests of the Utah Securities Division and is in full compliance with all such requests.  The Utah Securities Division has notified the Adviser that it does not intend to take any adverse action against the Adviser.

### Management Team

Kyle J. Thompson is the principal executive officer of the Adviser and makes determination of all general investment advice given to the Fund.  Mr. Thompson was born in 1959 and obtained a BA degree in Business Finance in 1986 from the University of Utah.  He has been President and Chief Executive Officer of Thompson Consulting, Inc. since its organization in 1991 and is a Vice President of Sherwood Financial, Inc.  Mr. Thompson obtained his Uniform Securities Agent license (Series 63) in January of 1988, his General Securities license (Series 7) in February of 1988, his General Securities Principal license (Series 24) in May of 1998 and his Investment Adviser license (Series 65) in May of 1999.  From May of 1978 to February of 2002 he was a branch manager for Walnut Street Securities. From February of 2002 through August of 2004 he was a registered representative and a registered principal with Sammons Securities Company, LLC.

Cory H Thompson is Vice President of the Adviser, Thompson Consulting, Inc., and President of its management firm, Sherwood Financial, Inc.  Mr. Thompson was born in 1957 and obtained a BS degree in Business Management in 1986.  He has been the Vice President and Chief Financial Officer of Thompson Consulting, Inc. since its organization in 1991.  He is also the President of Sherwood Financial Inc.  He obtained his Investment Company and Variable Contracts license (Series 6), his Uniform Securities Agent License (Series 63) in March of 1995.  He obtained his Investment Company and Variable Contracts Principal license (Series 26) in July of 1999.  Mr. Thompson has extensive experience

in organizing and managing business entities, along with the development of investment plans and strategies.

**David C. Condie, JD** is the Chief Operations Officer of Sherwood Financial, Inc., which serves as part of the Adviser's management team. Mr. Condie was born in 1969. He received his undergraduate degree in 1994 from the University of Utah, and his juris doctorate degree from the J. Reuben Clark School of Law, Brigham Young University, in 1997. He was admitted to the Bar in Kentucky in 1997, and to the Utah and Indiana Bar Associations in 1998. He practiced law in Kentucky and Indiana for two years following his graduation from law school before returning to practice in his home state of Utah. Mr. Condie's practice has been centered primarily in commercial and business litigation. He has also assisted numerous clients with complex estate planning needs. Mr. Condie's litigation background, business and estate planning experience have been key elements in developing a successful management team.

The Fund Agreement does not require the General Partner, the Adviser or their principals, personnel or affiliates to devote all of their time to the Fund, and neither the General Partner, the Adviser nor their principals, personnel or affiliates is expected to work exclusively for the Fund.

## SUMMARY OF THE FUND AGREEMENT

The rights and obligations of Limited Partners of the Fund will be governed by the Fund Agreement.  The following briefly summarizes certain provisions of the Fund Agreement that are not described elsewhere in this Memorandum.  Prospective investors are urged to read the Fund Agreement that is attached to this Memorandum in its entirety and consult with legal Advisers concerning it before subscribing.

### General

The Fund is organized as a limited partnership under the Delaware Limited Partnership Act.  The Fund Agreement provides that the General Partner will have complete control of the business of the Fund and that the Limited Partners will have no power to take part in the management of the Fund.  Upon admission to the Fund, each Limited Partner will acquire a percentage interest in the Fund equal to his or her capital contribution as of the date of admission divided by the sum of the capital accounts of all Limited Partners (including the investor) as of that day.  A Limited Partner's percentage interest will be adjusted to take account of each additional capital contribution using the same technique.  Each Limited Partner's percentage interest should be expected to increase or decrease proportionally as additional capital contributions or withdrawals of capital are made.

### Admission of Limited Partners

The General Partner has the right in its sole discretion to accept or reject subscriptions from potential investors for any reason and to accept any additional capital contributions from existing Limited Partners.  Limited Partners are not required to make any additional capital contributions to the Fund.  Capital contributions will generally be accepted as of the first day of each month, although the General Partner in its sole discretion has the right to admit new investors and to accept additional capital contributions from existing Limited Partners at any time up to the Fund closing date, as shall be determined at the discretion of the General Partner.  Upon such admission of new investors or receipt of additional capital contributions from existing Limited Partners, the Interests of the Limited Partners will be readjusted in accordance with their capital accounts.

In connection with an additional capital contribution by an existing Limited Partner, the General Partner may (i) treat such additional capital contribution as a capital contribution with respect to one of such Limited Partner's existing capital accounts, or (ii) establish a new capital account to which such capital contribution shall be credited and maintained for the benefit of such Limited Partner separately from any existing capital account of such Limited Partner.  Such separate capital account will be maintained for purposes of calculating the Management Fee, and the Performance Fee.  All capital contributions invested in the Fund by investors will be held in the Fund's name and the Fund will not commingle its funds with any other party.

### Determination of Net Asset Value

The Net Asset Value of the Fund shall be determined on the accrual basis of accounting in accordance with U.S. generally accepted accounting principles consistently applied, and further, in accordance with the following:

(i)      A determination shall be made on the last day of each month (or other time period, as the case may be) as to the value of all Fund assets and as to the amount of liabilities of the Fund.  In making such determination, securities which are listed or admitted to trading on a national securities exchange or over-the-counter securities listed on NASDAQ or securities which are not so listed, shall be valued at

their last sales price on such date, or if no sales occurred on such date, at their "bid" price for a long position and the "ask" price for a short position; provided, that if the General Partner determines that the valuation of any securities pursuant to foregoing methods does not fairly represent market value, the General Partner may value such securities as it reasonably determines.  For securities not listed on a security exchange or quoted on an over-the-counter market, but for which there are available quotations, such valuation will be based upon quotations obtained from market makers, dealers or pricing services. securities which have no public market and all other assets of the Fund are considered at such value as the General Partner may reasonably determine in consultation with such industry professionals and other third parties as the General Partner deems appropriate.  All values assigned to securities by the General Partner pursuant to the Fund Agreement are final and conclusive as to all Partners.

(ii)     There shall be deducted the Management Fee payable to the Adviser, estimated expenses for accounting, legal, custodial and other administrative services (whether performed therein or to be performed thereafter) and such reserves for contingent liabilities of the Fund, including estimated expenses, if any, in connection therewith, as the General Partner shall determine.

(iii)    After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Asset Value of the Fund during the month (or other time period, as the case may be) just ended.  The term "increase in Net Asset Value" shall be the excess of Net Asset Value at the end of any month (or other time period, as the case may be) over that of the preceding period, after adjusting for interim capital contributions and withdrawals.  The term "decrease in Net Asset Value" shall be the amount by which the Net Asset Value at the end of the month (or other time period, as the case may be) is less than the Net Asset Value of the Fund as of the end of the preceding period after making the adjustments specified above.

(iv)     Once the increase or decrease in Net Asset Value has been determined, the amount of the Performance Fee, if any, payable to the General Partner, shall be deducted.

### Side Pocket Accounts

The General Partner may designate that certain investments, such as investments in privately placed unregistered securities or securities that, in the opinion of the General Partner, do not have a readily ascertainable market value or other illiquid securities which may be valued but are not freely transferable (such privately placed and illiquid securities, collectively, "Illiquid Securities"), be carried in one or more separate memorandum accounts (a "Side Pocket Account") for such period of time as the General Partner determines.  Illiquid Securities held in a Side Pocket Account shall be carried at their fair value as determined by the General Partner, and unrealized income with respect to such investments shall not be subject to the General Partner's Performance Fee until such investments are reallocated to the capital accounts of participating Partners.  At the election of the General Partner or upon the sale or disposition of an Illiquid Security, such security or the proceeds thereof shall be reallocated, pro rata, to the capital accounts of participating Partners.  Until such reallocation, a Limited Partner may not make withdrawals from its capital account that are related to the value of Illiquid Securities held in a Side Pocket Account.  Illiquid Securities may be held in a Side Pocket Account for a period of time determined by the General Partner in its discretion.

Newly admitted Limited Partners shall not participate in investments in Illiquid Securities carried in a Side Pocket Account that were made prior to their admission. Any expenses relating specifically to a Side Pocket Account will be charged to the Partners participating in such account. If in its discretion the General Partner designates certain investments as follow-up investments to an existing investment in an Illiquid Security, only the Partners participating in such investment will participate in such follow-up investment in proportion to their interest in the related Side Pocket Account.

**Allocation of Profit & Loss**

To determine how profits and losses of the Fund will be shared, the Fund Agreement allocates net income or loss (increases or decreases in Net Asset Value) to each Partner's capital account. Net income or loss includes all portfolio gains and losses, whether realized or unrealized, plus all other Fund items of income (such as interest) and less all Fund expenses. Generally, net income and net loss for each month (or other period, as the case may be) will be allocated to the investors in proportion to their capital account balances as of the start of such month (or such other period). Capital account balances will reflect capital contributions, previous allocations of increases and decreases in Net Asset Value and withdrawals.

**Allocation of Taxable Income and Loss**

For income tax purposes, all items of taxable income, gain, loss, deduction and credit will be allocated among the Partners at the end of each fiscal year pro rata in proportion to their respective capital accounts in the Fund.

In light of the fact that the Fund does not intend to make distributions, to the extent the Fund's investment activities are successful, Limited Partners should expect to receive allocations of income and loss, and may incur tax liabilities from an investment in the Fund without receiving cash distributions from the Fund with which to pay those liabilities. To obtain cash from the Fund to pay taxes, if any, Limited Partners may be required to make withdrawals, subject to the limitations thereon set forth in the Fund Agreement.

In the event a Limited Partner withdraws all of its capital account from the Fund, the General Partner, in its sole discretion, may make a special allocation to such Limited Partner for income tax purposes of the net capital gains recognized by the Fund in the last year in which the withdrawing Limited Partner participated in the performance of the Fund, in such manner as will reduce the amount, if any, by which such Limited Partner's capital account exceeds its income tax basis in its Interest in the Fund before such allocation.

**Distributions**

The Fund does not expect to make any distributions to Limited Partners from profits or capital, except pursuant to requests for withdrawals and upon termination of the Fund.

**Liquidating Distributions**

Upon the termination of the Fund (as further described in the Fund Agreement), the assets of the Fund will be liquidated (or distributed) and the proceeds of liquidation will be used to pay off known liabilities and expenses of liquidation and to establish reserves for contingent liabilities. Any remaining balance will be applied and distributed in proportion to the respective capital accounts of the Partners.

**Withdrawals**

Limited Partners will be able to withdraw all or any portion of their capital account as of the close of business on the last business day of each calendar quarter (the "Withdrawal Date"), upon not less than sixty (60) days prior written notice to the General Partner, which notice period may be waived at the discretion of the General Partner. The Fund reserves the right to make withdrawal distributions in cash,

securities or a combination of both.   The General Partner may suspend or postpone the payment of withdrawal distributions under certain circumstances as set forth in the Fund Agreement.

