UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
RICHARD KELTER, individually and as
Trustee of the RICHARD KELTER TRUST
DATED JUNE 30, 2004,

Plaintiff,

- against -

APEX EQUITY OPTIONS FUND, LP, APEX
EQUITY MANAGEMENT, LLC, KYLE J. THOMPSON,
CORY H. THOMPSON, THOMPSON CONSULTING,
INC., SHERWOOD FINANCIAL, INC., E. SHERMAN
WARNER, M&K HOLDINGS, LLC, MICHAEL T.
MORLEY, KRYSTIN P. MORLEY, MTM LTD. and
WILLOWBEND PROPERTY COMPANY,

Defendants.
-----------------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8 24 09

**MEMORANDUM & ORDER**

08 Civ. 2911 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Richard Kelter, individually and as a trustee of
the Richard Kelter Trust dated June 30, 2004, filed his first
amended complaint on November 19, 2008 alleging, inter alia: (1)
securities fraud against Apex Equity Options Fund, LP, Apex
Equity Management, LLC, Kyle J. Thompson, Cory H. Thompson,
Thompson Consulting, Inc., Sherwood Financial, Inc. ("Apex
defendants") and E. Sherman Warner; and (2) that the Apex
defendants fraudulently conveyed at least $3,000,000 to M&K
Holdings, LLC, Michael T. Morley, Krystin P. Morley, MTM LTD.
and Willowbend Property Company ("Morley defendants").  The Apex
defendants now bring a motion to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6) arguing that plaintiff failed to state a claim for securities fraud under § 10(b) of the Securities Exchange Act (15 U.S.C. § 78(j)) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) ("Rule 10b-5"). For the following reasons, defendants' motion is granted and this case is dismissed.[1]

## BACKGROUND[2]

### I. The Apex Fund

Defendants Kyle Thompson and Cory Thompson, and David C. Condie founded Thompson Consulting and Sherwood Financial some time before March 1, 2005. (First Amended Complaint ("Compl.") ¶ 25.) Thereafter, defendants Kyle Thompson, Cory Thompson, Thompson Consulting, Sherwood Financial and Sherman Warner, along with Condi, founded the Apex Equity Options Fund ("the Apex fund") as a limited liability partnership with Apex Management serving as the general partner. (Id.)

In the spring of 2005, plaintiff Richard Kelter received a Private Placement Memorandum ("PPM") for the Apex fund from WealthWise, LLC ("WealthWise"), a registered investment advisor, and Jeffrey Forrest, a WealthWise employee. (Id. ¶¶ 28, 32.)

---

[1] Also pending before the Court is a motion filed by the Morley defendants seeking to dismiss this case for lack of personal jurisdiction. This motion is mooted by this opinion for the reasons discussed below.

[2] All facts are taken from Plaintiff's first amended complaint and the attached exhibits unless otherwise noted.

2

The lengthy PPM contains many statements about the fund's strategy and expected returns as well as language about various risks associated with investing in the fund. (Id. ¶¶ 28, 29; Compl. Ex. A.) The purchased limited partnership interests in the fund totaled approximately $40 million. (Compl. ¶ 31.)

On July 15, 2005, Forrest sent his clients, including Kelter, a memorandum ("WealthWise Memorandum") he prepared after meeting with the principals of Thompson Consulting that outlined the investment process to be used by the Apex defendants. (Id. ¶¶ 33, 34.) The complaint alleges that the Apex defendants and Sherman Warner represented to WealthWise and Forrest that the Apex investment process protects principal, that the investment is liquid at all times, that the principal is set in an account that earns approximately 2% interest, that the process sells options on both sides of the market, and that the monthly expected rate of return is 3% net of all fees (or approximately 36% a year assuming yearly compounding). (Id. ¶ 35.) Additionally, Kelter participated in a meeting in San Luis Obispo County, California ("the San Luis Obispo meeting") with Kyle Thompson and others where the Apex fund was marketed. (Id. ¶ 37.) During this meeting, plaintiff alleges that Kyle Thompson represented to plaintiff that his principal would not be put at risk. (Id.)