The value of a Limited Partner's capital account is determined in accordance with the Fund Agreement, which is calculated to include original and additional capital contributions and withdrawals by a Limited Partner, increases or decreases in the Net Asset Value of the Fund and charges for unamortized organizational expenses allocable to the withdrawing Limited Partner through the Withdrawal Date.

A Limited Partner who requests a withdrawal of the value of such Limited Partner's capital account shall be paid within thirty (30) days after the Withdrawal Date.   The Fund reserves the right to retain up to ten percent (10%) of the value of such Limited Partner's capital account (calculated on the basis of unaudited data), which shall be paid within thirty (30) days after completion of the Fund's December 31 audited financial statements for the fiscal year in which the withdrawal occurs without interest.   The balance remaining will not be considered to be invested in the Fund.   In circumstances where the Fund is unable to arrange for securities positions to be liquidated in an orderly manner in order to fund withdrawals, or where the value of the assets of the Fund cannot reasonably be determined, the Fund may take longer than thirty (30) days to effect settlement of withdrawals or may suspend withdrawals.   Under certain circumstances, the Fund has the right to require the compulsory withdrawal of all or any portion a Limited Partner's Interests.

Any withdrawal that occurs within one (1) year of an investor's investment, including subsequent investments to their initial investment, will be subject to a withdrawal fee equal to two percent (2%) of the aggregate Net Asset Value per Unit of Interest liquidated by the Fund upon the withdrawal. The Fund may permit withdrawals at any time in the sole and absolute discretion of the General Partner.   If the General Partner in its discretion permits a Limited Partner to withdraw capital prior to one (1) year from the date of the investor's investment or other than on a Withdrawal Date, the General Partner may impose an additional administrative fee to cover the legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal.

The General Partner may suspend or postpone the payment of any withdrawals from capital accounts (i) in the event that Limited Partners, in the aggregate, request withdrawals of twenty-five percent (25%) or more of the value of the Fund's capital accounts as of any Withdrawal Date; (ii) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Fund's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Fund's investments impractical or prejudicial to the Partners; (iii) where any withdrawals or distributions, in the opinion of the General Partner, would result in the violation of any applicable law or regulation; or (iv) for such other reasons or for such other periods as the General Partner may in good faith determine.

Upon withdrawal of all of its capital account, a Limited Partner shall be deemed to have withdrawn from the Fund, and upon notice of such withdrawal, a Limited Partner shall not be entitled to exercise any voting rights afforded to Limited Partners under the Fund Agreement.

The General Partner may agree with a Limited Partner to establish a lock-up period for such Limited Partner's Interests.

The General Partner may, in its sole discretion and with prior written notice, require any Limited Partner to withdraw any or all of the value of such Limited Partner's capital account from the Fund.   The General Partner may withdraw all or any portion of its capital contributions to the Fund at any time, without the consent of or notice to the Limited Partners.

**Transferability of Interests**

No Limited Partner may assign or transfer its Interest (except by operation of law) without the consent of the General Partner, which consent may be given or withheld in its sole discretion. No transfer of an Interest by a Limited Partner will be permitted if it would result in termination of the partnership status of the Fund for federal income tax purposes. Transfers of Interests are subject to other restrictions set forth in the Fund Agreement, including compliance with federal and state securities laws. Due to these limitations on transferability, Limited Partners may be required to hold their Interests indefinitely unless they withdraw from the Fund in accordance with the procedures set forth in the Fund Agreement.

**Loans**

The General Partner shall have the right, in its sole and absolute discretion, upon written request of a Limited Partner (hereinafter, a "Borrowing Limited Partner"), to cause the Fund to make a loan (the "Loan") to the Borrowing Limited Partner. All Loans shall be on such terms and conditions as shall be satisfactory to the General Partner in its sole and absolute discretion; provided, however, that the following conditions shall apply to all Loans: (i) the amount of the Loan shall at all times be no greater than twenty five (25%) percent of the value of the Borrowing Limited Partner's capital account; (ii) the Loan shall be secured by a first priority perfected security interest in the Borrowing Limited Partner's capital account; (iii) the Loan shall become payable on or before a withdrawal by the Borrowing Limited Partner; (iv) the interest rate shall not be less than one (1%) percent over the prime rate per annum; and (v) the Borrowing Limited Partner shall pay all of the General Partner's and Fund's costs and expenses, including legal and accounting fees, incurred in connection with the Loan.

**Reports to Investors**

Each Limited Partner will receive the following: (i) audited annual financial statements of the Fund, (ii) copies of such Limited Partner's Schedule K-1 to the Fund's tax returns, and (iii) other reports as determined by the General Partner in its sole discretion, including monthly Net Asset Value calculations. The Fund shall bear all fees incurred in providing such tax returns and reports. The General Partner may agree to provide certain investors with additional information on the underlying investments of the Fund as well as access to the General Partner and its employees for relevant information.

**Voting Rights and Amendments**

The voting rights of the Limited Partners are very limited. Other than as explicitly set forth in the Fund Agreement, Limited Partners of the Fund have no voting rights as to the Fund or its management. Generally, the Fund Agreement may be amended only with the consent of the General Partner and Limited Partners owning more than fifty percent (50%) in outstanding Interests, except that the General Partner may amend the Fund Agreement without the consent of or notice to the Limited Partners if, in the good faith opinion of the General Partner, the amendment is clerical or inconsequential in nature and does not adversely affect the Limited Partners in any material respect.

## Liability of Investors

Except as otherwise provided by applicable law and subject to any indemnity obligations expressly set forth in the Fund Agreement, a Limited Partner's liability to the Fund, other Limited Partners or to creditors of the Fund, is limited in amount to such Limited Partner's capital contribution to the Fund. Once an Interest has been paid for in full, the holder of that Interest will have no further obligation at any time to make any loans or additional capital contributions to the Fund. No Limited Partner shall be personally liable for any debts or obligations of the Fund.

## Margin Calls

In the event the Partnership is subject to a margin call by its brokerage firm, the General Partner shall be solely responsible and liable for any amount of such margin call that exceeds the Net Asset Value of the Partnership as of the calendar month immediately proceeding the date upon which the margin call obligation becomes due and payable.

## Resignation of the General Partner

The General Partner may resign as general partner of the Fund upon thirty (30) days written notice to the Limited Partners. Upon such resignation or upon its bankruptcy or dissolution, the remaining Limited Partners will have the right to appoint a successor General Partner in accordance with the terms of the Fund Agreement. If the Limited Partners fail to appoint a successor general partner, the Fund will be dissolved pursuant to the procedures set forth in the Fund Agreement. The Fund Agreement permits the General Partner to appoint additional general partners and to transfer its general partnership interest to an affiliate of the General Partner without the consent of the Limited Partners.

## Other Activities of the General Partner, the Adviser and their Affiliates

The General Partner, the Adviser, Kyle J. Thompson and Cory H Thompson (collectively, the "Principals") and their respective personnel and affiliates are not required to manage the Fund as their sole and exclusive function. The Principals may engage in other business activities, including competing ventures and/or unrelated employment. In addition to managing the Fund's investments, the General Partner, the Adviser, the Principals and their personnel and affiliates may provide investment advice to other parties and may manage other accounts and/or establish other private investment funds in the future which employ an investment strategy similar to that of the Fund.

## Exculpation and Indemnification of the General Partner

The General Partner will generally be liable to third parties for all obligations of the Fund to the extent such obligations are not paid by the Fund or are not by their terms limited to recourse against specific assets. The General Partner shall not be liable to the Fund or the Limited Partners for any action or inaction in connection with the business of the Fund unless such action or inaction is found to constitute gross negligence or willful misconduct. The Fund (but not the Limited Partners individually) is obligated to indemnify the General Partner and its manager and members from any claim, loss, damage or expense incurred by such persons relating to the business of the Fund, provided that such indemnity will not extend to conduct adjudicated to constitute gross negligence or willful misconduct.

The foregoing notwithstanding, securities laws impose liabilities on investment advisers, issuers of securities and others under certain circumstances and nothing in the Fund Agreement will be deemed to waive or limit any right the Fund or any investor may have under any of those laws. The Fund will indemnify the General Partner (and the manager, members, and agents of the General Partner) for any

loss or liability incurred by it (or them) on behalf of the Fund or in furtherance of the Fund's business so long as it is not the result of gross negligence or willful misconduct by it (or them); provided, that neither the General Partner, its manager, members, and agents will under any circumstances be deemed grossly negligent for good faith errors of judgment where such person or entity was acting in a manner which a reasonably prudent fund manager would have believed to be in the best interest of the Fund. In addition, the Fund may pay the expenses incurred by such persons in defending a civil or criminal action in advance of the final disposition of such action, provided such persons undertake to repay such expenses if they are found, in a formal adjudication, not to be entitled to indemnification.

## Term

The term of the Fund shall continue until the Fund is dissolved in accordance with the Fund Agreement. Under the Fund Agreement, the Fund may be terminated at the election of the General Partner.

27

**-35-**

# BROKERAGE PRACTICES & CUSTODIAN

## Brokerage Arrangements

The Adviser is responsible for the placement of the portfolio transactions of the Fund and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities' exchanges or directly from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the bid and the asked price. The Adviser will not commit to provide any level of brokerage business to any broker. The Adviser may utilize the services of one or more introducing brokers who will execute the Fund's brokerage transactions through other brokers who will clear the Fund's transactions.

Securities transactions for the Fund are executed through brokers selected by the Adviser in its sole discretion and without the consent of the Fund. In placing portfolio transactions, the Adviser will seek to obtain the best execution for the Fund, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; the broker's risk in positioning a block of securities; the quality, comprehensiveness and frequency of available research services considered to be of value; and the competitiveness of commission rates in comparison with other brokers satisfying the Adviser's other selection criteria.

The Adviser is authorized to pay higher prices or commissions for the purchase of securities from or accept lower prices for the sale of securities to brokerage firms that provide it with such investment and research information if the Adviser determines such prices or commissions are reasonable in relation to the overall services provided. Research services furnished by brokers may include written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; statistics and pricing or appraisal services; discussions with research personnel; and invitations to attend conferences or meetings with management or industry consultants. The Adviser is not required to weigh any of these factors in any particular manner so long as it deems them necessary to justify such higher prices or commissions in the best interests of the Fund. Information so received is in addition to and not in lieu of services required to be performed by the Adviser, and the quarterly and Performance Fee is not reduced as a consequence of the receipt of such supplemental research information. Research services provided by broker-dealers used by the Fund may be utilized by the Adviser, and its affiliates in connection with their investment services for other clients and, likewise, research services provided by broker-dealers used for transactions of other clients may be utilized by the Adviser in performing its services for the Fund. Since commission rates in the United States are negotiable, the Adviser's selection of brokers on the basis of considerations which are not limited to applicable commission rates may at times result in the Fund being charged higher transaction costs than it could otherwise obtain solely on the basis of such costs.