On or around September 2005, Kelter invested $250,000.00 in

the fund.  (Id. ¶ 40.)  By May 2006, his total contribution was
$3,980,000.00.  (Id.)  Over the course of his investment, Kelter
also withdrew approximately $146,611.52 from his account, making
his net investment $3,833,388.48.  (Id.)

During 2007, the Fund neither provided the returns nor
followed the strategy that Kelter claims were represented to
him.   (Id. ¶ 43-47.)   Kelter claims that these lower-than-
expected returns caused him to question the prudence of his
investment with Apex and that Apex, recognizing this waning
confidence, caused WealthWise to send Kelter and the other Apex
fund investors a memorandum ("March 6, 2007 Memorandum") which
reported a promising outlook for the Apex fund in the future.
(Id. ¶ 48.)  Additionally, Kyle Thompson sent a letter on April
15, 2007 ("April 15, 2007 Letter") to Kelter and the other Apex
investors   expressing   confidence   in   the   fund's   future
performance.  (Id. ¶ 49.)

In the summer of 2007, in response to recent market
movements, Kyle Thompson sent an e-mail ("August 9, 2007 E-
Mail") to Forrest about the state of the fund.  (Id. ¶ 54.)  In
it, he stated that "we are working feverishly, adjusting
according to the strategy and making decisions specifically for
end of quarter results, which we anticipate will be very good.
The strategy is performing very well and we'll continue giving
our best to it."  (Id.)

4

Within two weeks thereafter, on August 22, 2007, Kyle Thompson sent a letter ("August 22, 2007 Letter") to his investors informing them of a "near-total loss" in the value of his fund as of August 16, 2007. The loss was due, according to plaintiff, to a large purchase of unhedged call contracts[3] on the Chicago Board Options Exchange Volatility Index ("VIX"), a measure of market volatility. (Id. ¶ 61-62.) The VIX experienced an 11% increase on that day, which was unusually high. See Angela Pruitt, Investors Bet on Countrywide to Fall Further, Wall St. J., August 16, 2007, at C5 ("The Chicago Board Options Exchange market-volatility index, or VIX, shot up 11% to 30.67, a higher level than during other recent volatile market sessions. Derived from options on the Standard & Poor's 500-stock index, the VIX is a key measure of near-term volatility."). Plaintiff believes that defendants' failure to buy put contracts on the VIX in concert with the call contracts

---

[3] According to the PPM, a call option gives the buyer the right, but not the obligation, to buy a security at a specific price within a specific time-frame. (Compl. Ex. A PPM at 15.) A put option gives the holder the right, but not the obligation, to sell a security at a specific price within a period of time. (Id.) The seller of these derivatives has the obligation to sell a security at a certain price for a call option or buy a security at a certain price for a put option. (Id.) The main "hedging" mechanism outlined in the PPM is to either "straddle" or "strangle." (Id. at 32.) The differences between "straddling" and "strangling" are irrelevant for the purposes of this motion. Fundamentally, both require buying or selling both call and put options for the same security in order to "mitigate risk." (Id.)

5

led to the loss and contradicted the strategy Apex defendants represented to plaintiff that they would pursue.  (Compl. ¶ 72.)

## II. **The Morley Transfer**

The second aspect of plaintiff's complaint involves the Morley defendants.  Plaintiff alleges that Michael Morley and Krystin Morley, husband and wife, were the beneficial owners of M&K Holdings, LLC, a Utah limited liability corporation.  (Id. ¶¶ 15-17.)  Plaintiff further alleges that another Utah corporation, MTM Ltd., along with M&K Holdings, are the alter egos of, agents for, and co-conspirators with Michael and Krystin Morley.  (Id. ¶ 18.)  Additionally, plaintiff alleges that Michael Morley has an interest in a company called Willowbend Property Company, LLC, another Utah limited liability corporation.  (Id. ¶ 19.)  Plaintiff alleges that when the value of the M&K Holdings account that Thompson Consulting managed declined, Apex defendants transferred at least $3 million to these various entities.  (Id. ¶¶ 73-86.)  Though styled as loans, plaintiff alleges that these loans were merely a means by which Apex defendants fraudulently conveyed money to the Morley defendants and that no party ever intended these loans to be repaid.  (Id. ¶ 161.)