## Soft Dollar Arrangements

The term "soft dollars" refers to the receipt by an investment manager of products and services provided by brokers, without any cash payment by the investment manager, based on the volume of brokerage commission revenues generated from securities transactions executed through those brokers on behalf of the investment Adviser's clients.

The Adviser may use "soft dollars" generated by the Fund to pay for research and research related services.  Section 28(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), provides a "safe harbor" to investment managers who use commission dollars generated by their advised accounts to obtain investment research and brokerage services that provide lawful and appropriate assistance to the investment manager in the performance of investment decision-making responsibilities.  Conduct outside of the safe harbor afforded by Section 28(e) is subject to the traditional standards of fiduciary duty under state and federal law.  All soft dollar arrangements made by the Fund shall be consistent with Section 28(e) or shall be with respect to services the expenses of which would otherwise be required to be paid by the Fund pursuant to the Fund Agreement.

## Referral of Investors

Under no circumstances will the Fund, the General Partner or the Adviser direct Fund brokerage business to brokers or other persons who refer prospective investors to the Fund or pay finder's fee or other compensation to such persons.

The General Partner may, however, sell Interests through broker-dealers, placement agents and other persons and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's own expense (except in circumstances involving directed brokerage).  In certain cases, the General Partner reserves the right to pay a one-time fee or sales charge, on a fully disclosed basis, to a broker-dealer or placement agent based upon the capital contribution of the investor introduced to the Fund by such broker-dealer or agent.  Any such sales charge would be assessed against the referred investor and would reduce the amount actually invested by the investor in the Fund.

## Allocation of Trades

The Adviser may at times determine that certain securities will be suitable for acquisition by the Fund and by other accounts managed by the Adviser, possibly including the Adviser's own accounts or accounts of an affiliate.  If that occurs, and the Adviser is not able to acquire the desired aggregate amount of such securities on terms and conditions which the Adviser deems advisable, the Adviser will endeavor to allocate in good faith the limited amount of such securities acquired among the various accounts for which the Adviser considers them to be suitable.  The Adviser may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including but not limited to allocations based on relative account sizes, the degree of risk involved in the securities acquired, and the extent to which a position in such securities is consistent with the investment policies and strategies of the various accounts involved.

## Aggregation of Orders

The Adviser may aggregate purchase and sale orders of securities held by the Fund with similar orders being made simultaneously for other accounts or entities if, in the Adviser's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Fund based on an evaluation that the Fund will be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors.  In many instances, the purchase or sale of securities for the Fund will be affected simultaneously with the purchase or sale of like securities for other accounts or entities.  Such transactions may be made at slightly different prices, due to the volume of securities purchased or sold.  In such event, the average price of all securities purchased or sold in such transactions may be determined, at the Adviser's sole discretion, and the Fund may be charged or credited, as the case may be, with the average transaction price.

29

**Prime Broker and Custodian**

Cybertrader, Inc., a Charles Schwab company (the "Prime Broker"), will act as the initial prime broker for the Fund, and will generally clear (on the basis of payment against delivery) the securities transactions of the Fund which are effected through other brokerage firms. The Fund may also utilize the Prime Broker, its affiliates and other brokers and dealers for the purpose of executing transactions for the Fund. Accordingly, the Prime Broker will receive substantial brokerage commissions and/or margin interest related to the securities transactions of the Fund. The Fund is not committed to continue its prime brokerage with the Prime Broker for any minimum period, and may enter into prime brokerage relationships with other brokers.

Through this arrangement, the Prime Broker will provide, among other things, the following clearing, custodial and record keeping services: (i) settlement of transactions; (ii) the transfer of record ownership of securities; (iii) the receipt and delivery of securities purchased, sold, borrowed and loaned; (iv) financing of transactions through margin loans and compliance with margin and maintenance requirements; (v) custody of securities and funds; (vi) tendering securities in connection with tender offers, mergers or other corporate reorganizations; and (vii) maintenance of accounts and records for each transaction.

The Prime Broker is a service provider to the Fund and is not responsible for the preparation of this document or the activities of the Fund and therefore accepts no responsibility for any information contained in this document. The Prime Broker will not participate in the Fund's investment decision-making process.

Penson Financial Services will be retained to serve as the initial Custodian. For its services, the Fund will pay the Custodian a reasonable custodian fee to be negotiated. The General Partner may, at its discretion, change the Custodians from time to time. No Custodian will have any part in deciding the Fund's investment policies or making the Fund's investment decisions. The Fund, however, may invest in certain obligations of the Custodians and may purchase or sell certain securities from or to the Custodians.

**Adviser**

The Adviser is currently licensed in the state of Utah as an investment adviser and is in the process of registering as an investment adviser ("RIA") with the SEC. As a result of being an RIA, the Adviser is subject to a significant amount of additional regulation which is further discussed and set forth in the section entitled "Certain Regulatory Matters – Investment Advisers Act of 1940."

## CERTAIN RISK FACTORS

The Fund is speculative and involves a high degree of risk. An investment in the Fund involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment. There can be no assurance that the Fund will successfully implement its investing program and achieve its investment objectives or that investors will not lose all or a portion of their investment in the Fund.

You should consider an investment in the Fund as a supplement to an overall investment program and should only invest if you are willing to undertake the risks involved. In addition, investors who are subject to income tax should be aware that an investment in the Fund is likely (if the Fund is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities. **Investors should carefully consider their ability to assume the following risks before making an investment in the Fund.**

### 1. Risks Associated with Selling and Writing Options

Starting with the day an option is sold, the option is subject to being exercised by the option holder at any time until the option expires. This means that the Fund is subject to being assigned an exercise at any time after it has written an option until the option expires or until it has closed out the Fund's position in a closing transaction. If assigned, the Fund may not receive notice of the assignment until one or more days after the Options Clearing Corporation (OCC) has made the assignment. Once an exercise has been assigned to the Fund, the Fund can no longer close out the assigned position in a closing transaction. In such case, the Fund must deliver (in the case of a call) or purchase (in the case of a put) the underlying security.

As covered call writers, the Fund will forego the opportunity to benefit from an increase in the value of the underlying securities above the option price while continuing to bear the risk of a decline in value. If the Fund is assigned an exercise, the net proceeds that the Fund will realize from the sale of the underlying security pursuant to the exercise could be substantially below its prevailing market price.

As "naked" or uncovered call writers, the Fund could incur large losses if the value of the underlying securities increase above the exercise price. The potential for loss is unlimited. If an uncovered call were assigned as an exercise, the Fund would have to purchase the underlying security in order to satisfy its obligation on the call. The Fund's losses would be the excess of the purchase price over the exercise price of the call reduced by the premium received for writing the call. Anything that may cause the price of the underlying security to rise dramatically, such as a strong market rally, can cause large losses.

The risk of writing put options is substantial. As a writer of put options, the Fund will bear the risk of loss if the value of the underlying securities declines below the exercise price, and such loss could be substantial if the decline is significant. In such case, the Fund would bear the risk of a decline in the price of the underlying security, potentially to zero. If the Fund were assigned an exercise in this position, the Fund would be required to purchase the underlying security at the exercise price, which could be substantially greater than the current market price of the underlying security.

### 2. Risks Associated with Writing Multiple Options in Combination

The Fund may attempt to reduce risk by purchasing other options on the same underlying securities it writes options on, and thereby assuming a "spread" position, or by acquiring other types of hedging positions in the options market. However, even when the Fund assumes a spread or other

hedging position, the risks may still be significant. Transactions that involve writing multiple options in combination, or writing options in combination with buying or selling short the underlying securities, present additional risks. For example, it may at times be impossible simultaneously to execute transactions in all of the options involved in the combination. Also, it may be difficult to execute simultaneously two or more buy or sell orders at the desired prices. There is the possibility that a loss could be incurred on both sides of a combination transaction. There is increased risk exposure that may result from the exercise or closing out of one side of a trade while the other side of the trade remains outstanding. Also, the transaction costs of combination transactions can be especially significant, since separate costs are incurred on each component of the combination.

2.   Risks Associated with "Straddle" and/or "Strangle" Writing

As described above, a "straddle" is the writing of both a put and a call on the same underlying security at the same exercise price, and a "strangle" is the writing of both a put and a call on the same underlying security at different exercise prices. Although combinations such as straddles and strangles can be used to mitigate risk or achieve specific investment objectives, it may also increase the risk of loss for the Fund. To the extent that the price of the underlying security is either above or below the exercise price by more than the combined premium, the Fund will incur losses when one of the options is exercised. In addition, if the Fund is assigned an exercise on one option position in the straddle or strangle and if the Fund fails to close out the other position, subsequent fluctuations in the price of the underlying security could cause the other option to be exercised as well. This would cause a loss on both writing positions.

3.   Performance Based Compensation

Normally, under the Investment Adviser's Act of 1940 the ("Adviser's Act"), an adviser would be prohibited from charging a performance-based fee, but pursuant to certain exceptions to the rules under the Adviser's Act, an adviser is permitted to receive such performance-based fees provided it meets certain requirements. The Fund's Limited Partnership Agreement (See Exhibit "A") provides for performance-based compensation to the General Partner, an affiliate of the Adviser, in addition to the Adviser's asset based management fees. The General Partner's performance-based fee comprises a profit sharing arrangement based on the performance of the underlying investment strategies. You should be aware that such a compensation arrangement might create an incentive for the Adviser to make investments that are riskier or more speculative than would be the case in the absence of a performance-based fee.

Additionally, the performance-based fee is earned and paid on a quarterly basis based on the performance of the Fund for each quarter. There is no deduction from the performance-based fee for losses in subsequent quarters or periods. This means that the General Partner may profit significantly for good performance during one quarter, but will not be penalized for poor performance during later quarters.

Other investment advisers or fund managers may offer investors more attractive fee arrangements for their services. For example, other advisers may establish a watermark or "hurdle rate" that must be achieved before any performance-based fee is earned or paid to an adviser. The performance-based fee could also be subject to an annual adjustment so that losses during subsequent period would offset gains from pervious periods. The existing Fund Agreement does not provide for these types of fee arrangements.

4.    **Lack of Diversification**

Unlike some investment funds which, as a matter of investment policy, diversify portfolio holdings so that no more than a fixed percentage of their assets are invested in any one industry or group of industries, the Fund will not adopt fixed guidelines for diversification of its investments and does not generally seek to minimize the risk by diversification. The Fund's portfolio may be highly concentrated and may not be diversified across a broad range of companies or industries. Consequently, unfavorable performance of one or more investments could have a material adverse impact on the aggregate returns realized by investors.