## III. **The SEC Enforcement Action**

On March 4, 2008, the Securities and Exchange Commission filed a complaint in the District of Utah, SEC v. Thompson

6

Consulting et al., 2:08-cv-00171(BSJ), against Thompson Consulting, Inc., Kyle Thompson, E. Sherman Warner, and David Condie, naming Apex Equity Options Fund and M&K Holdings, inter alia, as relief defendants, alleging various securities fraud claims, including an allegation of fraud in connection with the purchase and sale of securities in violation of Rule 10b-5. To the Court's knowledge, no substantive decisions have been issued in that case. Consistent with the parties' failure to even reference the SEC's complaint in their motion papers, we stress that this decision is limited to the sufficiency of plaintiff Kelter's complaint with the recognition that the SEC has a public enforcement role.

## DISCUSSION

## I. Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

### A. Standard of Review

#### 1. Motion to Dismiss Standard

When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in plaintiff's favor. Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). A complaint must include "enough facts to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v.

Twombley, 550 U.S. 544, 570 (2007). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Id. This pleading standard applies in "all civil actions." Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1951 (2009) (internal quotation marks omitted). Courts may consider exhibits to the complaint and documents incorporated into the complaint by reference, and "documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." Police and Fire Ret.Sys. of Detroit v. Safenet, Inc., No. 06 Civ. 5759(PAC), 2009 WL 2391849, at *7 (S.D.N.Y. August 5, 2009) (citing In re Gildan Activewear, Inc. Sec. Litig., No. 08 Civ. 5048(HB), 2009 WL 1919618, at *4 n. 3 (S.D.N.Y. July 1, 2009)).

## 2. **Applicable Heightened Pleading Standards**

Securities fraud plaintiffs must also satisfy the heightened pleading standards under both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. § 78u-4(b). Fed. R. Civ. P. 9(b) requires that plaintiffs alleging fraud "must state with particularity the circumstances constituting fraud . . . ." This requirement "serves to provide a defendant [in a Rule 10b-5 case] with fair notice of plaintiff's claim, safeguard[s] his reputation from improvident charges of wrongdoing, and

8

protect[s] him against strike suits." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Compliance with Fed. R. Civ. P. (9)(b) requires a plaintiff to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Although courts normally draw reasonable inferences in the non-movant's favor, "the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (citations and internal quotation marks omitted).

## B.  Plaintiff's Rule 10b-5 Claim

In order to maintain a claim for securities fraud pursuant to Rule 10b-5, a plaintiff must allege that defendants "(1) made

9

misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (citations omitted). Furthermore, "[i]t is long settled that a securities-fraud plaintiff must prove both transaction and loss causation." Id. (citations and internal quotation marks omitted). "Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" Id. (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)). Loss causation requires a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Id. (quoting Emergent Capital, 343 F.3d at 197) (internal quotation marks omitted; see also 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). It is akin to the tort-law concept of proximate cause in that the damages must be foreseeable consequences of the misrepresentation. Lentell, 396 F.3d at 172.

Plaintiff alleges that the following seven statements or documents were material misrepresentations that provide the basis for a Rule 10b-5 claim:

- The March 6, 2005 San Luis Obispo Meeting;
- The July 15, 2005 WealthWise Memorandum;
- The Private Placement Memorandum executed by Kelter on July 29, 2005;
- The March 6, 2007 Memorandum;
- The April 15, 2007 Letter;
- The August 9, 2007 E-Mail; and
- The August 22, 2007 Letter

This decision will begin by discussing the PPM, which is the principal alleged misrepresentation on which plaintiff relies. Then we will discuss the alleged misrepresentations that preceded Kelter's execution of the PPM.   Finally, we will examine the four misrepresentations alleged to have occurred in 2007.