5.    **Reliance on the Adviser and Key Personnel**

The Fund is wholly dependent on the services of the Adviser and the skill and acumen of the Fund's portfolio managers, Kyle J. Thompson, Cory H Thompson and David C. Condie, to successfully direct the Fund's operations. Should the services of the Fund's portfolio managers be lost to the Fund, such loss could severely impair the Fund and its ability to produce profits for investors.

As an investor, you should be aware that you will have no right to participate in the management of the Fund, and you will have no opportunity to select or evaluate any of the Fund's investments or strategies. Accordingly, you should not invest in the Fund unless you are willing to entrust all aspects of the management of the Fund and its investments to the discretion of the Management.

6.    **Use of Leverage and Margin Accounts**

As discussed in the "Investment Objectives & Strategy" section of this Memorandum, the Fund may use leverage in the purchase and sale of securities positions. Brokerage firms will typically allow the Fund to use leverage to purchase securities through the use of "margin accounts." To the extent that a brokerage firm "calls" a margin account, however, they may require the Fund to deposit additional assets to cover or reduce the use of leverage in these accounts. The Fund may be subject to losses when a margin loan is called if the Fund is required to liquidate other positions at a loss in order to cover the margin loan.

7.    **Certain Tax Consequences**

The Fund has not obtained, nor does it plan to obtain, a private letter ruling from the IRS regarding the validity of the "Federal Income Tax Considerations" section of this Memorandum as it may apply to the Fund's activities. Such rulings, even if obtained, are not binding on the IRS. Accordingly, such discussion should not be construed as tax advice. You should consult with your own tax adviser to determine the effect an investment in the Fund will have on your own individual tax situation. In the event the IRS takes the position that the Fund is to be treated as an "investment company" and/or an "investment partnership" for tax purposes, this may result in an adverse taxable event to you based upon your contribution. Such an event would significantly reduce the overall profitability of your investment in the Fund. You should review the section entitled "Federal Income Tax Considerations" section of this Memorandum for a more complete discussion of certain aspects of the tax risks inherent in the acquisition of interests in the Fund.

8.    **Redemptions and Investor Withdrawals**

An investor's right to withdraw funds from the Fund will be subject to important limitations and withdrawal fees, which may include legal and accounting expenses, certain unamortized expenses, as well as other costs attributable to the withdrawal. In the event that substantial amounts of capital are withdrawn from the Fund, the Fund may have to liquidate investments in a manner which is not consistent with maximizing the value of the Fund and its profitability.

Substantial withdrawals by investors within a short period of time could require the Fund to liquidate securities positions more rapidly than would otherwise be desirable, possibly reducing the value of the Fund's assets and/or disrupting the Fund's investment strategy. Reduction in the size of the Fund could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Fund's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

The General Partner may, in its sole discretion at any time, require an investor to withdraw all or a portion of his or her capital account balance. Such mandatory withdrawal could result in adverse tax and/or economic consequences to the investor and the Fund.

9.    **Transfer Restrictions**

Because of the restrictions on withdrawals and the fact that Interests are not tradable, an investment in the Fund is an illiquid investment and involves a high degree of risk. An investment in the Fund should be considered only by investors who are financially able to maintain their investment over a period of years and who can afford to lose all or a substantial part of such investment. Furthermore, there is not now any market for the resale of Interests and none is expected to develop. Neither the Fund nor the Adviser, nor any of their affiliates, has agreed to make a market for the Interests. Even if a purchaser for an Interest could be found, approval of the transfer of such Interest by the Fund and satisfaction of certain requirements set forth in the Fund Agreement would be required before any such transfer could occur. In addition, Interests have not been registered under any federal or state securities laws and the Fund has no plan of undertaking any such registration. Interests may not be transferred unless registered under applicable securities law or unless appropriate exemptions from such laws are available. There is no secondary market for the investor's interest in the Fund and none is expected to develop.

10.   **Changes in Applicable Laws and Regulations**

The Fund must comply with a wide variety of laws and regulations. See "Certain Regulatory Matters" section of this Memorandum. If any of these laws or regulations change or if new laws or regulations applicable to the Fund should come into force, the Fund may experience an adverse consequence and may even be required to cease its operations and to liquidate. Such events may negatively impact the value of investors' Interests. Even without new legislation, the Internal Revenue Service, SEC, and other governmental agencies might issue new regulations, possibly with retroactive effect, which could result in adverse consequences to the Fund and its investors.

11.   **Market Disruptions & General Economic Conditions**

Events independent of the financial markets themselves have recently caused disruptions in the functioning of these markets. In the wake of the events of September 11, 2001, Investors should be aware that, were similar unfortunate external events to again disrupt capital markets, the ability of the Fund to liquidate investments might be indefinitely delayed or prevented altogether. Such disruption could effectively preclude the liquidation of certain Fund investments.

12.     **Lack of Operating History & Performance Record**

        The Fund has no operating history, and there can be no assurance that the Fund will achieve its investment objective. Although the Adviser has experience in investment analysis and in managing similar funds, the Fund has no operating history upon which potential investors may base an evaluation of the anticipated performance of the Fund. The past performance of the Adviser, or representatives of the General Partner, should not be construed as an indication of the future results of an investment in the Fund.

13.     **Valuation of Securities**

        For the purposes of the allocation of profits and losses to investors and the calculations of the fees due the Adviser and General Partner, the Net Asset Value of the Fund shall be determined in accordance with the valuation policies approved by the General Partner. Although the General Partner will attempt to value the securities on a "marked-to-market" basis using market values established pursuant to public trading activities, these values are subject to extreme volatility and may or may not accurately reflect the true values of the underlying positions subsequent to any valuation date. By the time investors receive performance reports describing the activity and value of the Fund, the reports may no longer be reliable indications of the value of the Fund assets. In addition, to the extent that the Fund invests in securities for which there is no readily ascertainable value, the investors will have to rely upon the discretion of the General Partner to value those securities in accordance with the terms of the Fund Agreement. See "Side Pocket Accounts" in "Summary of the Fund Agreement" section of this Memorandum.

14.     **Tax Exempt Entities**

        Certain prospective investors may be subject to federal and state laws, rules and regulations which may regulate their participation in the Fund, or their engaging directly, or indirectly through an investment in the Fund, in investment strategies of the types which the Fund utilizes from time to time. Each type of exempt organization is subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund. In particular, exempt organizations should consider the applicability to them of the provisions relating to "unrelated business taxable income". Investments in the Fund by entities subject to ERISA, and other tax-exempt entities require special consideration. See the sections of this Memorandum entitled "ERISA Considerations" and "Federal Income Tax Considerations."

15.     **Conflicts of Interest**

        The General Partner is accountable to the Fund as a fiduciary and, consequently, must exercise good faith and integrity in handling the business of the Fund. Nonetheless, the potential for various conflicts of interest in the operations of the Fund and the sale of Interests exists. Although the General Partner and Adviser are required to disclose conflicts of interest that it may have with the Fund or investors in the Fund, there is no assurance that any conflict of interest will not result in adverse consequences to the Fund. The following conflicts of interest should be considered carefully prior to making an investment in the Fund:

        (a)     **Services of the General Partner and its Affiliates**   The Fund Agreement does not require the General Partner, the Adviser, or their respective affiliates and personnel to devote their entire time and attention to the Fund. They are only required to devote such time and attention to the Fund as they deem appropriate and they may engage in other activities and ventures, including competing ventures and/or unrelated employment, which result in various conflicts of interest between such persons and the Fund.

(b)    **Trading by the Affiliates of the General Partner and the Adviser**   Personnel and affiliates of the General Partner and the Adviser may, in certain circumstances, invest for their own account in the same areas of investment as the Fund.  In those circumstances, it is possible that positions taken by personnel and affiliates of the General Partner and the Adviser for their own accounts may be the same as or may be taken ahead of positions taken on behalf of the Fund. The investment records of such persons will not be available for inspection by the investors and may reflect a greater rate of return than that experienced by the Fund.

If the Fund and other investment portfolios of either the General Partner or the Adviser manages seek to buy or sell the same security at the same time, the General Partner and the Adviser, unless otherwise restricted by the Fund Agreement, may combine purchase and sale orders on behalf of the Fund with orders for those other portfolios, including its own personal account or the personal accounts of its personnel and affiliates, and to allocate the securities or proceeds arising out of those transactions (and the related transaction expenses) on an average price basis among the various participants in the transactions. While the General Partner and the Adviser believes combining transaction orders in this way is, over time, advantageous to all participants, in particular cases the average price could be less advantageous to the Fund than if the Fund had been the only account effecting the transaction or had completed its transaction before the other participants.

(c)    **Other Funds**   The General Partner, the Adviser, Kyle J. Thompson, Cory H Thompson and their respective personnel and affiliates may organize additional funds operating in parallel with the Fund in certain circumstances.  Competition between any such funds and the Fund may reduce the profitability of the Fund over time.  The Fund Agreement does not place restrictions on the establishment of other funds and should be read for more information on this and the other potential areas of conflict of interest discussed above.

(d)    **Performance Fee**   The Performance Fee creates an incentive for the Adviser to effect transactions in securities that are riskier or more speculative than would be the case in the absence of such a fee.  Since the Performance Fee is calculated on a basis which includes unrealized appreciation of the Fund's assets (other than Illiquid Securities held in Side Pocket Accounts), such allocation may be greater than if it were based solely on realized gains.

16.    **Important Factors Related to Forward-Looking Statements and Associated Risks**

This Memorandum contains certain forward-looking statements.  These forward-looking statements include the plans and objectives of management for future operations, including plans and objectives relating to the future economic performance of the Fund. The forward-looking statements included herein are based on current expectations that involve a number of risks and uncertainties. Although the General Partner, the Adviser, and the Fund (collectively, the "Promoters") believe that the assumptions underlying each of these forward-looking statements are reasonable, any of the assumptions could prove inaccurate and, therefore, there can be no assurance that the results contemplated in forward-looking information will be realized.  In addition, as disclosed elsewhere under other risk factors, the business and operations of the Fund are subject to substantial risks, which increase the uncertainty inherent in such forward-looking statements.  In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Promoters or any other person that the objectives or plans of the Fund will be achieved.

17.    **No Guaranteed Returns or Distributions**

The past performance of the Adviser, or any of its affiliates, is no guarantee of future results. The Fund's performance can be volatile. The Fund Agreement does not contain provisions for a guaranteed return of investors' capital contributions. There can be no assurances that the Fund will achieve the rates of return illustrated at any point in this Memorandum or suggested by the Adviser's historical investing experience.