## 1. The Private Placement Memorandum

Defendants argue that the PPM cannot be the basis for a securities fraud claim because it does not contain any misrepresentations on its face and it is replete with cautionary language about the risks associated with investing in the fund. Plaintiff replies that the cautionary language in the PPM does

11

not preclude a securities fraud claim because the statements in the PPM were false when they were made. In particular, plaintiff argues that the PPM stated that the fund would use the so-called Apex process, which later events showed that it never intended to do, and that it did not warn plaintiff of the particular risks at issue here, particularly the risk that plaintiff's principal could be lost and the risk of a total loss due to the sale of call options.

"Under the bespeaks caution doctrine, courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial." In re Sina Corp. Sec. Litig., No. 05 Civ. 2154(NRB), 2006 WL 2742048, at *9 (S.D.N.Y. Sept. 26, 2006) (internal quotation marks omitted). Additionally, the PLSRA also has a safe harbor provision for statements that have been accompanied by adequate cautionary language. See 15 U.S.C. § 77z-2(c)(1)(A)(i) (1997) (stating that there is no liability for statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . ."). Plaintiffs note that the bespeaks caution doctrine does not apply where "(1) the forward-looking statement was made with actual knowledge that it was false; or (2) where the forward-looking statement misrepresents present facts." In re Sina Corp., 2006 WL 2742048, at *9 (internal quotation marks

12

omitted).

Plaintiff argues that the bespeaks caution doctrine is inapplicable because the PPM's statement that the defendants would use a particular strategy, namely the Apex process, was either a statement of present fact that was false when it was made or a forward-looking statement misrepresenting present facts, since presumably the Apex defendants never intended to use this strategy. We disagree.

As an initial matter, we do not find that the PPM materially misrepresented the strategy that would be used by Apex. Although it is true the PPM makes reference to the use of a "proprietary investment selection criteria and methodology[,]" (Compl. Ex. A, PPM at 6) the Apex defendants never represented that they would solely use a strategy that involved buying both put and call options in every transaction, i.e. "straddles" or "strangles." In fact, the opposite is true. While the PPM states that those sorts of trades would be the "primary investment strategy of the Fund[,]" (Compl. Ex. A, PPM at 18) the PPM also states, "although the strategy and asset allocation utilized by the Fund is primarily centered on options, the [Apex defendants] intend[] to follow a flexible approach in order to place the Fund in the best position to capitalize on opportunities in the financial markets. Accordingly, the [Apex defendants] may employ other strategies and may take advantage

13

of opportunities in diverse asset classes. . . ." (Id. at 7.)

Further, the PPM execution agreement signed by Kelter includes the following language, "[t]he General Partner shall have sole discretion and authority to select investments. . . ." (Compl. Ex. A, Agreement at 3.) That agreement also notes that, "the General Partner in its sole and absolute discretion [shall have the right to] purchase, hold, sell and otherwise deal in put and call options, monetary instruments and any combinations thereof and any other financial instruments or contracts of any nature or kind." (Id. at 3.) On its face, the PPM and the PPM execution agreement contemplated and allowed the Apex defendants to make the investment in the VIX that led to the total loss which plaintiff alleges is beyond the scope of the so-called Apex process represented to him. Consequently, plaintiff has failed to show that the representations in the PPM were false, as all of the deviations from the Apex process alleged by plaintiff were explicitly contemplated by the representations made to plaintiff.[4]

Plaintiff next argues that the specific risks that led to his loss, to wit, the lack of diversification in the VIX

---

[4] Additionally, the PPM notes, "[t]he Fund has no operating history, and there can be no assurance that the Fund will achieve its investment objective." (Compl. Ex. A, PPM at 35.) This statement further underscores the fact that Apex defendants' statements about the Apex process could not be misstatements of historic or current facts.