The General Partner does not intend to make distributions to the Limited Partners, but intends instead to reinvest substantially all Fund income and gain, if any, that might otherwise be available for distribution. Gains will also be used to pay Fund obligations or other Fund expenses. As a result, if the Fund is profitable, Limited Partners in all likelihood will be credited with Fund net income, and will incur the consequent income tax liability (to the extent they are subject to income tax), even though Limited Partners will receive little or no Fund distributions.

## 18. **Other Risks**

You should not consider the above discussion an exhaustive treatment of the risks associated with investing in the options markets. Prior to investing, you should also thoroughly review and investigate industry publications, including a booklet entitled *"Characteristics and Risks of Standardized Options"* published by the Chicago Board Options Exchange jointly with other national and regional stock exchanges. To receive a copy of this booklet, at no charge or obligation to you, please call the General Partner at (801) 733-4488.

## FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain anticipated federal income tax consequences of investing in the Fund. The discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury regulations thereunder, Internal Revenue Service ("IRS") positions and court decisions now in effect. All of the above authorities are subject to change (possibly retroactive) by legislative or administrative action.

**THE FOLLOWING SUMMARY DOES NOT DISCUSS ALL TAX CONSIDERATIONS THAT MAY BE RELEVANT TO PROSPECTIVE INVESTORS AND DOES NOT CONSTITUTE LEGAL OR TAX ADVICE. THE TAX CONSDIERATIONS CONTAINED HEREIN WERE NOT INTENDED OR WRITTEN BY THE PRACTITIONER TO BE USED AND CANNOT BE USED FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED BY THE IRS. THE TAX CONSIDERATIONS CONTAINED HEREIN WERE WRITTEN TO SUPPORT THE PROMOTION OF PARTICPATION IN THE FUND. THE TAX CONSEQUENCES OF INVESTING IN THE FUND MAY VARY DEPENDING ON THE PARTICULAR INVESTOR'S STATUS. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN INDEPENDENT TAX ADVISER AS TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF INVESTING IN THE FUND.**

No rulings have been or will be requested from the IRS concerning any of the matters described in this section. No assurance can be given that these interpretations would be accepted by the IRS or followed if they became the subject of judicial or administrative proceedings. Any adjustment to any of the positions taken by the Fund for federal income tax reporting purposes could result in the assertion of tax deficiencies against the investors.

## I. Tax Treatment of Partnership Operations

A. **Taxation as a Partnership**. The Fund is a limited partnership that intends to be classified as a partnership for federal income tax purposes. If the Fund elected to be classified as an association taxable as a corporation for federal income tax purposes under the "check the box" entity classification Regulations, the Fund's taxable income would be subject to tax at regular corporate rates and would not flow through to the investors for reporting on their returns; and distributions by the Fund to the investors would be taxable to them as dividends, to the extent of the Fund's earnings and profits, and would not be deductible by the Fund. The Fund will not elect to be classified as an association taxable as a corporation.

Nonetheless, certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership (PTP) rules. The PTP rules provide that any partnership that is publicly traded will be taxed as a corporation. "Publicly traded" for purposes of this test includes those partnerships being traded on an established securities market, a secondary market, or the substantial equivalent of a secondary market. An exception to the PTP rules is provided for partnerships that generate mostly investment-type income. Specifically, if more than 90% of a partnership's gross income is "qualifying income," the partnership will not be taxed as a corporation as long as it is not registered under the Investment Company Act of 1940. Section 7704(d) of the Code defines qualifying income to include certain types of passive investment income such as interests, dividends, gain from the sale of a capital asset or income and gains from commodities or futures, forwards, and options with respect to commodities. It is anticipated that the Fund will fall under this exception to the PTP rules.

There is another exception to the PTP rules for private placements. To meet that exception, a partnership (1) must not be required to register sales of its partnership interests under the Securities Act of

38

1933 and (2) must have no more than 100 partners. The Fund is not required to register sales of its partnership interests under the Securities Act of 1933, nor will it have more than 99 partners. Therefore, it should also fall under the private placement exception to the PTP rules. It is assumed in the following discussion of tax considerations that the Fund will be taxed as a partnership for U.S. federal income tax purposes.

B.      **Basis of Fund Interest**. Generally, an investor's adjusted tax basis in its Interest in the Fund as of any date will be equal to the cash previously contributed by it to the Interest in the Fund, increased by its distributive share of Fund income and gain, and decreased by its distributive share of Fund distributions (including withdrawals), losses and nondeductible expenses, to that date. An investor's basis in its Interest generally will also reflect the investor's adjusted basis in securities or other property which the General Partner permits such investor to contribute to the Fund.

The determination of an investor's basis in its Interest is important for a number of income tax purposes. For example, an investor's share of Fund net loss for any year may be deducted only to the extent of such investor's adjusted basis in its Interest at the end of that year. In addition, distributions of cash to an investor are generally taxable only to the extent that they exceed the investor's adjusted basis of its Interest. Finally, an investor's adjusted basis in its Interest is relevant in determining gain or loss on the sale or other taxable disposition of that Interest.

C.      **Taxation of Investors on Net Profits and Net Losses**. As a partnership, the Fund will not be subject to federal income tax, but will file an annual partnership information return with the IRS. Each investor will be required to report on its federal income tax return its allocable share of income, gain, loss, deduction or credit of the Fund for each fiscal year. Since an investor's share is the same regardless of whether or not any distribution is made to it by the Fund, the tax payable by an investor with respect to its share of Fund income and gain for any year could exceed the amount of cash distributed to it from the Fund during that year.

D.      **Allocations Pursuant to the Fund Agreement**. An investor's allocable share of Fund income, gain, loss, deduction or credit for federal income tax purposes will generally be determined in accordance with the provisions of the Fund's Limited Partnership Agreement. Under Section 704(b) of Code, and there Regulations thereunder, an allocation will be respected only if it either has "substantial economic effect" or is in accordance with the investor's respective Interests. The validity of the allocations which do not satisfy any of the "safe harbors" of the Regulations is determined by taking into account "all relevant facts and circumstances" of the economic arrangements among the investors. If any allocation required by the Limited Partnership Agreement is determined to not have substantial economic effect, the IRS will make the allocation in accordance with its determination of the investors' Interests in the Fund.

Section 754 of the Code provides for certain adjustments to the basis of Fund property upon distribution to an investor and upon transfer of an Interest, provided that the Fund has made an election pursuant to the Code. The general effect of such an election is that transferees of an Interest are treated as though they had acquired a direct interest in the Fund assets, and upon distributions to investors, the Fund is treated as though it had newly acquired an interest in Fund assets and therefore acquired a new cost basis for such assets. Any such election, once made, is irrevocable without the consent of the IRS. The General Partner has discretion as to whether or not to make tax elections. Due to the burdensome and costly record-keeping requirements involved, it is unlikely that the General Partner will make this election.

There are potential downsides to the Fund not making a Section 754 election. For example, to the extent that the Fund owns securities with unrealized gains at the time an investor acquires its Interest,

39

such investor may be allocated its share of that gain if and when it is realized by the Fund, whether or not those securities further appreciate in value before they are sold.

E.    **Treatment of Fund Distributions and Withdrawals**.  In general, no gain or loss will be recognized by an investor on distributions of property (other than cash) from the Fund.  However, gain will be recognized by an investor on Fund distributions of cash to the extent that the amount distributed exceeds the adjusted basis of the investor's Interest immediately before the distribution.  An investor will recognize a loss upon the withdrawal of its entire Interest if the cash distributed to it is less than the investor's adjusted basis in its Interest.  This gain or loss has the same character as would gain or loss realized by an investor upon a sale of its Interest.

In addition, if an investor receives a distribution of cash or other property from the Fund which is treated as received in exchange for the investor's interest in the "unrealized receivables" or "substantially appreciated inventory items" of the Fund, the investor (and the Fund, under certain circumstances) could be required to recognize gain.  The General Partner does not expect that the Fund will own significant amounts of "unrealized receivables" or "substantially appreciated inventory items."  The IRS may take the position, however, that the Fund is a "dealer" in securities, in which case the securities held by it would be considered "inventory items."  If those securities are "substantially appreciated" at the time of any distribution to an investor, it could result in the realization of ordinary income by it (and possibly by the Fund).

Upon a non-cash distribution, including a distribution of non-marketable securities, other than in liquidation of the Fund or of an investor's Interest, the basis to the investor of the property distributed generally will be equal to the lesser of (a) the Fund's basis in that property or (b) the investor's basis in its Interest.  If any property is distributed in liquidation, the investor's basis in the distributed property will generally be equal to the investor's adjusted basis in its Interest (reduced by any cash and the adjusted basis of any "unrealized receivables" or "substantially appreciated inventory items" distributed to the investor).  The property distributed will generally retain the same character in the hands of the distributee investor as it had in the hands of the Fund, and the holding period of the distributed property will include the period during which it was held by the Fund.

F.    **Limitations on Deduction of Fund Losses**.  An investor's ability to deduct its share of Fund net losses to offset income from other sources is subject to certain limitations.  First, the amount of any such losses which may be used to offset other income in a given year is limited to the lesser of (a) the investor's adjusted basis for its Interest as of the end of the year in which the loss is incurred and (b) in the case of individuals and certain closely held corporations, the amount which the investor is deemed to have economically "at risk" in the Fund.

If recognition of an investor's distributive share of Fund losses would reduce the tax basis of its Interest below zero, the recognition of those losses is deferred until such time as the recognition would not reduce the investor's basis below zero.

An investor generally will be considered "at risk" to the extent of the adjusted basis of its Interest in the Fund, less any amounts borrowed in connection with the acquisition of that Interest for which he is not personally liable and for which he has not pledged any unrelated property as security.  An investor's share of Fund losses which is not allowable in any year as a result of the "at risk" limitation is carried forward indefinitely until such time, if ever, as it is allowable under the "at risk" rules (and may also be used to offset any gain on the sale of the investor's Interest).

In addition to the basis and "at risk" limitations, under the passive activity loss provisions of the Code, certain taxpayers may not use losses from "passive activities" to offset their earned income, active

business income or portfolio income (such as interest or dividends). Instead, those losses generally may be used only to offset income from other "passive activities." The term "passive activity" includes the conduct of a "trade or business" in which the taxpayer does not materially participate. Since Limited Partners ordinarily do not materially participate in the limited partnership's activities, a Limited Partner's share of the income or loss of a limited partnership derived from a "trade or business" is usually considered income or loss from a "passive activity." However, the income or loss derived by a limited partnership from its investment activities (including interest and gain or loss from the sale or other disposition of property held for investment) is treated as portfolio income or loss and not as income or loss from a "passive activity," even if incidental to a trade or business conducted by the limited partnership. An investor's share of any portfolio losses of a limited partnership may not be used to offset his income from passive activities and, correspondingly, his losses from passive activities may not be used to offset his portfolio income. Portfolio losses may, however, be used to reduce the income from other investment activities (subject to certain limitations discussed below). The General Partner does not believe that the Fund should be treated as engaged in a "trade or business" for purposes of these rules, so that an investor's share of any income or loss of the Fund generally should constitute portfolio income or loss.