14

investment, the loss of his principal, and the losses associated with the use of unhedged VIX call options, were not disclosed in the PPM and consequently that it does not bespeak caution. See Hunt v. Alliance North Am. Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language contained in the prospectus does not necessarily foreclose liability because it warned investors of a different contingency than that which plaintiffs allege was misrepresented.") This argument is also unavailing. First, in his complaint, plaintiff alleges that the fund "put his eggs in one basket." (Compl. ¶ 69.) According to plaintiff, this lack of diversification was in contradiction to the fund's stated goals. (Id.) However, the PPM has an entire section titled, "Lack of Diversification," (Compl. Ex. A, PPM at 33) which states, in part, "the Fund will not adopt fixed guidelines for diversification . . . and does not generally seek to minimize the risk by diversification. The Fund's portfolio may be highly concentrated and may not be diversified across a broad range of companies or industries. Consequently, unfavorable performance of one or more investments could have a material adverse impact on the aggregate returns realized by investors." (Id.) Therefore, this specific risk was identified.

Furthermore, the proposition that defendants represented to plaintiff that he could not lose his principal in any

15

circumstances whatsoever given the cautionary language in the PPM, is implausible. The implausibility of this proposition is underscored by the amount of money plaintiff invested and his apparent sophistication as an investor. The PPM itself states that "[t]he assets contributed to the Fund by investors will be used as collateral, leveraged in a margin trading account. . . ." (Compl. Ex. A, PPM at 5.) It is tautology that the collateral securing a loan can be forfeited if the loan is not repaid and well recognized that margin trading exposes principal to risk. Consequently, the risk that plaintiff's principal could be lost was disclosed.

Additionally, plaintiff argues the risks of making investments in unhedged options, including in call options, and the total loss of plaintiff's investment were not disclosed. However, the PPM also directly addresses these risks. First, as noted above, nothing about the PPM states that it had to hedge every call option it bought. Consequently, the eventuality that Apex defendants may invest in call options without investing in put options was disclosed.

Furthermore, the PPM notes that investors run the risk of losing their entire investment and that liquidity issues can arise. (Id. at 5 ("This investment is suitable for you only if you have adequate means of providing for your current and future needs, have no need for liquidity in this investment and can

16

afford to lose the entire amount of your investment.").) The PPM repeatedly makes statements like, "as . . . call writers, the Fund could incur large losses if the value of the underlying securities increase above the exercise price. The potential for loss is unlimited," (id. at 31) and "[t]here can be no assurance that the Fund will successfully implement its investing program and achieve its investment objectives or that investors will not lose all or a portion of their investment in the Fund." (Id.) These statements warn of the contingency of a total loss due to the fund's role as a call-writer. Consequently, the contingency of the near-total loss that occurred was addressed in the PPM.

For these reasons, we find that the PPM contains no misrepresentations. Furthermore, even if the PPM did contain misrepresentations, it is to be evaluated in accordance with the bespeaks caution doctrine and the safety valve of the PLSRA. Consequently, any alleged misrepresentations therein are rendered non-actionable and cannot be the basis for plaintiff's securities fraud claim.[5]

---

[5] We also note that even if we found that the PPM included misrepresentations, it would be very difficult for plaintiff to show scienter, i.e. that Apex defendants were aware that the statements about the Apex process were false when made in May 2006. The first alleged deviation from the Apex strategy that plaintiff points to in his complaint is the March 2007 put option contracts Apex wrote on New Century Financial Corp. stock. This trade did not happen for close to a year after plaintiff executed the PPM. Thus, plaintiff has pled no facts to

17

## 2. **Statements Made Prior to the Signing of the Limited Partnership Agreement**

The Apex defendants argue that plaintiff could not have reasonably relied on statements made before he invested in the fund given the existence of an integration clause in the PPM execution agreement. In response, plaintiff first argues that since the PPM contains material misrepresentations that defendant cannot rely on the integration clause in the agreement. However, we have already found that the PPM contains no misrepresentations and assuming, arguendo, that it did, any such misstatements could not be the basis for a securities fraud claim given the bespeaks caution doctrine.