A prospective investor should consult with its tax adviser with respect to its ability to offset other income with its share of Fund losses.

G.    Sale of Fund Interest.  No market is expected to exist for the sale or exchange of Interests. Nevertheless, if an investor were to sell or otherwise dispose of any portion of its Interest, such investor would be required to recognize gain or loss in the amount of the difference between the amount realized on the sale and the basis of the Interest sold. Any gain realized upon the sale of an Interest would be treated as capital gain except to the extent that it was attributable to "unrealized receivables" or "substantially appreciated inventory items." Any loss realized upon a sale or other disposition of an Interest would be treated as a capital loss.

## II.    Tax Treatment of Fund Investments

A.    General.  Under the Code, people or entities that purchase securities to sell them to customers are considered "dealers" and the securities are considered "inventory." Dealers must recognize gains and losses differently, and are entitled to different deductions, than other people who buy and sell securities. If the Fund is considered a "dealer" and the investments are considered "inventory" certain distributions of cash or property may result in the investors' recognition of ordinary income with respect to securities that are "substantially appreciated" within the meaning of the Code. The General Partner believes that the Fund will not be considered a dealer for federal tax purposes.

Those who are not "dealers" may be classified as either "traders" or "investors." In general, "traders" are those who engage in a trade or business of buying and selling securities for their own account to take advantage of short-term price changes. "Investors" are those who buy securities for longer term appreciation. Whether one is a "trader" or an "investor" is determined not by a specific formula or objective criteria but on the basis of all the facts and circumstances in one's activities taken as a whole. If the Fund is characterized as a "trader," this characterization would also affect, among other things, the extent to which investors may deduct certain items of Fund expenses for federal income tax purposes. See "Deductibility of the Fund's Investment Expenditures," below.

The Fund generally expects to hold many of its investments for periods sufficient to cause a significant portion of the Fund's realized gains to be long-term in character. However, as to a portion of its portfolio, the Fund may engage in short-term investment strategies that may involve significant turnover as well as short-selling and other hedging activities. As a result, it is not possible to predict

41

whether, in any given tax year, the Fund will be considered a "trader" or an "investor." If the Service or a court were to disagree with the position the Fund takes in a particular year as to its status as a "trader" or an "investor," the Service could determine that some Partners had underreported their taxable income and the Fund and those Partners could be subject to interest and penalties on the resulting tax deficiencies.

Generally, the gains and losses realized by a trader or investor on the sale of securities are capital gains and losses. Thus, subject to the treatment of certain transactions described below, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses. These capital gains and losses may be long term or short term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction. Property held for more than one year generally will be eligible for long-term capital gain or loss treatment. The application of certain rules relating to short sales, to so-called "straddle" and "wash sale" transactions and to Section 1256 Contracts (defined below) may serve to alter the manner in which the Fund's holding period for a security is determined or may otherwise affect the characterization as short-term or long-term, and also the timing of the realization, of certain gains or losses. Moreover, the straddle rules and short sale rules may require the capitalization of certain related expenses of the Fund.

The maximum ordinary income tax rate for individuals is 35% and, in general, the maximum individual income tax rate for long-term capital gains is 15% (unless the taxpayer elects to be taxed at ordinary rates - see "Limitation on Deductibility of Interest" below), although in all cases the actual rates may be higher due to the phase out of certain tax deductions, exemptions and credits. The excess of capital losses over capital gains may be offset against the ordinary income of an individual taxpayer, subject to an annual deduction limitation of $3,000. For corporate taxpayers, the maximum income tax rate is 35%. Capital losses of a corporate taxpayer may be offset only against capital gains, but unused capital losses may be carried back two years (subject to certain limitations) and carried forward twenty years.

The Fund may realize ordinary income from accruals of interest and dividends on securities. The Fund may hold debt obligations with "original issue discount." In such case, the Fund would be required to include amounts in taxable income on a current basis even though receipt of such amounts may occur in a subsequent year. The Fund may also acquire debt obligations with "market discount." Upon disposition of such an obligation, the Fund generally would be required to treat gain realized as interest income to the extent of the market discount which accrued during the period the debt obligation was held by the Fund. Income or loss from transactions involving certain derivative instruments, such as swap transactions, which may be substantial, will also generally constitute ordinary income or loss.

B.   **Options**.  For options on certain broad-based stock indices, options on stock index futures, and certain other options (collectively "Section 1256 Contracts"), the Code generally applies a "mark-to-market" system of annually taxing unrealized gains and losses and otherwise provides for special rules of taxation. A Section 1256 Contract includes certain regulated futures contracts, certain foreign currency forward contracts, and certain options contracts. Under these rules, Section 1256 Contracts held by the Fund at the end of each taxable year of the Fund are treated for Federal income tax purposes as if they were sold by the Fund for their fair market value on the last business day of such taxable year. The net gain or loss, if any, resulting from such deemed sales (known as "marking to market"), together with any gain or loss resulting from actual sales of Section 1256 Contracts, must be taken into account by the Fund in computing its taxable income for such year. If a Section 1256 Contract held by the Fund at the end of a taxable year is sold in the following year, the amount of any gain or loss realized on such sale will be adjusted to reflect the gain or loss previously taken into account under the "marked to market" rules.

Capital gains and losses from such Section 1256 Contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof. Such gains and losses will be taxed under the general rules described above. If an individual taxpayer incurs a net capital loss for a year, the portion thereof if any, which consists of a net loss on Section 1256 Contracts may, at the election of the taxpayer, be carried back three years. Losses so carried back may be deducted only against net capital gain to the extent that such gain includes gains on Section 1256 Contracts.

The character of income and loss received in connection with stock options that are not Section 1256 Contracts involves a number of income tax rules. In general, gain or loss from the sale or exchange of an option has the same character as would gain or loss from a sale of the property underlying the option. The Fund generally will treat options on securities as capital assets. The remainder of this discussion assumes that treatment is appropriate.

If the Fund were to write options on stock (or on certain narrow-based stock indices), certain gains and losses would be treated as short-term capital gains or losses, regardless of the Fund's holding period for the option. Thus, for example, if an option granted by the Fund expired, the Fund would recognize a short-term capital gain equal to the amount of the premium it received for issuing the option. Similarly, if the Fund "closes" an option it has written, any gain or loss will be treated as short-term capital gain or loss.

If an option on stock (or on narrow-based stock indices) purchased by the Fund expires, the Fund generally will realize a short-term or long-term capital loss equal to the cost of the option, depending upon the holding period for the option. Similarly, if the Fund were to resell that option, it generally would realize a short-term or long-term capital gain or loss, depending on the holding period for the option. The acquisition of a put option is treated as a short sale (discussed below), and thus may affect the holding period of any securities the Fund owns at the time it buys the put that are of the same class as those underlying the put.

C.    **Short Sales**. Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands. Except with respect to certain situations where the property used to close a short sale has a long-term holding period on the date the short sale is entered into, gains on short sales generally are short-term capital gains. A loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year. In addition, these rules may also terminate the running of the holding period of "substantially identical property" held by the Fund.

Gain or loss on a short sale will generally not be realized until such time that the short sale is closed. However, if the Fund holds a short sale position with respect to stock, certain debt obligations or partnership interests that has appreciated in value and then acquires property that is the same as or substantially identical to the underlying property, the Fund generally will recognize gain on the date it acquires such property as if the short sale were closed on such date with such property. Similarly, if the Fund holds an appreciated financial position with respect to stock, certain debt obligations, or partnership interests and then enters into a short sale with respect to the same or substantially identical property, the Fund generally will recognize gain as if the appreciated financial position were sold at its fair market value on the date it enters into the short sale. The subsequent holding period for any appreciated financial position that is subject to these constructive sale rules will be determined as if such position were acquired on the date of the constructive sale.

    D.    **Effect of Straddle Rules on Partners' Securities Positions**.  Under the Code, the Service may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Fund as "straddles" for federal income tax purposes.  The application of the "straddle" rules in any such case could affect a Partner's holding period for the securities involved and could defer the recognition of losses with respect to such securities.

    E.    **Application of Anti-Conversion Rules**.  The application of Code Section 1258 may cause what would otherwise be capital gain from certain types of transactions (such as "straddles") to be taxed at ordinary income rates to the extent that the gain results primarily from the time value of the taxpayer's investment.

    F.    **Limitation on Deductibility of Interest**.  For noncorporate taxpayers, Section 163(d) of the Code limits the deduction for "investment interest" (i.e., interest or short sale expenses for "indebtedness incurred or continued to purchase or carry property held for investment"). Investment interest is not deductible in the current year to the extent that it exceeds the taxpayer's "investment income," consisting of net gain and ordinary income derived from investments in the current year. For this purpose, any long-term capital gain is excluded from investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates.

    For purposes of this provision, the Fund's activities will be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a noncorporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. In such case, a noncorporate Limited Partner would be denied a deduction for all or part of that portion of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it had sufficient investment income from all sources including the Fund. A Limited Partner that could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry forward such losses to future years, subject to the same limitation. The investment interest limitation would also apply to interest paid by a noncorporate Limited Partner on money borrowed to finance its investment in the Fund. Potential investors are advised to consult with their own tax advisers with respect to the application of the investment interest limitation in their particular tax situations.

    G.    **Deductibility of the Fund's Investment Expenditures**.  In years in which the Fund is treated as an "investor," individual Limited Partners will not be entitled to deduct their share of the Fund's investment expenses, including operating and advisory expenses and certain other expenses that relate to investment activities, unless, and only to the extent, their share of those expenses, together with their other "miscellaneous" itemized deductions, exceed 2% of his or her adjusted gross income for the year.  This limitation would also apply to Limited Partners that are "pass-through" entities, such as partnerships, to the extent the owners of those entities were individuals.  In years in which the Fund is treated as a "trader," each Partner should be allowed fully to deduct his or her allocable share of the ordinary and necessary expenses incurred by the Fund in connection with the Fund's "trade or business," including management expenses.

    H.    **Application of Rules for Income and Losses from Passive Activities**.  The Code restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity. This restriction applies to individuals, personal service corporations and certain closely held corporations. Pursuant to Temporary Regulations issued by the Service, income or loss from the Partnership's securities investment and trading activity generally will not constitute income or loss from a passive activity. Therefore, passive losses from other sources generally could not be deducted against a Limited Partner's share of such income and gain from the Partnership.