In the alternative, plaintiff argues that while, as a general rule, he agrees that where "an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on the misrepresentation[,]" ATSI Commc'ns, 493 F.3d at 105, the integration clause in the PPM execution agreement is not controlling here for two reasons, to wit, that it is too general to preclude reliance on prior statements and that the rule does not apply since plaintiff was fraudulently induced into entering

---

support the conclusion that the PPM was in fact false when he signed the PPM execution agreement.

18

into the agreement.

We agree with defendants that the integration clause precludes plaintiff's reliance on statements that precede his investment. Under federal law, when "assessing the reasonableness of a [party's] alleged reliance, [a court must] consider the entire context of the transaction." Carlin Equities Corp. v. Offman, No. 07 Civ. 359(SHS), 2008 WL 4387328, at *5 (S.D.N.Y. Sept. 24, 2008). A court considers the following factors when determining whether reliance was reasonable: (1) the complexity and size of the deal, (2) the parties' sophistication, (3) the context of any agreements between the parties, (4) whether the deal was negotiated at arms-length and (5) whether the parties were advised by sophisticated counsel during the negotiations. Id. at *6.

None of the facts present in this case counsel against following the general rule that when a sophisticated investor signs an integrated agreement, he cannot reasonably rely on misrepresentations not contained within that agreement. Id.; see Emergent Capital, 343 F.3d at 196. Courts have found that a "standard merger clause" precludes reliance on prior representations. Carlin Equities, 2008 WL 4387328, at *7 (citing Emergent Capital, 343 F.3d at 196)). The integration clause in the PPM execution agreement signed by Kelter states, "This agreement constitutes the entire agreement among the

19

parties pertaining to the subject matter hereof, and supersedes all prior agreements and understandings pertaining thereto. No . . . representations . . . not expressed in this Agreement shall affect or be deemed to interpret, change or restrict the express provisions hereof." (Compl. Ex. A, Agreement at 30.) This language is indistinguishable from the language courts in this circuit have consistently held sufficient to preclude reliance on statements made prior to the execution of an integrated agreement. See Carlin Equities, 2008 WL 4387328, at *7. Consequently, plaintiff's argument that this merger clause is too general to be effective is unavailing.

Plaintiff's fraudulent inducement theory is equally unpersuasive. The case plaintiff relies on, Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310 (2d Cir. 1993), involved a bank suing a guarantor under New York law to enforce a personal guarantee and not a federal securities fraud claim. Here, we have a situation where a sophisticated investor advised by an investment advisor, invested millions of dollars in an arms length transaction. It is implausible for plaintiff to claim he was fraudulently induced to execute the PPM, which contained numerous representations detailing the various risks associated with investing with Apex as well as an integration clause that specifically precluded plaintiff from relying on previous statements or representations. Consequently, plaintiff cannot,

as a matter of law, rely on any statement made before he executed the PPM as the basis for a Rule 10b-5 claim. Thus, neither the WealthWise Memorandum[6] nor the San Luis Obispo Meeting[7] can be the basis for plaintiff's claim.

### 3. Statements Made After Plaintiff's Investment in the Fund

Turning to any alleged misrepresentations made after plaintiff's final purchase of the limited partnership interest in May 2006, defendants maintain that this category of statements cannot be the basis for a securities fraud claim

---

[6] The WealthWise memorandum is not a material misrepresentation under the federal securities law for at least two other reasons: (1) the memorandum explicitly states that it is "only [meant to] be a summary and can be relied upon just as an overview. The Offering Memorandum itself is the governing legal document that each of you need to peruse, be comfortable with, before you proceed." (Compl. Ex. B at 1;) and (2) it was not made by any of the Apex defendants. In fact, the PPM explicitly states that, "no person has been authorized to make any representation . . . with respect to the Fund" other than those named in the PPM, which does not include either Forrest or WealthWise. (Id. Ex. A, PPM at 5.) Nothing in the first amended complaint alleges any connection between the Apex defendants and WealthWise or Forrest sufficient to attribute the statements of WealthWise to Apex.