I.    **Capital Gains and Losses**.  Under Section 1211 of the Code, any net capital losses allocated to a Limited Partner for a taxable year will be deductible by the Limited Partner (i) to the extent of the Partner's capital gains in the case of a corporation or (ii) to the extent of the Partner's capital gains plus $3,000 in the case of an individual. An individual Limited Partner will be entitled to carry forward any unused capital loss indefinitely to succeeding taxable years and a corporate Limited Partner will generally be entitled to a two-year carryback and a twenty-year carryforward of any unused capital loss.

## III.    Miscellaneous Tax Items

A.    **Audit of Tax Returns**.  Any income tax return filed by the Fund may be audited by the IRS. Any adjustments resulting from an IRS audit could require the investors to file amended tax returns and may lead to an audit of an investor's own return, whether or not such investor is required to file an amended return. Any audit of an investor's tax return could result in the adjustment of non-Fund as well as Fund items.

In general, Fund tax audits will be handled administratively at the Fund level with the General Partner as the "tax matters partner" in a unified limited partnership proceeding rather than in separate proceedings against the investors. If the results of an audit are disputed, the tax matters partner has the right to seek judicial review and, if it files a lawsuit, no other investor may file suit. Any settlement with the IRS or a court decision at the Fund level would be binding on the investors.

B.    **State and Local Taxes**.  In addition to the federal income tax consequences described above, investors should consider the potential state and local tax consequences of an investment in the Fund. An investor's share of the income or losses of the Fund may or may not be taken into consideration for state or local income tax purposes, depending upon the location of its domicile or residence, the sources of its other income and applicable state laws, local ordinances and regulations. Also, depending on the applicable state and local tax laws, some deductions and credits that are available to investors for federal income tax purposes may not be available for state or local tax purposes. Each investor should consult its own tax adviser to determine if and to what extent its Fund income, gains, losses, deductions and credits have tax consequences in the state and locality in which it is a resident.

C.    **Foreign Limited Partners**.  The rules governing the United States federal income taxation of nonresident alien individuals, foreign corporations, foreign partnerships and other foreign Limited Partners (collectively, "Foreign Limited Partners") are complex and include special rules relating to foreign investment in United States real estate companies.  Prospective Foreign Limited Partners should consult with their own tax advisers to determine the impact of United States federal, state and local income and other tax laws with regard to an investment in the Fund, including any reporting requirements.

D.    **General Caveats**.  The above summary is based upon the relevant law as it existed on the date of this Memorandum. There can be no assurance that some of the positions taken by the Fund will not be successfully challenged by the IRS. Furthermore, Congressional Committees are considering and will continue to consider legislative proposals to revise the income tax laws or to raise additional revenues by other means, any of which, if enacted, could adversely affect the tax consequences of an investment in the Fund. Each investor is encouraged to consult with its tax adviser regularly regarding the status of proposed changes in the tax laws, with specific reference to its own situation.

## IV.   Tax-Exempt Investors

**THE FOLLOWING IS INTENDED ONLY AS A GENERAL DISCUSSION OF CERTAIN CONSIDERATIONS APPLICABLE TO TAX-EXEMPT INVESTORS. THE PROVISIONS OF THE CODE ARE COMPLEX AND ARE SUBJECT TO EXTENSIVE AND CHANGING ADMINISTRATIVE AND JUDICIAL INTERPRETATION AND REVIEW. FURTHERMORE, THE APPLICABLE CONSIDERATIONS MAY VARY WITH THE PARTICULAR CIRCUMSTANCES OF AN INVESTOR. ACCORDINGLY, EACH INVESTOR SHOULD CONSULT WITH ITS OWN ADVISERS WITH RESPECT TO THE POSSIBLE CODE CONSEQUENCES OF INVESTING IN THE FUND.**

Tax-exempt employee benefit plans, including corporate employee benefit and profit-sharing plans, simplified employee benefit plans, Keogh plans and IRAs, are generally exempt from federal income tax except to the extent of their "unrelated business taxable income" ("UBTI"). In principle, a tax-exempt investor's distributive share of the Fund's income should consist principally of dividends, interest and capital gain from corporate stock and corporate securities – types of income that are expressly excluded from UBTI. However, any debt incurred by the Fund to acquire securities may cause income from such securities be treated as UBTI (sometimes referred to as "debt-financed" UBTI).

In addition, the Fund may invest in securities (including equity interests in partnerships and limited liability companies engaged in business) that will generate UBTI. Each tax-exempt investor would generally be subject to U.S. federal income taxation on its share of any UBTI earned by the Fund (and the receipt of UBTI could give rise to additional tax liability for certain limited categories of tax-exempt investors).

Finally, if a tax-exempt investor borrows any amount to fund its capital contributions to the Fund, some or all of its, distributive share of income from the Fund could be debt-financed UBTI. Borrowings to bridge capital calls could also create debt-financed UBTI.

Any break-up fees or closing, monitoring, retainer and/or consulting fees from portfolio companies (collectively, "Portfolio Company Fees") will be paid directly to, or at the direction of, the General Partner, which will then, subject to the terms of the Fund Agreement, reduce future management fees otherwise payable by the Fund. A tax-exempt investor should not be deemed to have received any portion of such Portfolio Company Fees. There is, however, a risk that the IRS might take the position that a tax-exempt investor should be treated as having received a portion of such fees and, if such fees were regularly received by the Fund, the tax-exempt investor's share of such fees could be treated as UBTI.

No assurance can be given that the IRS will concur with the foregoing opinion or the tax consequences set forth above. No ruling has been or will be requested by the Fund from the IRS as to such matters.

Each prospective investor is advised to consult its own tax counsel as to the federal income tax consequences of an investment in the Fund and as to applicable state and local and foreign tax consequences as well. Special considerations may apply to prospective investors who are not United States persons or entities, and such investors are advised to consult their tax advisers with regard to the United States, state and foreign tax consequences of an investment in the Fund.

# ERISA CONSIDERATIONS

**THE FOLLOWING IS INTENDED ONLY AS A GENERAL DISCUSSION OF CERTAIN CONSIDERATIONS APPLICABLE TO BENEFIT PLANS UNDER ERISA AND THE CODE. THE PROVISIONS OF ERISA AND THE CODE ARE COMPLEX AND ARE SUBJECT TO EXTENSIVE AND CHANGING ADMINISTRATIVE AND JUDICIAL INTERPRETATION AND REVIEW.   FURTHERMORE, THE APPLICABLE CONSIDERATIONS MAY VARY WITH THE PARTICULAR CIRCUMSTANCES OF AN INVESTOR. ACCORDINGLY, EACH INVESTOR SHOULD CONSULT WITH ITS OWN ADVISERS WITH RESPECT TO THE POSSIBLE ERISA AND CODE CONSEQUENCES OF INVESTING IN THE FUND.**

An investment of employee benefit plan assets in the Fund may raise issues under the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the U.S. Internal Revenue Code of 1986, as amended (the "Code"). Certain of these issues are described below.

## General Fiduciary Matters

ERISA and the Code impose certain duties on persons who are fiduciaries of a plan and prohibit certain transactions involving the assets of a plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of the Plan (as defined below), or the management or disposition of the assets of a Plan or who renders investment advice for a fee or other compensation to the Plan, is generally considered to be a fiduciary of the plan.

In considering an investment in the Fund of a portion of the assets of any employee benefit plan (including a "Keogh" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "Plan"), a fiduciary should determine, in light of the high risks and lack of liquidity inherent in an investment in the Fund, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan, if the General Partner or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "party in interest") with respect to the Plan.

## Plan Assets

ERISA and the Code do not define "plan assets." However, regulations promulgated under ERISA by the U.S. Department of Labor (the "Plan Asset Regulations") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company," in each case as defined in the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" if they hold, in the aggregate less than 25% of the value of any class of such entity's equity, excluding equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof.   For purposes of this 25% test (the "Benefit Plan Investor Test"), "benefit plan investors" generally include all employee benefit plans, whether or not subject to ERISA or the Code, including "Keogh" plans, individual retirement accounts ("IRAs") and pension plans maintained by foreign

corporations, as well as any entity whose underlying assets are deemed to include Plan assets under the Plan Asset Regulations (e.g., an entity of which 25% or more of the value of any class of equity interests is held by employee benefit plans or other benefit plan investors and which does not satisfy another exception under the Plan Asset Regulations). Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests of the Fund were held by benefit plan investors, an undivided interest in each of the underlying assets of the Fund would be deemed to be "plan assets of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Fund." If, however, all of the benefit plan investors are IRAs, the Benefit Plan Investor Test will not apply since IRAs are not subject to ERISA.

The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act and it is not expected that the Fund will qualify as an "operating company" under the Plan Asset Regulations. Consequently, the General Partner intends to use reasonable effort either to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Fund or to provide that investment by benefit plan investors in the Fund will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Fund to less than 25% of the value of any class of Interests in the Fund as described above. However, each Plan fiduciary should be aware that even if the Benefit Plan Investor Test were met at the time a Plan acquires Interests in the Fund, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or redemptions of Interests in the Fund, and that Interests held by benefit plan investors may be subject to mandatory redemption or withdrawal in such event in order to continue to meet the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Fund, the Fund will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Fund will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Fund will not otherwise be deemed to include ERISA plan assets.

### Plan Asset Consequences

If the assets of the Fund were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Fund and (ii) certain transactions in which the Fund might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the General Partner and any other fiduciary that has engaged in the prohibited transaction could be required (i) to restore to the Plan any profit realized on the transaction and (ii) to reimburse the Plan for any losses suffered by the Plan as a result of the investment. In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. Plan fiduciaries that decide to invest in the Fund could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Fund or as co-fiduciaries for actions taken by or on behalf of the Fund or the General Partner. With respect to an IRA that invests in the Fund, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA, to lose its tax-exempt status.

Under the Fund Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Fund characterized as plan assets including, without limitation, the right to exclude a Limited Partner from an investment or to require the withdrawal of a Limited Partner's Interests in the Fund. While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

Each plan fiduciary should consult its own legal adviser concerning the considerations discussed above before making an investment in the Fund.

49

## CERTAIN REGULATORY MATTERS

The Fund and the General Partner, including certain affiliates, are subject to various federal and state securities and other laws that may limit the Fund's activities and, under certain circumstances, subject the Fund to substantial sanctions if it did not comply. In addition, other securities and similar laws would subject the Fund to further restrictions if the Fund did not adhere to the requirements for exemptions from some or all of the provisions of those laws.

### The Investment Company Act of 1940

If the Fund were considered an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "ICA"), it would be subject to numerous requirements and restrictions relating to its structure and operation. If the Fund were required to register as an investment company under the ICA and to comply with these requirements and restrictions, it would have to make significant changes in its proposed structure and operations, which could adversely affect its business.