[7] The statements in this meeting, as alleged by plaintiff, are that if he were to invest in the Apex fund, his investment would be "principal protected," "his principal [would not] be put at risk," and "that various written representations, including statements reflected in the Private Placement Memorandum and in materials transmitted to Kelter through WealthWise and Forrest were, in fact true." (Compl. ¶ 37.) As stated above, the PPM did not contain any material misrepresentations on which plaintiff could have reasonably relied. The WealthWise memorandum also is not a material misrepresentation for the reasons mentioned in footnote 5 above. Additionally, statements that plaintiff's principal was not at risk are belied by the PPM and are otherwise implausible as noted previously.

because they were not made, "in connection with the purchase or sale of securities." In response, plaintiff argues that when an individual buys and thereafter retains securities based on a misrepresentation, that individual has stated a claim for securities fraud. Further, he alleges that he did sell some of his Apex fund holdings, with his final sale occurring in May 2007.

Plaintiff's first argument, that some of the misrepresentations were made in relation to the purchase of the Apex fund, fails for the reasons set out supra, namely that none the alleged misrepresentations made prior to the investment, nor the PPM itself, can be the basis of a securities law claim. Additionally, plaintiff's argument that the small sales he executed up until May 2007 can satisfy the "in connection with the purchase or sale of securities" requirement is misplaced. First, plaintiff cannot make a primary claimed based on any of the small sales. Plaintiff cannot show transaction causation here, which requires "an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" Lentell, 396 F.3d at 172 (citations omitted). There is no allegation here that plaintiff relied on any specific statement of the Apex defendants when making these sales as required at least by Fed. R. Civ. P. 9(b). In fact, nothing in the record suggests that

22

plaintiff did not receive regular statements or that those statements were false. Second, given plaintiff's position that Apex defendants' alleged misrepresentations caused him to invest and retain his investment, the sales of these securities were actually beneficial to him. Thus, plaintiff cannot show loss causation here either.

Further, plaintiff's effort to use the small sales he executed up until May 2007 as a hook for his larger retention claim fails for an additional reason. First, it is clear in this Circuit that "the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiff[] w[as] induced fraudulently not to sell [his] securities." Abrahamson v. Fleschner, 568 F.2d 862, 868 (2d Cir. 1977) (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737-38 (1975)); see also First Equity Corp. v. Standard & Poor's Corp., 869 F.2d 175, 180 n.2 (2d Cir. 1989) (10b-5 plaintiffs "may recover only for losses that result from decisions to buy or sell, not from decisions to hold or refrain from trading"). In this regard, the Court perceives no rationale for distinguishing between the decision to retain all of a securities interest, which cannot be the basis of a securities fraud claim as a matter of law, and the decision to retain part of a securities interest.

Thus, none of the statements that occurred after plaintiff

23

fully funded his Apex investment in May 2006 are actionable. Consequently, the March 6, 2007 Memorandum, the April 15, 2007 Letter, the August 9, 2007 E-Mail and the August 22, 2007 Letter cannot be the basis for a Rule 10b-5 claim. As these are the last of the statements plaintiff offers as misrepresentations, plaintiff's securities fraud claim is dismissed.

## 4. Conclusion

Ultimately, this is a case where plaintiff made an investment in a hedge fund with no track record that had full discretion over the way his assets were invested. This fund repeatedly proclaimed itself to be highly risky and ultimately those risks come to pass. While it is surely unfortunate that plaintiff lost his investment in this fund, the risks were disclosed. Plaintiff, along with other investors, felt the consequences of an unusual market day. However painful, these consequences do not amount to securities fraud.