The Fund intends, however, to operate in a manner that will permit it to be excluded from the definition of "Investment Company" under Section 3(c) (1) of the ICA. That Section excludes (for most purposes) issuers whose securities are beneficially owned by not more than 100 persons and have not been offered publicly. Generally, if a corporation, partnership or other entity owns an Interest in the Fund, the Interest will be deemed "beneficially owned" by only one person unless, under certain circumstances, the corporation or other entity owns 10% or more of the outstanding voting securities of the Fund. As a result of these provisions, the General Partner generally expects to limit the amount that any corporation, partnership, or other entity may invest in the Fund. The General Partner may also require the complete or partial withdrawal by a Limited Partner should the Limited Partner's continued investment in the Fund jeopardize the Fund's exemption from registration and regulation under the ICA. Each prospective investor will be required to make certain representations and undertakings to assure that this exemption will be available to the Fund on an ongoing basis.

The interpretations relating to beneficial ownership are complex and, in some cases, unclear. Under certain interpretations, it is possible that, under some circumstances, multiple investment partnerships with the same investment objectives can be "integrated" for purposes of determining whether they have more than 100 beneficial owners. As a result, there can be no assurance that the Fund will not be considered to have more than 100 "beneficial owners," and therefore to be ineligible for the exclusion under Section 3(c)(1). Should that exclusion cease to be available to the Fund, the Fund and the General Partner could be subject to legal action by the SEC and others, possibly resulting in financial losses to the Fund and the termination of the Fund's business.

Investors should be aware that, although the General Partner believes registration and regulation under the ICA would subject the Fund to expenses and limitations on its operations that would impair the Fund's ability to achieve its investment objectives, the ICA does provide protections that will not be available to investors in the Fund. For example the Fund would be required to have a board of directors, a majority of which would, as a practical matter, need to be independent of the General Partner, and the Fund would be restricted in its relationship with and compensation to affiliated persons (such as the General Partner) and its capital structure. In addition, the ICA requires an investment company to state definite policies as to certain enumerated types of activities and, in some cases, forbids the investment company from changing those policies without Limited Partner approval. By contrast, the Fund's investment activities, as described above in "Investment Objectives & Strategy," provide the General Partner with extremely broad discretion to determine and to change the Fund's investment program without consulting the Limited Partners.

## Securities Dealer Status

Although the General Partner believes the Fund is not a "dealer" within the meaning of the Securities Exchange Act of 1934 and, accordingly, does not intend to register the Fund as such, it is possible that the SEC or a court could find that the Fund's business does make it a "dealer." In such an event, the Fund could be fined, and could be prevented from continuing its business, either temporarily or permanently. If the Fund were required to register as a "dealer," its operating expenses would increase significantly, its activities would be restricted, and its profitability would suffer.

## Investment Adviser Regulation

The Adviser is currently a licensed investment adviser in the state of Utah, as in the process of applying for registration as a registered investment adviser with the SEC ("SEC"). Upon being registered as an investment adviser with the SEC, the Adviser will be subject to a variety of regulatory filing, record-keeping, and governance rules and requirements, some of which are set forth below.

In general, investment advisers who are deemed to have "custody" of client funds must comply with the requirements of Rule 206(4)-2 of the Adviser's Act. This rule, among other things, requires advisers to maintain client funds with a qualified custodian and provide clients with audited financial statements within 120 days of the end of each calendar year. Failure to adhere to these rules constitutes a "fraudulent, deceptive or manipulative act, practice or course of business" under the Adviser's Act.

Investment advisers are also subject to other affirmative disclosure requirements with respect to their clients. Among other obligations, investment advisers must deliver to a potential client a copy of Part II of such investment adviser's Form ADV prior to being retained by the client, a copy of which is attached to this Memorandum. Additionally, investment advisers are required to disclose to clients (i) any financial condition of the adviser that is reasonably likely to impair the ability of the adviser to meet contractual commitments to clients and (ii) a legal or disciplinary event that is material to the evaluation by the client of the adviser's integrity or ability to meet contractual commitments to clients.

In addition, investment advisers must maintain and preserve certain books and records, among other documents, including each of the following: (1) financial records, statements and ledgers, including information regarding all receipts and disbursements made by the investment adviser relating to the business; (2) written documentation relating to most client communications, including agreements, powers of attorney, transaction orders, circulars, and recommendations to clients; (3) a list of all accounts in which the investment adviser is vested with any discretionary power with respect to the funds, securities or transactions of any client; (4) copies of the investment adviser's required code of ethics and compliance policies and records relating to any violations thereof; (5) a copy of Part II of such investment adviser's Form ADV; (6) records and receipts relating to the making of any cash payments to solicitors on behalf of the investment adviser; and (7) account statements or other documents necessary for the determination of the performance or rate of return of a fund.

Certain other substantive restrictions on activities apply to investment advisers. In general, investment advisers may not receive performance based compensation for investment advisory services rendered, unless the adviser provides clients with proper disclosure regarding the fee arrangement and provided that the clients meet certain wealth, sophistication or other requirements. If the Fund fails to adhere to these requirements, the payment of the contemplated performance fee may violate these rules and could result in disciplinary action by the SEC. Additionally, registered investment advisers are subject to certain limitations on their ability to advertise their services, including limitations on the use of client testimonials and on references to specific profitable recommendations made by the investment adviser. Also, an investment adviser cannot make cash payments to solicitors of personal clients for the

investment adviser, unless (i) such payment is made pursuant to a written agreement detailing certain restrictions on the solicitor, (ii) the client is provided with a written disclosure statement by both the investment adviser and the solicitor, (iii) the client acknowledges in writing the receipt of such disclosure statements prior to entering into the advisory relationship, and (iv) the investment adviser makes a bona fide effort to ascertain the solicitor's compliance with the agreement and has a reasonable basis for believing the solicitor has complied. Finally, investment advisers are required to maintain an ethics and compliance policy regarding their activities.

If, in the course of its activities (both those relating to the Fund and others), the General Partner or the Adviser were found to have violated the custody-related requirements or any other applicable laws or regulations applicable to investment advisers, it could be subject to significant penalties and sanctions and its ability to manage or advise the Fund's investment portfolio could be impaired.

## Private Placement Status

The limited partnership Interests described in this Memorandum are not registered under the Securities Act of 1933, as amended (the "Securities Act"), or state securities laws in reliance upon the exemptions for transactions not involving a public offering. As a purchaser of such Interests in a private placement not registered under the Securities Act, each investor will be required to make certain representations to the Fund, including that it is acquiring such interests for investment and not with a view to resale or distribution, and that it is an accredited investor as defined in Regulation D of the Securities Act. Further, each investor must be prepared to bear the economic risk of his, her or its investment for an indefinite period, since these Interests cannot be sold unless they are subsequently registered under the Securities Act or an exemption from such registration is available. It is extremely unlikely that the limited partnership Interests will ever be registered under the Securities Act.

During the course of the transaction and prior to sale, each purchaser of the Interests and its purchaser representatives, if any, are invited to ask questions of the General Partner and other representatives of the General Partner concerning the terms and conditions of the offering. Each prospective purchaser may request additional information necessary to verify the accuracy of the information furnished in this memorandum, and the Promoters will endeavor to provide such information if it can be acquired without unreasonable effort or expense and if it can be provided to such prospective purchaser without violating contractual restrictions by which any of the Promoters is bound.

## CUSTOMER IDENTIFICATION PROGRAM

To comply with the Fund's responsibilities under applicable anti-money laundering and trade sanction laws and regulations, as part of the Fund's Customer Identification or "Know Your Customer" Program, before engaging in a transaction with a prospective investor, the Fund may request certain information and documentation from the prospective investor in order to (a) confirm the identity of such investor (and such investor's beneficial owners or control persons, if any) and (b) ascertain whether applicable anti-money laundering or trade sanction laws, rules or regulations prohibit us from engaging in the proposed transaction with such investor. Among other things, the Fund may check lists maintained by governmental agencies, including the Department of the Treasury's Office of Foreign Assets Control ("OFAC"), to determine whether the prospective investor (or such investor's beneficial owners or control persons, if any) appear on such lists. Depending on the circumstances, applicable law, rules or regulations may require or allow the Fund to provide certain information (e.g., currency transaction reports, suspicious activity reports, etc.) to governmental agencies.

**-48-**

## PRIVACY POLICY

This privacy policy explains the manner in which the Fund, the Adviser, and the General Partner (collectively, the "Fund") collect, utilize and maintain nonpublic personal information about the Fund's investors, as required under recently enacted Federal legislation.  This privacy policy only applies to nonpublic information of investors who are individuals (not entities).

### Collection of Investor Information

The Fund collects personal information about its investors mainly through the following sources:

- Subscription forms, investor questionnaires and other information provided by the investor in writing, in person, by telephone, electronically or by any other means. This information includes name, address, nationality, tax identification number, and financial and investment qualifications; and

- Transactions within the Fund, including account balances, investments and withdrawals.

### Disclosure of Nonpublic Personal Information

The Fund does not sell or rent investor information.  The Fund does not disclose nonpublic personal information about its investors to nonaffiliated third parties or to affiliated entities, except as permitted by law.  For example, the Fund may share nonpublic personal information in the following situations:

- To service providers in connection with the administration and servicing of the Fund, which may include attorneys, accountants, auditors and other professionals.  The Fund may also share information in connection with the servicing or processing of Fund transactions;

- To affiliated companies in order to provide you with ongoing personal advice and assistance with respect to the products and services you have purchased through the Fund and to introduce you to other products and services that may be of value to you;

- To respond to a subpoena or court order, judicial process or regulatory authorities;

- To protect against fraud, unauthorized transactions (such as money laundering), claims or other liabilities; and

- Upon consent of an investor to release such information, including authorization to disclose such information to persons acting in a fiduciary or representative capacity on behalf of the investor.

### Protection of Investor Information

The Fund's policy is to require that all employees, financial professionals and companies providing services on its behalf keep client information confidential.

The Fund maintains safeguards that comply with federal standards to protect investor information.  The Fund restricts access to the personal and account information of investors to those employees who need to know that information in the course of their job responsibilities.  Third parties with whom the Fund shares investor information must agree to follow appropriate standards of security and confidentiality.

The Fund's privacy policy applies to both current and former investors.  The Fund may disclose nonpublic personal information about a former investor to the same extent as for a current investor.

Changes to Privacy Policy

The Fund may make changes to its privacy policy in the future.  The Fund will not make any change affecting you without first sending you a revised privacy policy describing the change.

-49-

EXHIBIT A

LIMITED PARTNERSHIP AGREEMENT
OF
APEX EQUITY OPTIONS FUND, LP

---

EXHIBIT B

ADVISER'S FORM ADV

---

EXHIBIT C

FORM OF
SUBSCRIPTION AGREEMENT

---