## C. Control Liability

To establish a prima facie claim for control liability under 15 U.S.C.A. § 78t, a plaintiff must show, "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108 (citations omitted). As plaintiff has failed to allege a primary

24

violation, he cannot maintain a control liability claim. Consequently, plaintiff's second claim for relief is dismissed.

## D. State Law Claims

Section 1367(c) of the Title 28 of the United States Code reads, in part, that, "The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. 1367(a)] if . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ." Here, given the early stage of the litigation and the fact that the remaining claims are matters of state law, we decline to exercise supplemental jurisdiction. See N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc., 497 F.3d 109, 119 (2d Cir. 2007) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotation marks omitted)).

## E. Leave to Amend

Plaintiff requests leave to amend his complaint in the event of a dismissal. Plaintiff's request, which is his second, does not propose any specific amendments. If such vague requests are granted after potential deficiencies are made known to plaintiff and plaintiff fails to amend, plaintiff is in effect seeking an advisory opinion from the Court as to the deficiencies of his complaint. "Leave to amend is appropriately denied where, as here, the plaintiff has already had an

25

opportunity to replead after specific warnings as to a complaint's deficiencies." Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F.Supp.2d 282, 304 n. 27 (S.D.N.Y. 2000); see Chill v. General Electric Co., 101 F.3d 263, 271-72 (2d Cir. 1996); In re Hyperion Securities Litigation, No. 93 Civ. 7179, 1995 WL 422480, at *8 (S.D.N.Y. Jul. 14, 1995) (denying leave to amend where plaintiffs had been given "more than two bites at an apple they have not been able to get their teeth into") aff'd 98 F.3d 2 (2d Cir. 1996).

Furthermore, amendment here would be futile. As noted above, there are seven alleged misstatements that could possibly be the grounds for a securities fraud claim pursuant to Rule 10b-5. The first two chronologically are precluded by the merger clause in the PPM, the third alleged misstatement. We have ruled that the PPM, as a matter of law, is not misleading and "bespeaks caution," such that plaintiff was not fraudulently induced into executing the PPM agreement. Consequently, no statements made before plaintiff's investment in Apex, including the first two statements, can be the grounds for a securities fraud claim. The last four statements chronologically that plaintiff argues could be the basis for his suit were not made in connection with the purchase or sale of a security, and, as a consequence, plaintiff cannot use them to bring a Rule 10b-5 claim. Thus, as a matter of law, none of the alleged

misrepresentations provide a basis for a securities fraud claim and amendment would be futile. Consequently, plaintiff is denied leave to amend.

## CONCLUSION

For the foregoing reasons, plaintiff's federal securities law claims are dismissed and plaintiff's non-federal claims are dismissed without prejudice to refiling in the appropriate non-federal forum.    Additionally, the Morley defendants' pending motion to dismiss for lack of personal jurisdiction is now moot, since there are no pending federal claims against the Morley defendants and the Court, in its discretion, will not exercise jurisdiction over plaintiff's remaining state law claims against the Morley defendants.

We would further like to note that while plaintiff has not stated a claim under federal securities laws, plaintiff has potentially stated several state law claims, particularly his allegation that the transfers between Apex and M&K Holdings were fraudulent conveyances.    The dismissal of plaintiff's securities law claims should not be read as a determination of the merits of plaintiff's other state law claims.

27

**SO ORDERED.**

Dated:    New York, New York
          August 21, 2009

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

28

Copies of the foregoing Memorandum and Order have been mailed on
this date to the following:

Kevin W. Goering, Esq.
Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112

John A. Wait, Esq.
Fox Rothschild LLP
100 Park Avenue, Suite 1500
New York, NY 10017

Robert J. Anello, Esq.
Thomas M. Keane, Esq.
Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C.
565 Fifth Avenue
New York, NY  10017

Christopher C. Zenisek
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, Suite 2200
Denver, CO 80202